UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HERBASWAY LABORATORIES, LLC, | ) | 2006 NOV -8 P 5: 04 |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 3:02-CV-1382 (AHN) |
| v. | ) | |
| | ) | |
| HEBA LABORATORIES, LLC, | ) | |
| HERBAMEDICINE, LLC, and | ) | |
| HERBASCIENCE and TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Defendants. | ) | NOVEMBER 8, 2006 |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Mark D. Giarratana (CT 10410)
Eric E. Grondahl (CT 08988)
Alexandra B. Stevens (CT 20300)
MCCARTER & ENGLISH, LLP
CityPlace I
185 Asylum Street
Hartford, CT  06103
860.275.6700
860.724.3397 (fax)

On behalf of:
Heba Laboratories, LLC, HerbaMedicine, LLC,
and HerbaScience & Technologies, LLC

## TABLE OF CONTENTS

I.    INTRODUCTION....................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................2

      A.    Heba Laboratories and Its Products..........................................................3
      B.    HerbaSway Laboratories and Its Products................................................5
      C.    Background on Internet Search Engines and Keywords............................5
      D.    Heba's Use Of Keywords..........................................................................7
      E.    HerbaSway's Brochure..............................................................................8

III.  ARGUMENT ..........................................................................................................8

      A.    Heba is Entitled to Judgment as a Matter of Law That its Use of
            the Accused Keywords Was Not Trademark Infringement......................9

            1.    Heba Did Not Use The Accused Keywords "in
                  Commerce"....................................................................................9
            2.    In the Alternative, There is No Initial Interest Confusion as
                  a Matter of Law............................................................................13

      B.    There is no Likelihood of Confusion Between HebaGreen and
            HerbaGreen as a Matter of Law, and Therefore Defendant is
            Entitled to Summary Judgment on Count I of the Amended
            Complaint..................................................................................................14

            1.    "Green" is Generic With Respect to Green Tea Products,
                  and May Not be Appropriated for Exclusive Use........................15
            2.    There is no Likelihood of Confusion Between the Non-
                  generic Elements "Heba" and "Herba"........................................16

      C.    Defendants are Entitled to Judgment as a Matter of Law on Count
            III of the Amended Complaint...................................................................19

            1.    HerbaSway Has Not Adequately Described Its Alleged
                  Trade Dress...................................................................................19
            2.    HerbaSway's Labels Are Not Inherently Distinctive...................21
            3.    HerbaSway's Alleged Trade Dress Is Not Inherently
                  Distinctive....................................................................................22
            4.    HerbaSway's Green and Purple Color Combination is Not
                  Inherently Distinctive...................................................................22
            5.    HerbaSway has failed to Demonstrate that the Size of its
                  Labels Is Inherently Distinctive...................................................24
            6.    HerbaSway has Failed to Demonstrate that The Lettering
                  on Its Labels is Inherently Distinctive.........................................25
            7.    The Design, Shape and Placements on HerbaSway's Labels
                  are Not Inherently Distinctive......................................................26

      D.    HerbaSway Cannot Demonstrate That Its Alleged Trade Dress Has
            Acquired Secondary Meaning in the Market.............................................28

            1.    Consumer Studies Linking Mark to Source.................................29

|  | 2. | Advertising Expenditures. | 29 |
|  | 3. | Unsolicited Media Coverage of the Product | 30 |
|  | 4. | Sales Success. | 30 |
|  | 5. | Attempts to Plagiarize the Trade Dress. | 31 |
|  | 6. | Length and Exclusivity of the Mark's Use | 31 |
| E. | | Defendants are Entitled to Judgment as a Matter of Law on Count IV of the Amended Complaint. | 32 |
| IV. | | CONCLUSION | 38 |

## TABLE OF AUTHORITIES

### FEDERAL CASES

*1-800 Contacts, Inc. v. Whenu.com, Inc.*, 414 F.3d 400 (2d Cir. 2005), <u>cert. denied</u> 126 S.Ct. 649 (2005) ................................................................................ 9, 10

*Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976) ................ 22

*Affiliated Hospital Products v. Merdel Game Manufacturing Company et al.*, 513 F.2d 1183 (2d Cir. 1975) ........................................................................................ 17

*American Cyanamid Corp. v. Connaught Laboratories, Inc.*, 800 F.2d 306 .................. 14

*Aymes v. Bonnelli*, 980 F.2d 857 (2nd Cir. 1992) ........................................................... 35

*Beech-Nut, Inc., v. Warner-Lambert Co.*, 346 F. Supp. 547 (S.D.N.Y. 1972), <u>aff'd</u>, 480 F.2d 801 (2nd Cir. 1973) ..................................................................... 14, 16

*Bristol-Meyers Squibb Co. v. McNeill-P..C., Inc.*, 973 F.2d 1033 (1992) ...................... 17

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149 (2nd Cir. 2003) ...................................................................................................................... 32

*Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77 (2nd Cir. 1995) .......................................... 35

*Cartier v. Symbolix, Inc.*, No. 05 Civ. 2777(RJH), 2006 WL. 2821535 (S.D.N.Y. Sept. 29 2006) ...................................................................................................... 13

*Deere & Company v. MTD Holdings, Inc.*, 2004 WL. 324890 (S.D.N.Y. 2004)............. 23

*Centaur Commc'n, Ltd. v. A/S/M Commc'n, Inc.*, 830 F.2d 1217 (2d Cir. 1987) ............ 29

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ....................... 34, 35

*Duraco Products. Inc. v. Joy Plastics Enterprises Ltd.*, 40 F.3d 1431 (3rd Cir. 1993) ...................................................................................................................... 31

*Field Enterprises Education Corp. v. Cove Industries, Inc.*, 1969 WL. 9573, 161 U.S.P.Q. 243 (E.D.N.Y. 1969) ............................................................................... 17

*Fun-Damental Too, Ltd. v. Gremmy Industrial Corp.*, 111 F.3d 993 (2nd Cir. 1997) ...................................................................................................................... 19
*Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993 (2d Cir. 1997) .... 21, 22 ............................................................................................................ 25

*General Mills Inc. v. Kellogg Co.*, 843 F.2d 622 (8th Circuit).........................................18

*ITAR-TASS Russian News Agency v. Russian Kurrier*, 153 F.3d 82 (2nd Cir. 1998).................................................................................................................................32

*Jeffrey Millstein. Inc. v. Greger, Lawlor, Roth,. Inc.*, 58 F.3d 27 (2nd Cir. 1995)...........19

*Landscape Forms Inc. v. Columbia Cascade Co.*, 113 F.3d 373 (2d Cir. 1997)..............20

*Mana Products Inc. v. Columbia Cosmetics Manufacturing Inc.*, 36 U.S.P.Q. 2d 1176 (2d Cir. 1995) ................................................................................23, 24, 26, 29

*McGregor-Doniger, Inc. v. Drizzle Inc.*, 599 F.2d 1126 (2d Cir. 1979), <u>overruled on other grounds</u>.............................................................................................................17

*Medforms, Inc. v. Healthcare Management Solutions, Inc.*, 290 F.3d 98 (2nd Cir. 2002)...............................................................................................................................33

*Merck I*, 425 F. Supp. 2d at 413.......................................................................10, 11, 12

*Merck II*, 2006 WL. 1418618 ......................................................................................11

*Motta v. Samuel Weiser, Inc.*, 768 F.2d 481 (1st Cir. 1985) ..........................................37

*Nabisco Inc. v. Warner-Lambert Co.*, 220 F.3d 43 (2nd Cir. 2000) ...............................14

*Nestle's Milk Products, Inc. v. Baker Importing Company, Inc.*, 182 F.2d 193 (Fed. Cir. 1950) ...........................................................................................................16

*Paddington Corp. v. Attiki Importers & Distributings, Inc.*, 996 F.2d 577 (2d Cir. 1993)...........................................................................................................................22, 24

*Papercutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558 ..........................................28, 29

*Park' N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985)....................................................................................................24

*Playboy Enterprise, Inc. v. Welles*, 279 F.3d 796 (9th Cir. 2002)............................11, 14

*Playboy Enterprise, Inc. v. Welles*, 279 F.3d 796 (9th Cir. 2002)..................................14

*Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961) ..................14

*Qualitex Co. v. Jacobson Products, Co.*, 514 U.S. 159, 115 S. Ct. 1300, 131 L. Ed. 2d 248 (1995)...................................................................................................23

*Rescuecom*, 2006 WL. 2811711 ....................................................................... 6, 8, 10, 11

*Resource Developers, Inc. v. Statute of Liberty-Ellis Island Foundation, Inc.*, 926
    F.2d 134 (2nd Cir. 1991) ......................................................................... 13

*Rule v. Brine, Inc.*, 85 F.3d 1002 (2d Cir. 1996).............................................................. 9

*Savin Corp. v. Savin Group*, 391 F.3d 439 (2nd Cir. 2004) <u>cert. denied</u>, 126 S.Ct.
    116 (2005)........................................................................................................ 13

*Smithkline Beckman Corp., et al., v. Procter & Gamble Co., et al.*, 591 F. Supp.
    1229 (N.D.N.Y. 1984) ............................................................................. 14

*The Forschner Group, Inc. v. Arrow Trading Co.*, 124 F.3d 402 (2nd Cir. 1997)........... 23
...........................................................................................................................25, 26, 27

*Thomas & Betts*, 65 F.3d at 662.................................................................................... 30

*Two Pesos*, 505 U.S. at -- 112 S. Ct. at 2757.................................................21, 22, 24, 25

*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 120 S. Ct. 1339,
    147 L. Ed. 2d 182 (2000).................................................................................. 23, 28

*Wooster Brush Co v. Prager Brush Co.*, 1986 WL. 83707, 231 U.S.P.Q. 316
    (TTAB 1986)............................................................................................ 18

*Yankee Candle*, 259 F.3d at 44 (citing <u>Thomas & Betts Corp. v. Panduit Corp.</u>, 65
    F.3d 654, 662 (7th Cir.1995)) ............................................................................ 29, 30

*Yurman Design Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001)........................... 19, 20, 21

## FEDERAL STATUTES

15 U.S.C. § 1115(a)................................................................................................. 14, 16

15 U.S.C. § 1125(a)(3) .................................................................................................. 21

17 U.S.C. § 101 ....................................................................................................... 34, 37

17 U.S.C. § 201(a)......................................................................................................... 33

17 U.S.C. § 204(a).......................................................................................................... 37

17 U.S.C. § 501(b) ........................................................................................................ 32

F.R.C.P. 56(c) ................................................................................................................. 8

15 U.S.C. § 1125(a).................................................................................................... 1, 19

## MISCELLANEOUS

J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, §§ 12:1 ........ 15

## I.    INTRODUCTION

Defendants Heba Laboratories, LLC, HerbaMedicine, LLC, and HerbaScience and Technologies, LLC ("Defendants") submit this memorandum of law in support of their Motion for Summary Judgment. Defendants Motion should be granted because:

1. The accused keywords used by Heba in connection with its website were internal to the respective search engine or website, were not a "use in commerce", and therefore could not support a trademark infringement claim. The limited instances in which the "herbasway" keyword appeared in search results was only to describe Dr. Zhou, and therefore were permissive nominative uses that likewise could not support a trademark infringement claim. In the alternative, there is no evidence that Heba used the accused keywords with an intent to deceive the public into believing that its website was affiliated with HerbaSway, and therefore there was no initial interest confusion as a matter of law.

2. Heba is indisputably the owner of the federal registration of the mark HEBA for herbal teas, "green" is generic with respect to green tea products, and it necessarily follows that Heba was entitled to combine its house mark "Heba" with the generic suffix "green" to identify the source of its green tea product. Further, "Herba" is a slightly truncated form of "herbal" that is descriptive of herbal products, is of weak trademark significance, and therefore there is no likelihood of confusion between "HebaGreen" and "HerbaGreen" as a matter of law.

3. HerbaSway's claim in Count III of the Amended Complaint that Defendants have infringed protectable trade dress in violation of Section 43(a) of the Lanham Act, 15 U.S.C § 1125(a) should be dismissed because: (i) HerbaSway has not adequately described its alleged trade dress; and (ii) to the extent that HerbaSway has described an alleged trade dress, the alleged trade dress is not inherently distinctive, and has not acquired secondary meaning.

1

4. In Count IV of its Amended Complaint, HerbaSway alleges that Defendants infringed a copyright in a brochure distributed by HerbaSway. HerbaSway cannot demonstrate that it meets the statutory requirements to establish ownership of the copyright in the brochure. Accordingly, HerbaSway does not have standing to sue Defendants for copyright infringement for the brochure, and Count IV of the Amended Complaint should be dismissed.

## II.    STATEMENT OF FACTS

In the early 1990s, Dr. James Zhou taught at Yale University. During this time, he also worked on developing various herbal dietary supplements. In June 1996, Dr. Zhou formed HerbaSway Laboratories, LLC ("HerbaSway") with Franklin and Lorraine St. John. Zhou and the St. Johns entered into an Operating Agreement which provides that the three of them are the sole member-managers of HerbaSway.[1]  (Ex. 20). Section 5.4 of the Operating Agreement provided that the managers of HerbaSway "may have other business interests and may engage in other activities in addition to those related to the Company."

On December 30, 1996, Zhou and the St. Johns entered into an additional agreement to further memorialize their business relationship. (Ex. 21). This agreement provided that Zhou would perform certain duties for HerbaSway, and it provided that Zhou would "devote his full time and best efforts to the Company and its businesses, Section 5.4 of the Company's Operating Agreement notwithstanding." Although Zhou agreed to perform certain duties for the Company, the agreement did not provide any specific payment to Zhou. (Id.)

Zhou performed various duties to promote the business of HerbaSway, including developing formulations for various products and authoring brochures used by HerbaSway.

---

[1] Prior to his association with the St. Johns, Dr. Zhou had sold an herbal sweetener under the name "Herbaswy", which was initially used as the name of the LLC. The name was later changed to "HerbaSway."

2

Although he performed substantial duties for HerbaSway, Zhou was never treated as an employee. Throughout his tenure at HerbaSway, Zhou received a periodic draw against the amounts due to him as a member of the company. (Ex. 15 at ¶ 3). There were no federal or state taxes withheld by HerbaSway on Zhou's behalf, and HerbaSway did not pay any social security taxes on behalf of Zhou. (Ex. 15 at ¶ 5). Insurance coverage was provided to Zhou as a member of HerbaSway, on the same terms and conditions as coverage was provided to the St. Johns as members. (Id., at ¶ 6).

By 2000, the relationship between Zhou and the St. Johns had deteriorated for various reasons. On February 1, 2001, Zhou was denied further access to HerbaSway's premises. HerbaSway also ceased paying Zhou a periodic draw against amounts due to him as a member. When Zhou attempted to obtain unemployment benefits after he was locked out of HerbaSway, he was told by the Connecticut Labor Department that he did not qualify because he was not an employee of HerbaSway. (Id., at ¶ 5).

## A.    Heba Laboratories and Its Products.

Heba Laboratories, LLC ("Heba") was formed in June 2001.[1]  Heba was owned by Herbascience & Technologies, LLC, which held a 70% interest, and Forwide, a Hong Kong corporation that owned the remaining 30%. Wendy Zhou, Zhou's wife, was the Chief Operating Officer of Heba.

Heba entered the dietary supplement market shortly after it was formed. The products sold by Heba were shipped to Heba from Zhou Jun, Zhou's brother, who worked for the Giulin

---

[1]  Heba filed a petition for bankruptcy under Chapter 7 of the Bankruptcy Code on June 5, 2006. Bankruptcy Action No. 3-06-BK-3089 (ASD)  The bankruptcy trustee filed a proposed notice of abandonment on September 26, 2006 [Dkt. # 29]. On September 20, 2006, HerbaSway's motion for relief from the automatic bankruptcy stay was granted to allow HerbaSway to proceed with this action to the extent, if any, that the claims may be covered under Heba's general liability insurance policies [Dkt. # 26]. Heba's insurer, The Hartford, is defending this

3

Foreign Trade Company in China. Most of Heba's products came "pre-mixed", in powder form, from China. At Heba, the pre-mixed products were cooked and bottled.

Heba filed a registration for a trademark for the term "HEBA", which was issued by the U.S. Patent & Trademark Office on December 24, 2004. HEBA was registered for use in connection with herbal supplements, dietary supplements and herbal teas for medicinal purposes. Zhou created the HEBA mark, which was an Americanized expression of two Chinese words roughly translated as "intelligent treasure". (Ex. 15 at ¶ 8).

Heba began sales of various products, including a green tea extract product that it called "HebaGreen". This name was a combination of Heba's registered house mark "HEBA" and the generic word "green" commonly used to describe green tea products.

Heba packaged its HebaGreen green tea extract in standard sized brown bottles that are commonly used and sold for a variety of purposes, including for use with liquid dietary supplements. The bottles were labeled using standard size labels that are commonly used with the standard bottles and that are compatible with standard bottling equipment.

Heba contracted with an outside company for the design and printing of its labels. The labels had a cream background with green and blue ink used for the text. The blue ink was chosen because it was a commonly used, inexpensive ink. The text was a standard sized font used for many labels. The placement of the text on the label was chosen based on either (1) various regulatory requirements, or (2) placements of text in locations commonly found for these

---

action under a reservation of rights, and it has not been established that there is any coverage of any of the claims should liability of Heba be established.

[2] Dr. Zhou had previously created the HerbaSway name as well. Prior to his association with the St. Johns, Dr. Zhou had sold an herbal sweetener under the name "HerbaSwy". This name was modified by adding an "a" to make the name easier to say.

types of products. In addition to the various text, in the top center portion of the label, the HEBA

trademark was displayed over a symbol of a dove holding a branch.

As part of its marketing, Heba created various brochures and marketing materials. Heba

also created a web site to promote its products. The web site noted that Dr. Zhou was on the

advisory board for Heba, and that Zhou had previously been affiliated with HerbaSway. Because

of Zhou's prior affiliation with HerbaSway, the name "HerbaSway" was used as a metatag on the

Heba web site to identify Zhou.

### B.    HerbaSway Laboratories and Its Products.

Since its inception in 1996, HerbaSway has sold a green tea extract product under the

name "HerbaGreen". The vast majority of HerbaSway's advertising expenditures have been for

the purchase of radio air time for its infomercials. Indeed, from 1996 through June 2001, when

Heba was formed, HerbaSway spent two-thirds of its advertising budget on the radio

infomercials, with a total of ▓▓▓▓▓▓ being spent on other types of advertising, such as print

ads during that five year period.

The HerbaGreen product is packaged in standard sized brown bottles with standard sized

labels on the outside of the bottles. The labels have a light green background with green and

purple lettering. The text is made up of various standard fonts. The placement of the text on the

label is dictated by either (1) various regulatory requirements, or (2) placements of text in

locations commonly used for these types of products. In addition to the text, in the top center

portion of the label, the HerbaSway trademark is displayed over a symbol of a plant.

### C.    Background on Internet Search Engines and Keywords.

As is commonplace on the Internet, Heba used various keywords to direct traffic to its

website at www.hebamedicine.com. HerbaSway alleges in Count II of its Amended Complaint

that Heba's use of certain keywords was a trademark infringement, and Heba denies this allegation. In order to facilitate addressing this issue, a brief background on Internet search engines and keywords culled from other Second Circuit cases is provided below.

"There are two primary ways an Internet user can find a particular company's website. An Internet user may either guess that the company uses its name or trademark as its domain name, and enter that domain name into an Internet browser, or enter the company's name or trademark into an Internet search engine such as Google.' Rescuecom Corp. v. Google, Inc., 2006 WL 2811711 at *1 (N.D.N.Y. Sept. 28, 2006). 'A search engine will find all web pages on the Internet with a particular word or phrase.' Sporty's Farm L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 493 (2d Cir.2000). Google, Yahoo, and others 'sell advertising linked to search terms, so that when a consumer enters a particular search term, the results page displays not only a list of Websites generated by the search engine program using neutral and objective criteria, but also links to Websites of paid advertisers (listed as 'Sponsored Links').' Gov't Employees Ins. Co. v. Google, Inc., 330 F. Supp. 2d 700, 702 (E.D.Va.2004) ("GEICO")." Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, n. 4 (S.D.N.Y. 2006) ("Merck I").

Keywords are sold by search engines like Google to advertisers so that when an Internet user enters the keyword into the search engine, the advertiser's website will appear as a "sponsored link". See Rescuecom, 2006 WL 2811711 at * 2 ("[A]n advertiser can bid on terms (keywords) an Internet user might enter as a search term on Google. * * * When an Internet user enters the keyword, it triggers the sponsored link to appear on the search results page either to the right or immediately above the search results.). Keywords also are used by website designers as metatags identified as search terms for use by search engines.[2]

---

[2] "A metatag is hypertext markup language ("HTML") code, invisible to the Internet user, that permits web designers to describe their webpage. There are two different types of metatags: keyword and description. The

6

## D.    Heba's Use Of Keywords.

In 2002 and 2003, Heba used certain keywords as metatags on its website and also purchased keywords from various search engines, such Find.com and Google. Heba used hundreds of keywords during this period, including, for example, "arthritis", "pain relief", "joint pain", "green tea", and "natural medicine". (Ex. 22). In addition, Heba used as keywords certain HerbaSway trademarks, including the "HerbaSway" keyword (collectively referred to herein as the "accused keywords"). (Ex. 21). The evidence produced by HerbaSway to support its claims demonstrates that the only accused keyword that ever appeared in search results was the "HerbaSway" keyword. (Ex. 20). All other accused keywords were internal to the respective search engine or website, did not appear in search results, and otherwise were not visible to the computer users. With respect to the "HerbaSway" keyword, the evidence produced demonstrates that the only way this appeared on the search results was when used to describe Dr. James Zhou as the founder and formulator of "HerbaSway". (Ex. 20). An exemplary such search result was as follows:

> Dr. Zhou, Opens His New Herbal Tea Co
> Dr. James Zhou, founder and formulator of HerbaSway, has opened his new, independent, herbal tea facilities to better serve you. Visit HebaMedicine.com for all your herbal tea needs.
> http://www.hebamedicine.com

(Ex. 20). As can be seen, the search result listing used the word "HerbaSway" only to identify Dr. James Zhou as the "founder and formulator of HerbaSway". Otherwise, the search result listing made clear that the sponsor was "HebaMedicine.com", and that Heba Medicine was not related to HerbaSway but rather was a new and independent herbal tea facility. The other search

---

keyword metatag permits designers to identify search terms for use by search engines. Description metatags allow designers to briefly describe the contents of their pages. This description appears as sentence fragments beneath the webpage's listing in a search result." <u>Bihari v. Gross,</u> 119 F. Supp. 2d 309, n. 3 (S.D.N.Y.2000).

results responsive to the accused keywords produced in this case did not list any of the accused keywords. An exemplary such search result listing was as follows:

> Heba Laboratories – HebaMedicine.com – Produces organic, caffeine-free, and concentrated green tea medicines. The patented teas for alternative medicine are created via traditional Chinese methods.
> http://www.hebamedicine.com/

(Ex. 20). Accordingly, the undisputed facts demonstrate (1) that the accused keywords were used purely internally to trigger Heba's website in response to a search request, and did not appear in the search results or otherwise to the computer users, and (2) only the accused "HerbaSway" keyword appeared at times in the search results, and when it did, it was used only to describe Dr. James Zhou as the founder and formulator of HerbaSway.

### E.     HerbaSway's Brochure.

On August 8, 2002, HerbaSway filed a copyright registration on an educational brochure. (Ex. 28). The brochure that was the subject of the copyright registration was authored primarily by Dr. Zhou. (Ex. 11 at 156-60; Ex. 10 at 79). Franklin St. John transcribed the ideas expressed by Dr. Zhou and corrected grammar. (Id.). Some portion of the materials in the copyrighted brochure may have been authored by Phil Clement or Rhode Van Gessel. (Ex. 11 at 158-59).

At the time that they worked on the copyrighted brochure, Van Gessel and Clement were not employees of HerbaSway. (Ex. 11 at 157-59; Ex. 14 at 16, 22). Moreover, there were no written agreements or contracts between HerbaSway and either Van Gessel or Clement. (Ex. 11 at 157-59). HerbaSway has not produced any written assignments transferring ownership of the copyrighted brochure by any of Clement, Van Gessel or Zhou.

### III.     ARGUMENT

Defendants are entitled to summary judgment if there is no genuine issue as to any material fact. F.R.C.P. 56(c). The Court should grant Defendants' Motion for Summary

Judgment on Counts I through IV of HerbaSway's Amended Complaint [Dkt. # 95] because

there are no disputed material facts. In ruling on Defendant's Summary Judgment Motion, the

Court must draw all factual inferences in favor of, and take all factual assertions in the light most

favorable to, the party opposing summary judgment. Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d

Cir. 1996). To defeat a motion for summary judgment, the non-moving party must produce

affidavits, depositions or other sworn evidence setting forth specific facts showing that there is a

genuine issue of material fact for trial. Rule, 85 F.3d at 1011.

### A.    Heba is Entitled to Judgment as a Matter of Law That its Use of the Accused Keywords Was Not Trademark Infringement.

#### 1.    Heba Did Not Use The Accused Keywords "in Commerce".

"In order to prevail on a trademark infringement claim for registered trademarks,

pursuant to 15 U.S.C. § 1114, or unregistered trademarks, pursuant to 15 U.S.C. § 1125(a)(1), a

plaintiff must establish that (1) it has a valid mark that is entitled to protection under the Lanham

Act; and that (2) the defendant used the mark, (3) in commerce, (4) 'in connection with the sale

... or advertising of goods or services,' 15 U.S.C. § 1114(1)(a), (5), without the plaintiff's

consent." 1-800 Contacts, Inc. v. Whenu.com, Inc., 414 F.3d 400, 407 (2d Cir. 2005), cert.

denied 126 S.Ct. 649 (2005) (footnotes and citations omitted). "In addition, the plaintiff must

show that defendant's use of that mark "is likely to cause confusion ... as to the affiliation,

connection, or association of [defendant] with [plaintiff], or as to the origin, sponsorship, or

approval of [the defendant's] goods, services, or commercial activities by [plaintiff]." Id.

"A trademark is "used in commerce" in connection with goods when "it is placed in any

manner on the goods or their containers or the displays associated therewith or on the tags or

labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on

documents associated with the goods or their sale, and ... the goods are sold or transported in commerce." 15 U.S.C. § 1127(1)." Merck I, 425 F. Supp. 2d at 415.

Second Circuit law is clear that the internal use of a plaintiff's trademark as a key word to trigger the display of a link to a defendant's website is not a use of the mark in a "trademark sense", and thus cannot support a trademark infringement claim under the Lanham Act. Merck I, 425 F. Supp. 2d at 415 (granting defendants' motion to dismiss claims regarding defendants' purchase of plaintiff's trademark "ZOCOR" as a keyword from Internet search engines, holding that defendants' purchase of the trademark was an "internal use" and did not constitute a "trademark use" because defendants did not place plaintiff's marks "on any goods or containers or displays or associated documents, or use them in any way to indicate source or sponsorship"); Merck & Co., Inc. v. Mediplan Health Consulting, Inc., No. 05 CIV 3650, 2006 WL 1418616 at * 3 (S.D.N.Y. May 24, 2006) ("Merck II" ) (denying motion for reconsideration); and Rescuecom, 2006 WL 2811711 at *6 (trademark infringement claim dismissed because defendant's internal use of plaintiff's trademark to trigger links to defendant's website was not a "trademark use" within the meaning of the Lanham Act). Cf. 1-800 Contacts, 414 F.3d at 408 (holding that defendant's inclusion of plaintiff's website address, www.1800contacts.com, in defendant's internal directory to trigger pop-up ads was not "use" in trademark sense).

The evidence produced by HerbaSway to support its infringement claim indisputably shows that the only accused keyword that ever appeared in search results was the "HerbaSway" keyword; that all other accused keywords were internal to the respective search engine or website, did not appear in search results, and otherwise were not visible to the computer user; and in the limited instances where the "HerbaSway" keyword did appear in the search results, it was used only to describe Dr. James Zhou as the founder and formulator of "HerbaSway".

10

[cite]. Accordingly, Plaintiff has indisputably failed to produce evidence of any Defendant's use of the respective mark in a trademark sense.

With respect to the "HerbaSway" keyword, its appearance in the search results to describe Dr. James Zhou as the founder and formulator of HerbaSway was a permissible, nominative use, and likewise was insufficient as a matter of law to support Plaintiff's associated claim for trademark infringement. Playboy Enter., Inc. v. Welles, 279 F.3d 796 (9th Cir. 2002) (trademark infringement claim dismissed on summary judgment where former Playboy model's use of the trademarks "Playboy" and "Playmate" in connection with metatags, headlines and banner advertisements was held to be a permissible, nominative use).

In each of the Merck I and II and Rescuecom cases, the court held that the defendant's internal use of the plaintiff's trademark to trigger links to the defendant's website was not a "trademark use" within the meaning of the Lanham Act as a matter of law, and the trademark claims were dismissed. These Second Circuit cases are directly on point and compel granting summary judgment for Defendants on Count II.    Merck I, 425 F. Supp. 2d at 415 ("This internal use of the mark 'Zocor' as a key word to trigger the display of sponsored links is not use of the mark in a trademark sense."); Merck II, 2006 WL 1418618 at *2 ("This internal use of the mark 'Zocor' as a key word to trigger the display of sponsored links is not use of the mark in a trademark sense; rather, this use is more akin to the product placement marketing strategy employed in retail stores, where, for example, a drug store places its generic products alongside similar national brand products to capitalize on the latter's name recognition."); and Rescuecom, 2006 WL 2811711 at *7 ("[I]n the absence of allegations that defendant placed plaintiff's trademark on any goods, displays, containers, or advertisements, or used plaintiff's trademark in

any way that indicates source or origin, plaintiff can prove no facts in support of its claim which would demonstrate trademark use.").

With respect to the nominative use of the keyword "HerbaSway" in some of the search results, the Welles case is directly on point and further compels granting summary judgment of non-infringement. In Welles, the court summarized the three-part test to demonstrate nominative use. First, "'the product or service in question must be one not readily identifiable without use of the trademark.'" 279 F.3d at 802 (quoting New Kids on the Block v. New America Publ'g. Inc., 971 F.2d 302, 308 (9th Cir. 1992)). Second, "'only so much of the mark or marks may be used as is reasonably necessary to identify the product or service.'" Id. (quoting New Kids, 971 F.2d at 308). Third, the user should do "'nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.'" Id. at 803 (quoting New Kids, 971 F.2d at 308). See also Merck I, 425 F. Supp. 2d at 413.

Heba's display of the "HerbaSway" keyword in select search result listings indisputably satisfied the three-part nominative use test. First, Dr. Zhou was the founder and formulator of HerbaSway. There would be no way for Heba to convey that information without using the HerbaSway mark. Second, Heba used the mark HerbaSway only to identify Dr. Zhou by his prior work with the company. Welles, at 802 (Welles' use of the trademarks "Playboy" and "Playmate" marks on her web site were "only to describe the thing, rather than to identify its source"). Third, Heba did not use the HerbaSway mark to suggest "sponsorship or endorsement by" HerbaSway, but rather used the mark only to identify Dr. Zhou by his prior work with HerbaSway.

Accordingly, the undisputed facts show that Heba did not use the accused keywords in commerce, and the instances in which the HerbaSway mark did appear in the search results were

12

a permissive nominative uses. Thus, summary judgment should be granted for Defendants on Count II.

### 2.    In the Alternative, There Wass No Initial Interest Confusion as a Matter of Law.

HerbaSway claims Heba's prior use of the accused keywords infringed its trademark rights under the initial interest confusion doctrine. Initial interest confusion occurs when "potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers were not actually confused at the time of purchase." Cartier v. Symbolix, Inc., No. 05 Civ. 2777(RJH), 2006 WL 2821535, at * 9 (S.D.N.Y. Sept. 29 2006) (citations omitted). In order to establish initial interest confusion based on Internet activities, the Second Circuit "requires a showing of intentional deception". Savin Corp. v. Savin Group, 391 F.3d 439, 462 fn. 13 (2nd Cir. 2004) cert. denied, 126 S.Ct. 116 (2005) (citations omitted) ("[C]onsumers diverted on the Internet can more readily get back on track than those in actual space, thus minimizing the harm to the owner of the searched-for site from consumers becoming trapped in a competing site."). "Intentional deception" requires a showing that the defendant "intentionally set out to deceive the public." Resource Developers, Inc. v. Statute of Liberty-Ellis Island Found., Inc., 926 F.2d 134, 140 (2nd Cir. 1991).

There is no evidence supporting HerbaSway's initial interest confusion claim. First, the search results did not display the accused keywords except in the limited instances when used to describe Dr. Zhou as the founder and formulator of HerbaSway. In these instances, "HerbaSway" was used only to identify Dr. Zhou, and otherwise the sponsor of the listing was clearly identified as Heba at www.hebamedicine.com. [cite].    Accordingly, there is no evidence that any Defendant used the keywords in such as way as to intentionally set out to deceive the

13

public into believing that its website was purportedly sponsored by, or affiliated with, HerbaSway. Cf. Playboy Enter., Inc. v. Welles, 279 F.3d 796 (9th Cir. 2002).

It is therefore respectfully submitted that Defendants are entitled to summary judgment on Count II on the alternative ground that there was no initial interest confusion as a matter of law.

**B.    There Was No Likelihood of Confusion Between HebaGreen and HerbaGreen as a Matter of Law, and Therefore Defendants are Entitled to Summary Judgment on Count I of the Amended Complaint.**

In evaluating likelihood of confusion, the factors set forth in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495, (2d Cir. 1961) must be considered.  Any likelihood of confusion between composite marks including generic terms must be based on the likelihood of confusion between the non-generic elements of the marks.  Smithkline Beckman Corp., et al., v. Procter & Gamble Co., et al., 591 F.Supp. 1229, 1238 (N.D.N.Y. 1984); American Cyanamid Corp. v. Connaught Laboratories, Inc., 800 F.2d 306, 308; Beech-Nut, Inc., v. Warner-Lambert Co., 346 F. Supp. 547, 549 (S.D.N.Y. 1972), aff'd, 480 F.2d 801 (2nd Cir. 1973).  If, on balance of the Polaroid factors, the undisputed facts fail to establish likelihood of confusion with a protectable mark, summary judgment is appropriate.  Nabisco Inc. v. Warner-Lambert Co., 220 F.3d 43, 45 (2nd Cir. 2000).

It is undisputed that Heba is the owner of U.S. Federal Trademark Registration No. 2,667,326 of its house mark "HEBA" for "herbal supplements, dietary supplements, and herbal teas for medicinal purposes", and that this registration is prima facie evidence of Heba's ownership of, and exclusive right to use this mark in connection with these goods.  (Ex. 3); 15 U.S.C. § 1115(a).  It is also undisputed that "green" is generic with respect to the products at issue – green tea extracts.  (Ex. 1).  Accordingly, it necessarily follows that Heba was entitled to

14

combine its house mark "Heba" with the generic suffix "green" to identify the source of its green tea extract. Further, Plaintiff's mark HerbaGreen consists of the prefix "HERBA" which is descriptive of goods made of herbs, and the generic suffix "Green". There is indisputably no likelihood of confusion between Heba's house mark "HEBA", and the non-generic element of HerbaSway's mark "HERBA". For these reasons, and those set forth below, the undisputed facts dictate a finding that there was no likelihood of confusion between Heba's mark HebaGreen, and HerbaSway's mark HerbaGreen.

### 1.    "Green" is Generic With Respect to Green Tea Products, and May Not be Appropriated for Exclusive Use.

Words which name a product itself are termed "generic", and are regarded by the law as free for all to use. J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §§ 12:1 to 12:2, pp 12-1 to 12-9. As Plaintiff's own use demonstrates, the word "green" is part of the generic name of the goods at issue, "green tea" and "green tea extract". (Ex. 5). Use of the term by the public at large as the name of the product and dictionary definitions evidence that "green" is generic with respect to green tea products. J. Thomas McCarthy, supra., at §§ 12:13-12:15, pp 12-32 to 12-36. Many manufacturers of dietary and nutritional supplements and teas use the term "green" in their product names to describe the ingredients of their products, and all makers of tea products use the word "green" as part of the generic name of "green tea". (Ex. 1). This type of generic designation can never function as a trademark to indicate origin, and may not be appropriated for exclusive use in connection with the goods it names. J. Thomas McCarthy, supra, at §12:1, page 12-4.

Although a composite mark comprised of a generic name combined with some protectable feature may produce a composite that is protectable, generic elements have no

trademark significance, and a trademark holder cannot appropriate generic terms for its exclusive use.  J. Thomas McCarthy, supra, at §12:39, pp 12-102.10 – 12-102.11 (4th ed. 2006); American Cyanamid, supra, at 129 (generic component Hib of composite mark HibVAX may not be appropriated); Beech-Nut, supra at 549 (the term "breath" is generic with respect to the product "breath mints", and no party may claim a proprietary interest in the word).

Defendant's federal registration of the mark HEBA is prima facie evidence of its exclusive right to use the mark in connection with the goods identified in the registration, and HerbaSway has not contested this right.  15 U.S.C. § 1115(a).  Like the public and all competitors in the green tea market, Defendant was free to use the generic suffix "green" in connection with its house mark HEBA to describe the source of its green tea products, and Plaintiff may not appropriate this generic term for its exclusive use.  American Cyanamid, supra at 308; Nestle's Milk Products, Inc. v. Baker Importing Company, Inc., 182 F.2d 193, 196 (Fed. Cir. 1950) (no likelihood of confusion where each mark consisted of a word descriptive of the product and a prefix indicative of the respective company name).

### 2.    There is no Likelihood of Confusion Between the Non-generic Elements "Heba" and "Herba".

Because generic terms may not be appropriated for exclusive use, any likelihood of confusion and any consequent finding of infringement must be based on a likelihood of confusion between the non-generic elements of the marks at issue.  Smithkline Beckman, supra, at 1238 (the ending "-rin" contained in both marks at issue is a derivative of the generic term "aspirin" and as such cannot be the basis for a likelihood of confusion).  Beech-Nut, supra, at 549; Beech-Nut, Inc., v. Warner-Lambert Company, 480 F.2d 801, 803, (2d Cir. 1973); American Cyanamid, supra, at 308 (injunction overturned on appeal and case dismissed as a matter of law because generic component of composite marks could not be appropriated).

16

HERBA has very weak trademark significance. Marks which immediately convey knowledge of the characteristics of the product do not tend to identify a source, and are thus weak and entitled to a limited scope of protection. J. Thomas McCarthy, supra, at § 11:15, p. 11-21; Smithkline Beckman, supra, at 1238; Affiliated Hospital Products v. Merdel Game Manufacturing Company et al., 513 F.2d 1183, 1188 (2d Cir. 1975). The terms "herb" and "herbal" are highly descriptive of the goods to which Plaintiff's mark is applied. (Ex. 6 & 7). It is undisputed that Plaintiff adopted the element "herba" in its mark specifically to describe the herbal nature of its products. (Ex. 10, pp. 116-117). Further, Plaintiff's own product literature indicates that the product contains extracts of "wild crafted herbs". (Ex. 5).

Usage of the element "herba" by third parties further evidence the weak trademark significance of this element. J. Thomas McCarthy, supra, at § 11:25, p. 11-54 (the use of a term descriptively on the same or closely related goods by third parties tends to eliminate trademark significance of the term); Field Enterprises Education Corp. v. Cove Industries, Inc., 1969 WL 9573, 161 USPQ 243 (E.D.N.Y. 1969); Smithkline Beckman, supra, at 1236 (common third party use of an element of a trademark tends to reduce likelihood of confusion, as the public has come to expect that element on products and will rely on it less for source-identifying significance). Being commonly used to refer to herbal products, "Herba" has little source-identifying significance. (Ex. 2).

"The strength or distinctiveness of a mark determines both the ease with which it may be established as a valid trademark and the degree of protection it will be accorded." McGregor-Doniger, Inc. v. Drizzle Inc., 599 F.2d 1126, 1132 (2d Cir. 1979), overruled on other grounds, Bristol-Meyers Squibb Co. v. McNeill-P..C., Inc., 973 F.2d 1033 (1992). Where a mark is relatively weak and commonly used in the marketplace, it is entitled to a narrow scope of

protection, and small variations in the mark are enough to ward off likelihood of confusion. General Mills Inc. v. Kellogg Co., 843 F.2d 622, 625-628 (8th Circuit); Wooster Brush Co v. Prager Brush Co., 1986 WL 83707, 231 USPQ 316, 318 (TTAB 1986) (where certain terms have come to be commonly used to suggest certain characteristics of the product, the public can easily distinguish slight differences between the marks).

Given its descriptive usage, the element "Herba" has little source-identifying significance, and warrants a very narrow scope of protection. Significant differences in the sight, sound, meaning, and commercial impression, of the non-generic elements "Heba" and "Herba" are sufficient to eliminate any likelihood of confusion. Phonetically, the term "Herba" is pronounced with a short E sound blending into the R sound. In contrast, Defendant's house mark "Heba", when approached with the ordinary rules of English grammar, is instinctively pronounced with a long E sound. Moreover, "Herba" is immediately recognizable as a slight truncation of the common word "herbal", which is highly descriptive of the product. In contrast, Defendant's house mark "Heba" is arbitrary with respect to the goods, and thus is inherently distinctive and source-identifying, both standing alone and as the dominant element of the HebaGreen mark. (Ex. 15, ¶ 8).

Any likelihood of confusion is further eliminated by the fact that the non-generic element "Heba" of the HebaGreen mark is identical to Defendant's house mark, and thus directly identifies Heba as the source of the "green" tea product. McGregor-Doniger, supra, at 89 (2nd Cir. 1979) (no likelihood of confusion between DRIZZLER and DRIZZLE, where the latter's mark is used to identify the name of the source company, generating distinct source-identification). In view of the common usage, highly descriptive nature, and weak trademark

significance of the element "Herba", these differences further eliminate any likelihood of confusion between the marks.

### C.    Defendants Are Entitled to Judgment as a Matter of Law on Count III of the Amended Complaint because There Is No Protectable Trade Dress

#### 1.    HerbaSway Has Not Adequately Described Its Alleged Trade Dress.

Section 43(a) of the Lanham Act prohibits the use of "any word, term, name, symbol, or device" that "is likely to cause confusion, or to cause mistake, or to deceive" as to the source of a product. 15 U.S.C. § 1125(a). This section of the Lanham Act has been interpreted to provide protection not only for words and symbols, but also for trade dress. "The concept of trade dress encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer." Fun-Damental Too, Ltd. v. Gremmy Indus. Corp., 111 F. 3d 993, 999 (2nd Cir. 1997).

In determining whether to apply trade dress protection to a particular design or appearance, a court must be careful not to extend protection in a manner that will prohibit legitimate competition or undermine patent and copyright laws. Trade dress protection has limitless duration. "[O]verextension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas. Consequently, courts should proceed with caution in assessing claims to unregistered trade dress protection so as not to undermine the objectives of these other laws." Jeffrey Millstein. Inc. v. Greger, Lawlor, Roth,. Inc., 58 F.3d 27, 32 (2nd Cir. 1995).

One means to prevent overextension of trade dress protection is the requirement that, as a threshold matter, the plaintiff must specifically articulate the design elements that make up its alleged trade dress. Yurman Design Inc. v. PAJ, Inc., 262 F.3d 101, 114-18 (2d Cir. 2001).

19

Failure to define the alleged trade dress with sufficient specificity is by itself grounds for entry of judgment as a matter of law against the plaintiff. Id. at 118. In this case, HerbaSway has repeatedly refused to articulate definitively the elements that make up its alleged trade dress. For example, in response to Heba's interrogatories, HerbaSway described its trade dress as the:

> ornamental design and *overall appearance* of [its] product labels [which] *includes* the color schemes, sizes, lettering, design, shapes and placements of words, graphics and decorations on HerbaSway's product labels.

(HerbaSway's Answer to Pl.'s Interrog. No. 12)(emphasis added).

In deposition testimony, HerbaSway's designated Rule 30(b)(6) witness, Franklin St. John, similarly did not articulate HerbaSway's alleged trade dress definitively and, instead, vaguely defined its trade dress as:

> "the whole design of the label....the whole look." (Ex. 11 at 122-123);

> "the look of the label, the entire look of the label, is what is important here." (Id. at 134);

or

> "the label, the look of the label, that's the main part of the trade dress." (Id. at 188).

A "focus on the overall look ...does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress." Landscape Forms Inc. v. Columbia Cascade Co., 113 F.3d 373, 381 (2d Cir. 1997). Even the elements that plaintiff claims are "included" within the alleged trade dress are described in broad, vague terms. The vague description of an "overall look" offered by HerbaSway implicates the dangers identified by the Second Circuit in the Yurman case, including: (1) an inability to evaluate secondary meaning, overbreadth or functionality of the alleged trade dress; (2) that the plaintiff may try to protect an unprotectable style theme or idea; and (3) the difficulty for the court to shape the proper relief if it does not know what combination of features deserves protection. Yurman, 262 F.3d at 117.

20

Indeed, HerbaSway's studied vagueness invites the Court to apply the Lanham Act in an overly broad manner, thereby creating uncertainty in present and future competitors regarding their ability to compete utilizing common, functional aspects of the product packaging and labeling.

Because HerbaSway has failed to articulate adequately its purported trade dress, HerbaSway cannot be afforded trade dress protection, and Heba's motion for summary judgment on Count III of the Amended Complaint should be granted for this reason alone. Yurman, 262 F.3d at 118.

### 2.    HerbaSway's Labels Are Not Inherently Distinctive.

Even if HerbaSway adequately described it purported trade dress, which it did not, to prevail on its claim for trade dress infringement under § 43(a) of the Lanham Act, HerbaSway must "first demonstrate that its trade dress is *either* inherently distinctive *or* that it has acquired distinctiveness through a secondary meaning." Fun-Damental Too, Ltd. v. Gemmy Industries Corp., 111 F.3d 993, 999 (2d Cir. 1997) (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992)).   Where the mark "is a word, symbol or even product packaging, the plaintiff may prove distinctiveness by showing *either* that the 'intrinsic nature' of the mark serves to identify a particular source (what is known as 'inherent distinctiveness') *or* that 'in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself' (what is known as 'acquired distinctiveness' or 'secondary meaning.')" Yurman Design, 262 F.3d at 115 (2d Cir. 2001)(emphasis in original).  HerbaSway must also demonstrate that its trade dress is non-functional. 15 U.S.C. § 1125(a)(3). Because HerbaSway has not produced evidence demonstrating that its purported trade dress is either inherently distinctive or has acquired secondary meaning, HerbaSway cannot meet these elements of its

21

trade dress claim as a matter of law, and Heba's motion for summary judgment should be granted.

### 3. HerbaSway's Alleged Trade Dress Is Not Inherently Distinctive.

The Second Circuit applies the trademark classifications articulated in Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976) to evaluate the inherent distinctiveness of a trade dress in a product packaging case. Paddington Corp. v. Attiki Importers & Distribs., Inc., 996 F.2d 577, 583 (2d Cir. 1993); Fun-Damental Too, 111 F.3d at 1000-01 (Abercrombie test applies to product packaging cases.). Within the Abercrombie framework,

> trade dress is classified on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary/fanciful. Suggestive and arbitrary or fanciful trade dress are deemed inherently distinctive and thus always satisfy the first prong of the test for protection. A descriptive trade dress may be found inherently distinctive if the Plaintiff establishes that its mark has acquired secondary meaning giving it distinctiveness to the consumer. A generic trade dress receives no Lanham Act protection.

Fun-Damental Too, 111 F.3d at 1000 (citations omitted).

In Two Pesos the Supreme Court emphasized that an inherently distinctive trade dress is one whose "intrinsic nature serves to identify a particular source of a product," Two Pesos, Inc. 505 U.S. at 768. However, trade dress protection "has its limits." Fun-Damental Too, Ltd., 111 F.3d at 1000. A trade dress "that conforms to a well-established industry custom is generic and hence unprotected." Id. A "specific trade dress must . . . be evaluated to determine whether it is so distinctive as to point to a single source of origin and thereby be entitled to Lanham Act protection." Id.

### 4. HerbaSway's Green and Purple Color Combination is Not Inherently Distinctive.

In the Rule 30(b)(6) deposition of HerbaSway's principal, Franklin St. John, HerbaSway emphasizes that its trade dress includes a green and purple color combination on a cream or white background. (Ex. 11 at 112-113). HerbaSway's green and purple color combination on a white or cream colored background is incapable of being inherently distinctive as a matter of law. The Second Circuit has specifically held that as "an element of trade dress . . . color is never inherently distinctive, but is capable of identifying a product's source and may be a protected trademark only when it has attained secondary meaning and has come to be associated in the consuming public's mind with a single source of origin." The Forschner Group, Inc. v. Arrow Trading Co., 124 F.3d 402, 408 (2nd Cir. 1997) (citing Qualitex Co. v. Jacobson Prods, Co., 514 U.S. 159, 163, 115 S. Ct. 1300, 1303, 131 L.Ed.2d 248 (1995)); Mana Products, Inc. v. Columbia Cosmetics, Mfg, Inc., 65 F.3d 1063, 1070 (2nd Cir. 1995) ("color marks by their very nature are not generally distinctive."); Deere & Company v. MTD Holdings, Inc., 2004 WL 324890, at*10 (S.D.N.Y. 2004)(color is not inherently distinctive); Deere & Co. v. MTD Holdings, Inc., 2003 WL 22439778, at *2 (S.D.N.Y. 2003) ("combination of colors . . . can never be inherently distinctive.").

In Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205, 120 S. Ct. 1339, 147 L.Ed.2d 182 (2000) the Supreme Court held that "with respect to at least one category of mark – colors . . . no mark can ever be inherently distinctive." Id. at 1344. A "product's color is unlike a 'fanciful,' 'arbitrary,' or 'suggestive' mark, since it does not 'almost *automatically* tell a customer that [it] refer[s] to a brand . . . and does not 'immediately . . . signal a brand or a product 'source.'" Id. (citations omitted).

Moreover, commonly used colors cannot be protected as trade dress. See Mana Products Inc. v. Columbia Cosmetics, Inc., 65 F.3d 1063 (2d Cir. 1995)(color black commonly used for

cosmetic cases); Paddington, 996 F.2d at 583 (color green commonly used for cans of lime soda). It is common in the health drink concentrate and nutritional supplements industry to use the color green and the green and purple color combination.[3]  See Van Gessel Depo. at 55-56 (color green used to connote wellness and green tea product). Accordingly, HerbaSway's use of the color green and the green and purple color combination is generic. Generic "marks refer 'to the genus of which the particular product is a species' and are not entitled to trade dress protection." Mana Products, Inc. v. Columbia Cosmetics, Mfg, Inc., supra, 65 F.3d at 1069; Two Pesos, 505 U.S. at --, 112 S. Ct. at 2757; Park' N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 194, 105 S. Ct. 658, 661, 83 L.Ed.2d 582 (1985). In this case, because the colors used by HerbaSway are common or generic in the nutritional supplement industry, no trade dress protection can extend to the color scheme.

Even if the Court were to find that the colors used by HerbaSway are not generic, because a color or a combination of colors can never be inherently distinctive as a matter of law, HerbaSway must prove that its purple and green color combination on a white or cream colored background has attained secondary meaning. As set forth in detail below, HerbaSway has failed to produce evidence which would permit a reasonable jury to conclude that its alleged trade dress, including its allegedly distinctive color combination, has attained secondary meaning among consumers.

### 5.    HerbaSway has failed to Demonstrate that the Size of its Labels Is Inherently Distinctive.

---

[3] For example, the manufacturer of OLEDA nutritional products uses a purple and green color combination on its labels. Similarly, the manufacturer of NOKOMIS Nutrition also uses a purple and green color combination on its labels and website in connection with the identical nutritional supplements marketed and sold by HerbaSway such as Echinacea, Ginkgo Biloba and St. John's Wort. (See Exhibit 30).

As with its color combination discussed above, HerbaSway has also failed to demonstrate that the size of its labels is inherently distinctive. In HerbaSway's Rule 30(b)(6) deposition, St. John testified that the label size was not chosen or adopted to denote or indicate origin or to distinguish HerbaSway's products from those of competing manufacturers, but rather was adopted based on function (Ex. 11 at 131-132) . HerbaSway chose and adopted the particular label size because another size would not "work on [its] machines" or bottles, and that "we specify this particular size. If it's off, it doesn't work on our machines, it doesn't work in the bottles. It looks bad." (Ex. 11 at 132). When asked whether the specific size label was dictated by the function of its labeling machines, Mr. St. John testified that the particular size of label was dictated "by the bottle mostly", including by the "bottle size" and "diameter." (Ex. 11 at 132).

As St. John's deposition testimony above indicates, the size of HerbaSway's labels is not inherently distinctive but rather functional. Functional elements can never be protected as trade dress. Fun-Damental Too, Ltd., 111 F.3d at 1002. HerbaSway has failed to introduce any evidence that the "intrinsic nature" of the specific size of its labels "serves to identify" HerbaSway as the "particular source of its products." Two Pesos, Inc., 505 U.S. at 768. 112 S. Ct. at 2757. The size of HerbaSway's labels does not "serve[] primarily as an indication of origin, such that consumers will readily rely on it to distinguish [HerbaSway's products] from those of competing manufacturers." The Forschner Group, Inc. v. Arrow Trading Co., *supra*,124 F.3d 402, 408.

### 6.    HerbaSway has Failed to Demonstrate that The Lettering on Its Labels is Inherently Distinctive.

HerbaSway has also failed to demonstrate that the lettering on its labels is inherently distinctive and entitled to Lanham Act protection. Fun-Damental Too, Ltd., 111 F.3d at 1000. There is nothing inherently distinctive about the lettering or font used on HerbaSway's labels

that will allow consumers to rely on it to distinguish HerbaSway's products from those of its competitors. The Forschner Group, Inc., *supra*, 124 F.3d at 408.

St. John admitted during his deposition that the font or lettering on HerbaSway's labels are standard fonts available in the industry and were not specifically designed or adopted by HerbaSway as a source identifier. (Ex. 11 at 133-35). In addition, Rhode Van Gessel, HerbaSway's label designer, also testified that the fonts used on the labels were commonly used and generally available. (Ex.14 at 52 and 74). The font used on HerbaSway's labels is analogous to the plastic compact cases that were found generic in Mana, 65 F.3d 1063. In Mana, the court held that "[w]hen it is readily allowed that other cosmetic distributors and retailers have used the identical packaging or containers, it defies simple logic to suggest that the packaging was inherently distinctive." Id.

Here, HerbaSway admitted that it did not create the lettering or font, which were "taken off the graphic designer's computers." (Ex. 11 at 134). Additionally, Calvin Liu, Heba's label designer, testified that the fonts used on Heba's allegedly infringing labels were also standard, commonly used fonts. (Ex. 13 at 67-68). This clearly demonstrates that the fonts used by Heba on its allegedly infringing labels are widely used simple fonts, commonly used by other companies and businesses. Consequently, as in Mana, the lettering or font used by HerbaSway on its labels "can be purchased by other companies and are widely available", id., and it defies logic to suggest that the font or lettering used on HerbaSway's labels is inherently distinctive. Id.

### 7.    The Design, Shape and Placements on HerbaSway's Labels are Not Inherently Distinctive.

HerbaSway has also failed to prove that the design, shape and placement of words, graphics and decorations on its labels are inherently distinctive. Specifically, HerbaSway alleges

that the "design" of its labels includes the color scheme, size and lettering on the labels. (Ex. 11 at 118). As discussed above, HerbaSway has failed to show that the color scheme, size and lettering used on its labels is inherently distinctive. Additionally, there is nothing creative or distinct about the layout of HerbaSway's labels that will allow it to serve "primarily as an indication of origin" such that consumers will "readily rely on it to distinguish [HerbaSway's products] from those of competing manufacturers." The Forschner Group Inc. v. Arrow Trading Co., supra, 124 F.3d 402, 408. In fact, the layout of HerbaSway's labels is common. Furthermore, information such as the directions on how to use the product, the ingredients, the "supplemental facts" box and the product disclaimer must be included on the label in specified locations pursuant to FDA regulations (Ex. 12 at 138-143) and, therefore, are common to all product labels for dietary supplements.

Referring to Ex. 23, an exemplary HerbaSway label, it is apparent that the name of the company, "HerbaSway", appears at the very top of the label superimposed over HerbaSway's leaf logo, and the name of the specific nutritional supplement product (i.e. "MEMORYA") in purple text appears below the name HerbaSway, approximately 2.2 centimeters from the top of the label. Immediately below the product name appears a description of the product (i.e., "Memory Support with") in green text. The name of the herb used in the extract (i.e. "Ginkgo & Ginseng") appears below the product description in purple text. The phrase "GREAT TASTING TEA CONCENTRATE" appears at the bottom of the label in capital letters in green text.

There is nothing particularly creative about this layout since most manufacturers place their company name or trademark at the top of labels, as the top of a label is the location that would most prominently display the company name or trademark. (See, e.g., Ex. 5 and 6). Further, the placement of the product name below the manufacturer name or trademark is

common to identify the specific product being purchased followed by a description to further

inform consumers as to the ingredients or purpose of the product or extract. The layout is

straightforward and logical and not creative or unique. The supplement facts box and the

ingredients list on the labels are required by law and commonly placed on the sides of product

labels. (Ex. 12 at 138-143; Ex. 14 at 72-74).[4]

For all of the reasons set forth above, HerbaSway's alleged trade dress is not inherently

distinctive as a matter of law. Accordingly, HerbaSway must prove that its alleged trade dress

has acquired secondary meaning among consumers in order to be subject to protection under the

Lanham Act.

**D.    HerbaSway Cannot Demonstrate That Its Alleged Trade Dress Has Acquired Secondary Meaning in the Market.**

Because HerbaSway's labels are not inherently distinctive, whether HerbaSway's trade

dress claim is based upon its alleged product configuration or its product packaging, HerbaSway

must prove that the alleged trade dress has acquired secondary meaning and serves primarily to

designate HerbaSway as a source of particular products. See Wal-Mart Stores. Inc. v. Samara

Bros. Inc., 120 S. Ct. 1339 (U.S. 2000)(product design trade dress requires showing of secondary

meaning). In addition, to prevail on a claim of trade dress infringement, the plaintiff must

demonstrate that the alleged trade dress had acquired secondary meaning at the time that the

alleged infringer entered the market. Papercutter, Inc. v. Fay's Drug Co., Inc., 900 F.2d 558,.

564 (2d Cir. 1990).

To determine whether a product's configuration has achieved secondary meaning, the

courts generally assess the following circumstantial evidence: (1) consumer surveys linking the

---

[4] To the extent that anything on the HerbaSway label might be considered distinctive, it would be the HerbaSway leaf logo. HerbaSway does not emphasize this aspect of its label because Heba clearly does not have a similar logo.

trade dress to a source, (2) advertising expenditures and the nature of the advertising; (3)

unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark,

and (6) length and exclusivity of the mark's use. Mana Prods. Inc. v. Columbia Cosmetics Mfg.

Inc., 36 USPQ 2d 1176, 1181 (2d Cir. 1995), (quoting Centaur Commc'n, Ltd. v. A/S/M

Commc'n, Inc., 830 F.2d 1217, 1222 (2d Cir. 1987)).  The secondary meaning analysis hinges on

whether HerbaSway can produce evidence showing that "the consumer public had associated

[their] product, designated by its mark, with its source [HerbaSway]." Mana Prods. Inc. at 1181.

As set forth below, in this case, none of the circumstantial evidence supports an inference that

secondary meaning has attached to the configuration of HerbaSway's product.

### 1.    Consumer Studies Linking Mark to Source.

Properly conducted consumer surveys are generally considered to be the most probative

evidence of whether a particular trade dress has acquired secondary meaning. Papercutter, Inc.

v. Fay's Drug Co., 900 F.2d 558, 564 (2nd Cir. 1990).  In this case, HerbaSway did not produce

any consumer studies or surveys regarding its alleged trade dress.  The complete lack of survey

evidence is a significant factor weighing against any secondary meaning in this case.

### 2.    Advertising Expenditures.

To be probative of secondary meaning, advertising "must direct the consumer to those

features claimed as trade dress." Yankee Candle, 259 F.3d at 44 (citing Thomas & Betts Corp. v.

Panduit Corp., 65 F.3d 654, 662 (7th Cir.1995)). This type of advertising is known as "look for"

advertising as it "encourages consumers to identify the claimed trade dress with the particular

producer." Id. (quoting Thomas & Betts, 65 F.3d at 662).  "Merely 'featuring' the relevant

aspect of the product in advertising is no more probative of secondary meaning than are strong

sales" because "to provide protection based on extensive advertising would extend trade dress

29

protection to the [product] . . . without any showing that the consumer associated the dress with the product's source." Id. (citing Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 824 (9th Cir.1993)).

In this case, two-thirds of HerbaSway's advertising expenditures were made on radio infomercials (Ex. 11 at 76). However, radio infomercials are irrelevant in establishing secondary meaning because the consumer is not able to see the product's alleged trade dress, making it impossible for a consumer to link the trade dress to the product's source.

To the extent that HerbaSway spent some of its resources forwarding advertisements to potential customers via the mail, the internet and through tradeshows, this advetising is not probative of secondary meaning unless the advertisements direct consumers to the elements of HerbaSway's trade dress. Thomas & Betts, 65 F.3d at 662. HerbaSway has produced no advertisements which direct consumers to its alleged trade dress (See e.g. Ex. 2, 8, 14 and 17). Instead, the advertisements merely show a picture of one or more bottles of HerbaSway's product, and clearly focus on highlighting the benefits of the products to the consumer. Therefore, under Yankee Candle, HerbaSway's advertising is not the type from which the Court can infer secondary meaning.

### 3.    Unsolicited Media Coverage of the Product.

This factor focuses on whether a particular trade dress has been recognized in unsolicited media coverage, such as through awards or otherwise, which may tend to show that a configuration is capable of acquiring secondary meaning among consumers. HerbaSway has not produced any evidence demonstrating unsolicited coverage or awards prior to Heba's entry into the market in August 2001.

### 4.    Sales Success.

In this case, any sales success that HerbaSway may have had is not probative of secondary meaning in the alleged trade dress. HerbaSway has admitted that approximately 90% of its sales were generated by radio infomercials. (Ex. 11 at 59). These consumers do not even see the alleged trade dress, and clearly are not relying on the trade dress to identify the source of the goods.

### 5.    Attempts to Plagiarize the Trade Dress.

There is no evidence that Heba or any other competitor copied HerbaSway's alleged trade dress. The bottles and labels used by Heba were of a standard size and type. Heba's printer, Kevin Liu, testified that he designed the Heba labels on his own, using common colors, fonts and text placement for labels of the type used by Heba. (Ex. 13 at 16). Accordingly, this factor provides no support to HerbaSway's claim.

### 6.    Length and Exclusivity of the Mark's Use.

Under this factor, HerbaSway must produce evidence that from which the Court may infer that secondary meaning has attached to the alleged trade dress due to a long period of exclusive use. As discussed above, the features of the alleged trade dress are commonly used for similar types of products, and Herbasway's use is not exclusive. Even if HerbaSway could somehow produce evidence of exclusive use, the length of time that it used its product configuration before Heba began selling its product, about five years, was insufficient to create an inference of secondary meaning. See Duraco Products. Inc. v. Joy Plastics Enterprises Ltd., 40 F.3d 1431, 1453-54 (3rd Cir. 1993) (five year period of exclusive use insufficient to create inference of secondary meaning).

Because HerbaSway has failed to establish that any of the above factors tends to prove that its alleged trade dress has acquired secondary meaning among consumers, no reasonable

31

jury could find in HerbaSway's favor, and Heba is entitled to judgment as a matter of law.

E.    **Defendants are Entitled to Judgment as a Matter of Law on Count IV of the Amended Complaint Because HerbaSway Does Not Have Standing to Bring its Claim for Copyright Infringement.**

HerbaSway alleges that Defendants committed copyright infringement by copying portions of an educational brochure that contains educational information regarding herbal products, in particular green tea extracts. (See Ex. 28). Section 501(b) of the Copyright Act provides that "[t]he legal or beneficial owner of an *exclusive right* under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). This section of the Act establishes that only the owner of an exclusive right has standing to sue for infringement of a copyright. See ITAR-TASS Russian News Agency v. Russian Kurrier, 153 F.3d 82, 91 (2nd Cir. 1998)("Under United States law, an owner (including one determined according to foreign law) may sue for an infringement only if it meets the standing test of 17 U.S.C. § 501(b), which accords standing only to the legal or beneficial owner of an 'exclusive right'"). Accordingly, HerbaSway must establish that it is the owner of an exclusive right to have standing to maintain this claim.

The copyright registration filed by HerbaSway on August 8, 2002 does not establish HerbaSway's ownership of a copyright in the brochure. A copyright registration does not create an irrebuttable presumption of validity. Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 166 (2nd Cir. 2003). Rather the registration merely orders the burdens of proof. Id. "'[W]here other evidence in the record casts doubt on the question, validity will not be assumed.'" Id. (quoting Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 908 (2nd Cir. 1980)). In this case, the undisputed evidence demonstrates that HerbaSway has not met the statutory requirements to establish ownership of a copyright in the brochure.

32

Under the Copyright Act, copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). Generally, the person who actually authors or creates the copyrightable work is considered the author and owns the work. HerbaSway has admitted that the brochure was authored, in large part, by Dr. Zhou. (Ex. 11 at 156-60). Franklin St. John testified as the designated witness for HerbaSway that Dr. Zhou dictated the content of most of the brochure to St. John, and that St. John merely transcribed the information provided by Dr. Zhou and corrected the grammar. (Ex. 11 at 156-60; Ex. 10 at 79). St. John also testified that some portion of the materials in the brochure may have been authored by Phil Clement or Rhode Van Gessel.[5] (Ex. 11 at 158-59). Neither Clement nor Van Gessel were employees of HerbaSway at the time, and neither had written agreements with HerbaSway regarding their work on the brochure. (Id. 158-59; Ex. 14 at 16, 22).

The testimony from St. John establishes that Dr. Zhou is the author of at least a large portion of the content of the brochure, as the ideas expressed in the brochure plainly were provided by Dr. Zhou. See Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc., 290 F.3d 98, 107 (2nd Cir. 2002)(author is person who translates an idea into fixed, tangible expression and author can authorize another to "fix" his original idea). Moreover, St. John's role transcribing Dr. Zhou's ideas and correcting the grammar are insufficient acts to make St. John an author. Medforms, 290 F.3d at 107 (transcription that does not require intellectual modification or highly technical enhancement does not create authorship). As the authors of the work, Dr. Zhou, Clement and Van Gessel own the copyrights in the brochure, either individually or jointly, unless (1) their work falls within the definition of "a work made for hire" under Section 201 of the

---

[5] For purposes of this summary judgment motion, Defendants concede that Clement and Van Gessel may be authors of some part of the brochure. Defendants reserve the right to challenge Clement's and Van Gessel's authorship should the present motion be denied.

Copyright Act, or (2) they assigned their rights in writing to HerbaSway. As set forth below, the

undisputed facts demonstrate that HerbaSway cannot meet either of these requirements.

The Copyright Act provides that, if a work meets the statutory definition of a "work made

for hire", then the hiring party is considered the author and owns the copyright. A work made

for hire is defined as:

> (1) a work prepared by an employee within the scope of his or her
> employment; or (2) a work specially ordered or commissioned for
> use . . . if the parties specifically agree in a written instrument
> signed by them that the work shall be considered a work made for
> hire.

17 U.S.C. § 101.

There is no dispute that Clement and Van Gessel were not employees of HerbaSway at

the time that the brochure was created. (Ex. 11 at 158). There is also no dispute that there was

no written agreement between HerbaSway and either Clement or Van Gessel regarding their

work on the brochure, much less a written instrument specifying that the work was a work made

for hire. Accordingly, any of the work authored by either Clement or Van Gessel is not a work

made for hire under the statute. (Id. at 157-59; Ex. 14 at 16, 22).

As for Dr. Zhou, the undisputed facts demonstrate that his work on the brochure was not

a work made for hire under the statute. Zhou was not an "employee" of HerbaSway under the

Act at the time that he authored the work. Rather, Zhou was a member and co-owner of the

corporation. Accordingly, as discussed in detail below, Zhou cannot be considered an

"employee" under Section 201 of the Copyright Act as a matter of law.

The Copyright Act does not define the terms "employee" or "scope of employment." In

Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989), the Supreme Court held

that the federal common law of agency should be considered to determine whether a hired party

should be considered an employee under the Copyright Act. The Court established a multi-

34

factor test to apply to determine if a work was made by an employee. The specific factors

identified by the Court are:

> the hiring party's right to control the manner and means by which
> the product is accomplished. . . . the skill required; the source of
> the instrumentalities and tools; the location of the work; the
> duration of the relationship between the parties; whether the hiring
> party has the right to assign additional projects to the hired party;
> the extent of the hired party's discretion over when and how long
> to work; the method of payment; the hired party's role in hiring
> and paying assistants; whether the work is part of the regular
> business of the hiring party; whether the hiring party is in business;
> the provision of employee benefits; and the tax treatment of the
> hired party.

Reid, 490 U.S. at 751-52.

The Reid factors must be considered and weighed based upon the facts of each case.

"The factors should not merely be tallied, but should be weighed according to their significance

in the case." Aymes v. Bonnelli, 980 F.2d 857, 861 (2nd Cir. 1992). Some of the Reid factors

will have little or no significance in a specific case. Id. The Second Circuit has held that five of

the Reid factors are particularly relevant in nearly all cases: (1) the right to control the manner

and means of production; (2) the requisite skill; (3) provision of employee benefits; (4) tax

treatment of the hired party; and (5) whether the hired party may be assigned additional projects.

Carter v. Helmsley-Spear, Inc., 71 F.3d 77, 86 (2nd Cir. 1995).

In this case, all of the five particularly relevant factors weigh in favor of a finding that Dr.

Zhou was not an employee of HerbaSway at the time that he authored the brochure. Dr. Zhou

had complete control over the content of the parts of the brochure that he authored. (Ex. 11 at

156-57, 160). Creation of the content of the brochure required Dr. Zhou to apply his training and

skill in the area of herbal medicine. Dr. Zhou was a member and co-owner of the business, and

he was not assigned tasks by others. Although Dr. Zhou received coverage under the company's

medical plan, he received this coverage on the same terms and conditions as all of the members

of the company. (Ex. 15 at ¶ 6). He was not paid a salary, HerbaSway did not withhold federal

or state income taxes, and HerbaSway did not pay social security taxes on Dr. Zhou's behalf.

(Id. at ¶ 5). Indeed, when Dr. Zhou attempted to obtain unemployment benefits after he was

locked out of HerbaSway, he was advised by the Connecticut Labor Department that he did not

qualify for unemployment benefits because he was not an employee. (Id. at 7).

 The remainder of the Reid factors are of little, if any, significance in this case, and do not

outweigh the particularly relevant factors identified by the Second Circuit. There were no

substantial instrumentalities or tools required to do the work, and Dr. Zhou did not require any

paid assistants to perform the work. Dr. Zhou had complete discretion over when and how long

he worked on the brochure. Although HerbaSway was in business and the brochure was

prepared as part of its business, this is insufficient to convert Dr. Zhou from a member of the

company to a paid employee.

 Moreover, the agreements between the members of HerbaSway provide further support

that Dr. Zhou was not an employee of HerbaSway. The Operating Agreement establishing

HerbaSway provided that the members could have other business interests and engage in other

activities. (See Ex. 16 at p. 12). Although this provision was modified in some respects by the

December 1996 Agreement among all of the members of HerbaSway, that agreement did not

provide that Dr. Zhou was an employee of HerbaSway, and HerbaSway never treated him as an

employee. While the December 1996 Agreement provided that Zhou would, as a member of

HerbaSway, devote his full time and efforts to the company, it did not state that he was an

employee of the company, nor did it provide that Dr. Zhou would receive a salary or any other

benefits of employment. (Id.).

 Because Dr. Zhou was not an employee of HerbaSway under the Copyright Act, his work

on the brochure could only be considered a work made for hire if the work was specially ordered

or commissioned and Dr. Zhou and HerbaSway *specifically* agreed in a written instrument that

the work would be considered a work made for hire. 17 U.S.C. § 101. It is undisputed that there

is no such written instrument.[6]

The undisputed facts establish that the brochure was not a work made for hire under the

statute, and that HerbaSway therefore is not considered an author. Accordingly, to have standing

to bring its copyright infringement claim, HerbaSway must demonstrate that it has acquired an

exclusive right in the work by a transfer of ownership under the Act. See Motta v. Samuel

Weiser, Inc., 768 F.2d 481, 484 (1st Cir. 1985)("If a plaintiff is not the author of the copyrighted

work then he or she must establish a proprietary right through the chain of title in order to

support a valid claim to the copyright."). Section 101 of the Act defines a "transfer of copyright

ownership" as "an assignment, mortgage, exclusive license, or any other conveyance, alienation,

or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright,

whether or not it is limited in time or place of effect, but not including a nonexclusive license."

17 U.S.C. § 101. The Copyright Act provides that any transfer of copyright ownership is not

valid unless the transfer is in a signed writing. 17 U.S.C. § 204(a).

HerbaSway has not produced any signed writing transferring ownership of the copyright

in the brochure, or any part of the brochure, from any of Clement, Van Gessel or Dr. Zhou.

Therefore, HerbaSway cannot demonstrate that it owns a proprietary right to the copyright in the

brochure, or any part of the brochure, and HerbaSway does not have standing to maintain its

copyright claim. Motta, 768 F.2d at 484 (absent showing of proprietary right in copyright,

plaintiff does not have standing to bring an action under the Copyright Act).

---

[6] While the December 1996 Agreement included certain provisions regarding the treatment of trade secrets or confidential information, it is silent regarding the ownership of published, copyrightable works. See Ex. 17.

37

The undisputed facts demonstrate that the brochure was not a work made for hire, and HerbaSway has produced no evidence that any of the authors of the brochure assigned their rights to HerbaSway in writing. Accordingly, HerbaSway does not have any exclusive right to the brochure under the Copyright Act. At most, HerbaSway may have an implied, non-exclusive license to use the brochure. Under the Copyright Act, this is insufficient to establish standing to sue for copyright infringement, and Defendants' motion to dismiss Count IV of the Complaint should be granted.

## IV.    CONCLUSION

For the foregoing reasons, it is respectfully requested that Defendants' motion for summary judgment be granted.

THE DEFENDANTS,
HEBA LABORATORIES, LLC, HERBAMEDICINE,
LLC, and HERBASCIENCE and TECHNOLOGIES, LLC
BY MCCARTER & ENGLISH, LLP
THEIR ATTORNEYS

By _____
MARK D. GIARRATANA (CT 10410)
ERIC E. GRONDAHL (CT 08988)
CityPlace I
185 Asylum Street
Hartford, CT 06103
(860) 275-6700
(860) 724-3397 (fax)
        -and-
ALEXANDRA B. STEVENS (CT 20300)
Financial Centre, Suite A304
695 East Main Street
Stamford, CT 06901-2138
(203) 399-5900
(203) 399-5800 (fax)
astevens@mccarter.com

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing MEMORANDUM OF LAW IN

SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT has been mailed,

postage prepaid, this 8th day of November, 2006, to:

> JOHN R. HORVACK, JR., ESQ.
> FATIMA LAHNIN, ESQ.
> Carmody & Torrance LLP
> 50 Leavenworth Street
> P.O. Box 1110
> Waterbury, CT  06721-1110
>
> LAWRENCE SGRIGNARI, ESQ.
> KRISTA A. O'BRIEN, ESQ.
> SHEILA J. HALL, ESQ.
> Gesmonde Pietrosimone & Sgrignari LLC
> 3127 Whitney Avenue
> Hamden, CT 06518-2344

ALEXANDRA B. STEVENS