A

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2821535 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Page 1

Briefs and Other Related Documents

Cartier v. Symbolix, Inc.S.D.N.Y.,2006.Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
CARTIER, a division of Richemont North America, Inc., et al., Plaintiffs,
v.
SYMBOLIX, INC., d/b/a Park Cities Jewelers, et al., Defendants.
**No. 05 Civ. 2777(RJH).**

Sept. 29, 2006.

**Background:** Watch manufacturer sued jeweler, its principal, and others for infringement of its "CARTIER" trademark, and false designation of origin. Manufacturer moved for summary judgment as to liability on its trademark infringement claims, and sought to permanently enjoin defendants from altering and selling its watches.

**Holdings:** The District Court, Holwell, J., held that:

(1) manufacturer established a likelihood of downstream confusion with respect to counterfeit watches sold by jeweler, as required for permanent injunction to enjoin defendants from altering and selling its watches;

(2) manufacturer did not consent to defendants' alleged infringement of its trademark by using an undercover investigator to investigate defendants' practice of counterfeiting its watches; but

(3) defendants' modifications in polishing and adding diamonds to manufacturer's watches, which were previously purchased by customers, was not "use in common," and, thus, did not fall within scope of the Lanham Act;

(4) defendants' use of counterfeit watch in its advertisements did not create **initial interest confusion**; and

(5) manufacturer established actual success on the merits of its trademark infringement claim, and irreparable harm, as required for permanent injunction.

Motion granted.

**[1] Trademarks 382T 🔑1084**

382T Trademarks
    382TIII Similarity Between Marks;  Likelihood of Confusion
        382Tk1083 Nature of Confusion
            382Tk1084 k. In General. Most Cited Cases

**Trademarks 382T 🔑1419**

382T Trademarks
    382TVIII Violations of Rights
        382TVIII(A) In General
            382Tk1418 Practices or Conduct Prohibited in General;  Elements
                382Tk1419 k. In General. Most Cited Cases

**Trademarks 382T 🔑1421**

382T Trademarks
    382TVIII Violations of Rights
        382TVIII(A) In General
            382Tk1418 Practices or Conduct Prohibited in General;  Elements
                382Tk1421 k. Infringement. Most Cited Cases
For trademark infringement and false designation of origin claims under the Lanham Act, the plaintiff must demonstrate: (1) that it has a valid mark that is entitled to protection under the Act, and (2) that the defendant's actions are likely to cause confusion as to the origin of the mark. Lanham Trade-Mark Act, 15 U.S.C.A. § § 1114(1)(a), 1125(a)(1).

**[2] Trademarks 382T 🔑1714(2)**

382T Trademarks
    382TIX Actions and Proceedings
        382TIX(F) Injunctions
            382Tk1712 Permanent Injunctions
                382Tk1714 Grounds and Subjects of Relief
                    382Tk1714(2) k. Infringement. Most Cited Cases
To receive permanent injunctive relief in a trademark infringement case, the party seeking the injunction

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2821535 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

need only prove a likelihood of confusion.

**[3] Trademarks 382T ⬤⇝1714(2)**

382T Trademarks
   382TIX Actions and Proceedings
      382TIX(F) Injunctions
         382Tk1712 Permanent Injunctions
            382Tk1714 Grounds and Subjects of Relief
               382Tk1714(2) k. Infringement. Most Cited Cases
Watch manufacturer established a likelihood of downstream confusion with respect to counterfeit watches sold by jeweler to customers, for purposes of manufacturer's trademark infringement and false designation of origin claims under the Lanham Act, as would support manufacturer's motion for permanent injunction to enjoin jeweler from altering and selling its watches. Lanham Trade-Mark Act, 15 U.S.C.A. § § 1114(1)(a), 1125(a)(1).

**[4] Trademarks 382T ⬤⇝1099**

382T Trademarks
   382TIII Similarity Between Marks; Likelihood of Confusion
      382Tk1099 k. Nature of Goods or Services Underlying Marks. Most Cited Cases
For purposes of trademark infringement and false designation of origin claims under the Lanham Act, counterfeits, by their very nature, cause confusion. Lanham Trade-Mark Act, 15 U.S.C.A. § § 1114(1)(a), 1125(a)(1).

**[5] Trademarks 382T ⬤⇝1530**

382T Trademarks
   382TVIII Violations of Rights
      382TVIII(D) Defenses, Excuses, and Justifications
         382Tk1530 k. Conduct or Misconduct of Plaintiff in General. Most Cited Cases
Watch manufacturer did not consent to jeweler's alleged infringement of its "CARTIER" trademark by using an undercover investigator to investigate jeweler's practice of counterfeiting manufacturer's watches.

**[6] Trademarks 382T ⬤⇝1422**

382T Trademarks
   382TVIII Violations of Rights
      382TVIII(A) In General

         382Tk1422 k. Nature of Defendant's Use; Use in Commerce. Most Cited Cases
Jeweler's modifications in polishing and adding diamonds to watch manufacturer's watches, which were previously purchased by customers, was not "use in commerce," and thus did not fall within scope of the Lanham Act, although people viewing the modified watches were likely to be misled as to whether they were manufacturer's genuine diamond watches, where components of watches were still incorporated in the final product, and there was no concern that jeweler was engaged in "fraud or palming off" because the modified watches were returned to the same customer at the conclusion of the transaction. Lanham Trade-Mark Act, 15 U.S.C.A. § 1127.

**[7] Trademarks 382T ⬤⇝1136(1)**

382T Trademarks
   382TIV Creation and Priority of Rights
      382Tk1132 Use of Mark
         382Tk1136 Nature and Extent of Use
            382Tk1136(1) k. In General. Most Cited Cases

**Trademarks 382T ⬤⇝1422**

382T Trademarks
   382TVIII Violations of Rights
      382TVIII(A) In General
         382Tk1422 k. Nature of Defendant's Use; Use in Commerce. Most Cited Cases
Under the Lanham Act, a mark is in "use in commerce" when: (1) the mark has been placed on the goods or their containers, labels, or the documents associated with the goods or their sale, and (2) the goods are sold or transported in commerce. Lanham Trade-Mark Act, 15 U.S.C.A. § 1127.

**[8] Trademarks 382T ⬤⇝1422**

382T Trademarks
   382TVIII Violations of Rights
      382TVIII(A) In General
         382Tk1422 k. Nature of Defendant's Use; Use in Commerce. Most Cited Cases

**Trademarks 382T ⬤⇝1429(2)**

382T Trademarks
   382TVIII Violations of Rights
      382TVIII(A) In General

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2821535 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Page 3

382Tk1423 Particular Cases, Practices, or Conduct
    382Tk1429 Use on Genuine Goods; Resale Under Original Marks or Name
       382Tk1429(2) k. Repaired, Rebuilt, or Altered Goods. Most Cited Cases
A repair for an owner's personal use would not fall within the scope of the Lanham Act because such repairs do not trade upon the goodwill of a trademark holder; if, on the other hand, a repair or modification still bearing the original manufacturer's trademark is so extensive as to become a different product, that modification trades on the goodwill of, or association with, the trademark holder and is a "use in commerce." Lanham Trade-Mark Act, 15 U.S.C.A. § 1127.

**[9] Trademarks 382T ⬦1088**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
      382Tk1083 Nature of Confusion
        382Tk1088 k. "Initial Interest" Confusion. Most Cited Cases
Jeweler's use of counterfeit watch in its advertisements did not create **initial interest confusion**, for purposes of watch manufacturer's trademark infringement claim under the Lanham Act against jeweler, where a would-be purchaser reviewing the advertisement would reasonably believe that jeweler was offering a genuine item, and only when the customer called or visited the store would the customer discover that the watch was counterfeit. Lanham Trade-Mark Act, 15 U.S.C.A. § 1114(1)(a).

**[10] Trademarks 382T ⬦1088**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood of Confusion
      382Tk1083 Nature of Confusion
        382Tk1088 k. "Initial Interest" Confusion. Most Cited Cases
For purposes of a trademark infringement claim under the Lanham Act, "initial interest confusion" occurs when potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase. Lanham Trade-Mark Act, 15 U.S.C.A. § 1114(1)(a).

**[11] Trademarks 382T ⬦1714(2)**

382T Trademarks
    382TIX Actions and Proceedings
      382TIX(F) Injunctions
        382Tk1712 Permanent Injunctions
         382Tk1714 Grounds and Subjects of Relief
          382Tk1714(2) k. Infringement. Most Cited Cases
Watch manufacturer established actual success on the merits of its trademark infringement claim against jeweler, and irreparable harm, as required for permanent injunction enjoining jeweler from marketing new or used watches that it caused to be altered in such a way as to deceive the general public as to the origin of the watch's craftsmanship, where manufacturer showed that jeweler was violating the Lanham Act by offering to purchase manufacturer's watch on behalf of a customer and then modifying or arranging for modifications to that watch so that it would resemble a more expensive watch. Lanham Trade-Mark Act, 15 U.S.C.A. § 1114(1)(a).

**[12] Injunction 212 ⬦9**

212 Injunction
    212I Nature and Grounds in General
      212I(B) Grounds of Relief
        212k9 k. Nature and Existence of Right Requiring Protection. Most Cited Cases
To obtain a permanent injunction, the party seeking the injunction must demonstrate: (1) actual success on the merits, and (2) irreparable harm.

**Trademarks 382T ⬦1800**

382T Trademarks
    382TXI Trademarks and Trade Names Adjudicated
      382Tk1800 k. Alphabetical Listing. Most Cited Cases
CARTIER.

Milton Springut, Tal S. Benschar, Kalow & Springut LLP, New York, NY, for Plaintiffs.
Debra Joy Guzov, Guzov Ofsink Flink LLC, New York, NY, for Plaintiffs/Defendants.
Brian K. Norman, Dallas, TX, C. Gregory Shamoun, Guzov Ofsink Flink LLC, New York, NY, for Defendants.

*MEMORANDUM OPINON AND ORDER*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2821535 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

RICHARD J. HOLWELL, District Judge.

*1 On March 11, 2005, plaintiffs Cartier, a division of Richemont North America, Inc., and Cartier International, B.V. (collectively "Cartier" or "plaintiffs") initiated litigation against defendants Symbolix, Inc., d/b/a Park Cities Jewelers, its principal, Ahmed M. Saleh, and John Does 1-5 (collectively "defendants"), alleging trademark infringement and false designation of origin under § 32(1) and § 43(a)(1) of the Lanham Act, 15 U.S.C. 1114(1) and 1125(a)(1) respectively. These claims relate to Cartier's Tank Française line of watches. On April 5, 2005, plaintiffs moved for a preliminary injunction preventing defendants from modifying stainless steel Tank Française watches by mounting diamonds on the bezels and cases, applying polish to the watch in order to simulate Cartier's more expensive white gold Tank Française watches, and thereafter selling the modified watches. On June 1, 2005, the Court granted a preliminary injunction to prevent defendant from altering and selling watches. Cartier now has moved for partial summary judgment with respect to liability on its federal trademark infringement claims and seeks to permanently enjoin defendants from altering and selling Cartier watches.

For the reasons set forth above, the Court grants plaintiffs' motion for partial summary judgment [22] and enters a permanent injunction against defendants.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed and taken in the light most favorable to defendants.

Cartier has been developing, marketing, and selling luxury watches in the United States for nearly a century. (Destino Decl. ¶ 3.) Cartier owns the word mark CARTIER and deploys the mark on both its watch and jewelry products. (Id. ¶ 4; Exs. A, B.)

Park Cities Jewelers sells various luxury brands, including used but unworn Cartier watches. (Saleh Aff. ¶ 5).[FN1] Saleh is the manager and owner of Symbolix Inc., which does business as Park Cities Jewelers. (Id. ¶ 1.) Park Cities Jewelers is not an authorized Cartier dealer. (Defs. 56.1 Statement ¶ 17.)

In December of 2004, Cartier deployed a private investigator, Kathy Braunstein, to conduct an investigation into Park Cities Jewelers. (Braunstein Decl. ¶ 1; Defs. Mot. in Opp'n to Pls. Mot. for Partial

Summ. J. and Permanent Inj. ("Defs.Opp'n") ¶ 2.) On December 13, 2004, Braunstein spoke to Saleh over the phone and expressed an interest in purchasing "a watch with diamonds on the bezel and case." (Braunstein Decl. ¶¶ 2, 3; Defs. Opp'n 2.)[FN2] Braunstein asserts that when she asked about a ladies' Cartier watch, Saleh responded that he could sell her a brand new Cartier Tank Française stainless steel model and add diamonds on the bezel and case for $6,000 (Braunstein Decl. ¶¶ 2, 3); defendants claim that Braunstein was the first to bring up the possibility of adding diamonds to a stainless steel model (Defs. Opp'n 2-3). Saleh indicated that it would be possible to add diamonds to the stainless steel model. (Saleh Aff. ¶ 14; Defs. Opp'n 3.) By comparison, Saleh said, a genuine Cartier Tank Française watch with diamonds would cost $14,500. (Braunstein Decl. ¶¶ 2, 3.) Saleh also indicated that such diamonds would be "aftermarket diamonds" and that the work would be unauthorized by Cartier and void the warranty. (Saleh Aff. ¶ 14.) Although Braunstein and Saleh did not finalize the terms of the deal, Braunstein called back on December 16, 2004 and discussed the purchase of a small-size, stainless steel, ladies' Cartier Tank Française watch, with diamonds added to the bezel and case for $5,750 without any sales tax. (Braunstein Decl. ¶ 5.) Saleh informed her that the work on the watch would take about one week at the longest and would be accompanied by a two-year Park Cities Jewelers' warranty. (Braunstein Decl. ¶ 5.)

*2 On January 4, 2005, Braunstein called Saleh again regarding the Cartier Tank Française watch. (Braunstein Reply Decl. ¶ 3.) Braunstein told Saleh that Cartier did not manufacture the Cartier Tank Française watch in stainless steel with diamonds and that others viewing the watch might regard it as a fake. (Id. ¶ 4.) Saleh responded that the Cartier Tank Française model is made with stainless steel or white gold, but that diamonds are only placed by Cartier on the white gold model. (Id.) However, he reassured her that they "polished" the stainless steel to make it appear like "white gold; it looks exactly the same. They are exactly identical." (Id.) Saleh further stated that he had placed a picture of the Cartier Tank Française watch in stainless steel with diamonds in a recent advertisement in a Dallas newspaper around October or November of 2004 and that one could not tell the difference between the two watches. (Id. ¶ 6.) Defendants do not dispute that the watch pictured in the advertisement was an altered Cartier watch. (Defs. Opp'n 18.)

Thereafter, Vanessa Halvorsen, an administrative

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2821535 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

assistant employed at plaintiff's law firm, posed as a relative of Braunstein and contacted Saleh, who transferred her call to another employee named Reza on January 20, 2005. (Halvorsen Decl. ¶ ¶ 2-4.) Halvorsen told Reza she wanted to purchase a stainless steel Cartier Tank Française watch with diamonds. (Id. ¶ 4.) Halvorsen faxed her personal information including her credit card information and driver's license. (Id. ¶ 4.) Defendants then purchased an unworn stainless steel Cartier watch from International Watch Company, located in Miami; the watch did not, at that time, contain diamonds. (Saleh Dep. Tr. 25, 48; see also Defs. Opp'n 3.) At this point, Halvorsen had paid for the watch and the transaction was nonrefundable. (Saleh Aff. 10.) Defendants shipped the watch to America's Diamonds, located in Los Angeles, and requested that the watch be polished and encrusted with diamonds. (Saleh Dep. Tr. 48, 56.) America's Diamonds placed diamonds on the watch, polished the watch, and sent it back to defendants in Dallas. (Id. at 50.) Defendants then shipped the watch without an accompanying Park Cities Jewelers' receipt to Halvorsen. (Halvorsen Decl. ¶ 5.)

Ralph Destino, Chairman Emeritus of Cartier, inspected the watch received by Halvorsen and noted the "marked inferiority in the aesthetic appearance as compared to comparable genuine diamond-set Cartier watches." (Destino Decl. ¶ 8.) According to Destino, Cartier does not set diamonds on its stainless steel watches but rather exclusively places them on the higher-end white and yellow gold watches, including gold watches in the Cartier Tank Française line. (Id.) In Destino's opinion, the "combination of diamonds with stainless steel is not one offered or sold by Cartier; such a combination of a relatively inexpensive metal with expensive diamonds, appears incongruous and is certainly an aesthetically different watch from those sold and promoted by Cartier." (Id.) Moreover, he discerned that "the setting of the diamonds was done in a sloppy manner, resulting in a cheap, shoddy looking item." (Id.)

*3 Saleh has also admitted that Park Cities Jewelers added diamonds and polished at least two stainless steel Tank Française watches. (Saleh Dep. Tr. 16-17.)

On February 24, 2005, plaintiffs sent defendants a letter a "cease and desist" letter demanding that defendants discontinue the advertising, promotion and sale of any altered Cartier watches. (Springut Decl., Ex. A.) By letter dated March 4, 2005, defendants' counsel responded, representing that while defendants purchase diamond-encrusted

watches from various sources that may be factory originals or "aftermarket," defendants do "not alter, add, modify or recondition timepieces." (Id., Ex. C.) This denial was flatly contradicted by Saleh's subsequent deposition testimony. (Saleh Dep. Tr. at 16-17.) On April 5, 2005, plaintiffs moved by ex parte order to show cause why a preliminary injunction enjoining defendants from their infringing activities should not be entered before this Court. That same day, the Court granted the order to show cause. The Court subsequently heard oral argument on plaintiffs' motion for a preliminary injunction on April 21, 2005.

On June 1, 2005, the Court granted plaintiffs' motion for a preliminary injunction, enjoining defendants from altering and selling Cartier watches. Cartier v. Symbolix, 386 F.Supp. 354, 356 (S.D.N.Y.2005). Cartier now has moved for partial summary judgment with respect to liability on its federal trademark infringement claims and seeks to permanently enjoin defendants from altering and selling Cartier watches.

## DISCUSSION

### 1. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Of course, a "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also Quarles v. Gen. Motors Corp. (Motors Holding Div.), 758 F.2d 839, 840 (2d Cir.1985) ("[T]he mere existence of factual issues-where those issues are not material to the claims before the court-will not suffice to defeat a motion for summary judgment."). In short, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

On a motion for summary judgment, the Court is required to view the facts in the light most favorable to the nonmoving party and to make all reasonable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2821535 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Page 6

inferences in this party's favor. *E.g.,* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The initial burden rests with the moving party to make a prima facie showing that no material fact issues exist for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this showing is made, the burden falls on the nonmoving party to demonstrate that a material fact issue does exist, thus mandating a trial. *Id.* While the nonmoving party may defeat a motion for summary judgment by establishing that there is a legitimate fact issue for trial, it "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U .S. at 586 (citing *De Luca v. Atl. Ref. Co.,* 176 F.2d 421, 431 (2d Cir.1949)). In trademark infringement cases, summary judgment "may be appropriate in certain circumstances, where the undisputed evidence would lead only to one conclusion as to whether confusion is likely." *Cadbury Beverages v. Cott Corp.,* 73 F.3d 474, 478 (2d Cir.1996) (citing *Lang v. Ret. Living Publ'g Co.,* 949 F.2d 576, 582 (2d Cir.1991)).

## 2. Trademark Infringement

**\*4** [1] Section 32 provides that:
Any person who shall, without the consent of the registrant-
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a). Section 43(a) of the Act creates a cause of action against any person who misuses a mark in a manner that is likely to cause confusion, and extends this protection to unregistered marks as well as registered marks and to "any false designation or origin":Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, ... which-
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ...

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). "For both Lanham Act claims, [the plaintiff] must demonstrate (1) that it has a valid mark that is entitled to protection under the Act and (2) that [the defendant's] actions are likely to cause confusion as to the origin of the mark." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.,* 286 F.Supp.2d 284, 287 (2d Cir.2003) (citing *Sports Auth., Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 960 (2d Cir.1996)).

Cartier owns U.S. Trademark Registration 759,201 for the word mark CARTIER for watches and clocks. (*See* Destino Decl. Ex. A.) This mark has become incontestable. *See* *Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1076 (2d Cir.1993) ("[A] mark registered by its owner shall be prima facie evidence of the registrant's exclusive right to use the mark in commerce on the product.... A registered mark becomes incontestable if it has been in continuous use for five consecutive years subsequent to its registration and is still in use." (citing 15 U.S.C. §§ 1065 & 1115(a))). Defendants do not contest the validity of Cartier's mark. Thus, Cartier need only establish a likelihood of confusion to prevail on its motion for a preliminary injunction.

[2] Defendants are correct in noting that Cartier has failed to establish actual confusion. Defendants' customers knew that they were receiving watches that resembled, but were not in fact, the more expensive model. Defendant thus argues that plaintiffs have failed to offer "any admissible evidence of such confusion" because they rely "solely on 'what if' scenarios." Cartier is correct, however, that to receive permanent injunctive relief, it need only prove a *likelihood* of confusion; a plaintiff need prove "actual consumer confusion or deception resulting from the violation" only for the recovery of money damages, which Cartier is not seeking in this motion. *A.V. by Versace, Inc. v. Gianni Versace S.p.A.,* No. 96 Civ. 9721(PKL)(THK), 2005 U.S. Dist. LEXIS 925, 2005 WL 147364, at \*6 (S.D.N.Y. Jan. 24, 2005) (internal citations omitted); *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 171 (2d Cir.1991).

**\*5** In determining the likelihood of confusion, the Court looks to the factors established in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961), including:
(1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2821535 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

of the products; (4) the likelihood of the products; (4) the likelihood that the prior owner will "bridge the gap" ...; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers.

*Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir.1995) (citing *Polaroid* ).

Before applying these elements to the facts at hand, it is useful to distinguish between the two types of infringement alleged in this case. This distinction is best drawn by considering the two different types of transaction at issue in this case. First, Saleh has admitted that Park Cities Jewelers added diamonds to the bezel and polished at least two stainless steel Tank Française watches that it did not purchase, but instead were brought by customers requesting such modifications. Second, Saleh concedes that he purchased a stainless steel Tank Française watch on Halvorsen's behalf and then, as part of the same transaction, polished the watch and added diamonds to the bezel before delivering the watch to her. Defendants attempt to argue that these transactions are indistinguishable because, in both cases, the modifications were made at the customers' request. However, the first transaction, taken as a whole, differs from second in that modification alone does not compete directly with the sale of new, white gold, diamond-encrusted Tank Française watches. Because these two situations present somewhat different issues of law, they are treated separately below.

### a. *Sale and Modification of Watch as Part of Same Transaction*

[3] In the second transaction, in which Halvorsen paid for a new stainless steel watch and requested its modification as part of the same transaction, the watch delivered to her at the conclusion of the transaction resembled a new, white gold, diamond-encrusted Tank Française watch. Indeed, the entire purpose of the modification was to make the stainless steel Tank Française watch resemble the diamond-encrusted, white gold Tank Française watch. (*See* Pls. 56.1 Statement ¶ 9; Defs. 56.1 Statement ¶ 9.) "The unauthorized use of an original label" in connection with the same goods as those for which the mark is registered is sufficient to state a claim of counterfeiting. 4 McCarthy on Trademarks and Unfair Competition 25:15 (4th ed.2006). Thus, although defendants did not imitate, copy, or reproduce Cartier's mark, but merely retained the

mark on the watch, the watch delivered to Halvorsen was a counterfeit good. *See Cartier v. Aaron Faber, Inc.,* 396 F.Supp.2d 356, 359 (S.D.N.Y.2005) (agreeing with this Court that altering the stainless steel Tank Française model to resemble the diamond-encrusted model renders the watch counterfeit within the meaning of the Lanham Act).

*6 [4] Because the Court finds that the watch delivered to Halvorsen was a counterfeit, "the Court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion." *Gucci,* 286 F.Supp.2d at 287 (citing *Topps Co. v. Gerrit J. Verburg Co.,* No. 96 Civ. 7302(RWS), 1996 U.S. Dist. LEXIS 18556, 1996 WL 719381, at *6 (S.D.N.Y. Dec.13, 1996)). "There may indeed be the occasional tourist who actually believes that he is buying a genuine Rolex for $20 from a man selling watches out of a briefcase in Battery Park," *People v. Rosenthal,* 800 N.Y.S.2d 354 (N.Y.City Crim.Ct.2003), but most people who purchase a knock-off Rolex or Cartier hope to benefit from the cachet of the premium watch without paying premium prices. *See id.; Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.,* 219 F.3d 104, 108 (2d Cir.2000) (stating that "post-sale confusion can occur when a manufacturer of knockoff goods offers consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product"). Accordingly, Saleh's disclosures to Braunstein that the diamonds would be "aftermarket" diamonds and that the work would be unauthorized by Cartier do not change the counterfeit nature of the watch itself.

Defendants also argue that "Cartier watches are very expensive.... Customers of this type of product are generally sophisticated. Given the discerning nature of Cartier's potential customers, it is unlikely that a casual observer will be confused as to the source of the goods." (Defs. Opp'n 12 (internal citations omitted).) This argument contradicts defendants' statement to Halvorsen that the two watches look "exactly the same" (Braunstein Reply Decl. ¶ 4), but even if true, the fact remains that the defendants' watch is a counterfeit. In addition, the "likelihood of confusion test concerns not only potential purchasers but also the general public." *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 382 (2d Cir.1997); *cf. United States v. Hon,* 904 F.2d 803, 804-08 (2d Cir.1990) (affirming conviction under 18 U.S.C. § 2320, which incorporates the confusion requirement in the civil Lanham Act, where judge instructed jury that they could find "likelihood of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2821535 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Page 8

confusion" by someone merely viewing the watch). Defendants' modifications, together with the retention of Cartier's mark, render the watch sold to Halvorsen a counterfeit. Pursuant to the Second Circuit's logic in *Gucci*, Cartier has established a likelihood of downstream confusion with respect to the watch sold to Halvorsen, thus establishing that the simultaneous purchase and modification of a watch by defendants on Halvorsen's behalf violated the Lanham Act.

[5] Finally, defendants argue that, notwithstanding the underlying merits of plaintiffs' claims, the Court should deny injunctive relief because plaintiffs' use of an undercover investigator demonstrates Cartier's "consent" to any alleged infringement. Defendants cite no authority for this proposition, asserting merely that "[t]he only reason that the Sample Watch was modified was because Cartier's representatives requested and insisted on it." [FN3] (Def.Br.20.) The Court rejects this argument. Undercover investigators are "an effective enforcement mechanism for detecting and proving anti-competitive activity which might otherwise escape discovery or proof." *Gidatex, S.r.L. v. Campaniello Imports, Ltd. ., 82 F.Supp.2d 119, 124 (S.D.N.Y.1999)*, and the Court declines to accept the argument that purchases made at the request of undercover investigators imply consent by the trademark holder. *See also A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, No. 96 Civ. 9721, 2002 U.S. Dist. LEXIS 16323, at *30 (S.D.N.Y. Sept. 3, 2002) (explaining that "courts in the Southern District of New York have frequently admitted evidence ... gathered by investigators posing as consumers in trademark disputes" and listing cases in which such evidence was admitted).[FN4]

### b. *Modification of Pre-Owned Watches*

*7 [6] Defendants also admit to polishing and adding diamonds to at least two stainless steel Tank Française watches at the request of customers who had previously purchased the watches. Defendants are correct in pointing out that courts have rejected Lanham Act violations where defendants merely repair or restore a trademarked item. *See, e.g., U.S. Surgical Corp. v. Orris, Inc., 5 F.Supp.2d 1201, 1209 (D.Kan.1998)* (finding no trademark infringement where plaintiff, a manufacturer of surgical instruments intended for single use, failed to show evidence that defendant who cleaned, resterilized and returned the surgical instruments to the hospital-owner purchaser, either resold the instruments or advertised that it repaired the instruments). Courts have also permitted modifications of trademarked

goods where there is no likelihood of confusion with the goods manufactured by the owner's mark. *See, e.g., Excalibur Auto. Corp. v. Elite Autoworks, Inc., 733 F.Supp. 65 (E.D.Wis.1990)* (finding no violation of the Lanham Act where there was no evidence that defendant who stretched luxury sedans made by Excalibur into limousines did not compete directly with plaintiff); *Ford Motor Co. v. Ultra Coachbuilders, Inc.*, No. 00 Civ. 0243(VAP), 2000 U.S. Dist. LEXIS 20173, 2000 WL 33256536, at *5 (C.D.Ca. July 11, 2000)* (finding no likelihood of confusion where plaintiff presented no evidence that Ford made limousines similar to those made by defendant from Ford's automobiles). Here, however, defendants are doing more than merely repairing or restoring Cartier watches, and the modified watches look similar to genuine Cartier watches. As explained in the previous section, Cartier has established that someone viewing the modified watch is likely to be confused as to its origin. The question remains, however, whether the modifications constitute "use in commerce" within the meaning of § 32(1) and § 43(a)(1) of the Lanham Act.

[7][8] Under 15 U.S.C. § 1127, a mark is in "use in commerce" when (1) the mark has been placed on the goods or their containers, labels, or the documents associated with the goods or their sale, and (2) the goods are "sold or transported in commerce." The Second Circuit has said that the "history and text of the Lanham Act show that 'use in commerce' reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause, rather than to limit the Lanham Act to profit-seeking uses of a trademark." *United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 92 (2d Cir.1997) (finding that certain political activity fell within the definition of "use in commerce" in § 32(1)(a) of the Lanham Act). The Ninth Circuit has added that " 'use in commerce' appears to contemplate a trading upon the goodwill of, or association with the trademark holder." *See Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848 (9th Cir.2002). Thus, a repair for an owner's personal use would not fall within the scope of the Lanham Act because such repairs do not trade upon the goodwill of a trademark holder. If, on the other hand, a repair or modification still bearing the original manufacturer's trademark is so extensive as to become a different product, that modification trades on the goodwill of, or association with, the trademark holder and is a "use in commerce." *Id. at 856*

*8 In *Storz*, the Ninth Circuit considered whether a repair company that rebuilt Storz endoscopes on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2821535 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

behalf of hospitals that owned the endoscopes was using Storz's trademark in commerce. The Ninth Circuit suggested a number of factors to consider in determining whether a modification results in a different product:

Those factors include the nature and extent of the alterations, the nature of the device and how it is designed (whether some components have a shorter useful life than the whole), whether a market has developed for service and spare parts, and, most importantly, whether end users of the product are likely to be misled as to the party responsible for the composition of the product.

*Id.* at 857-58 (citing *see Rolex Watch, U.S.A., Inc. v. Michel Co., 179 F.3d 704, 709-10 (9th Cir.1999).* The court reasoned that, because the repair company "discarded every important part" of the broken endoscopes and retained only the block that carried the Storz trademark, downstream consumers (such as the doctors using the scopes) were potentially deceived about the scope's origin. The court found that although the repairs were performed at the request of the owners and did not involve a sale other than the sale of parts used to rebuild the scopes, there was a "use in commerce."

Applying these factors to the instant case, the Court finds that defendants' modifications are not "use in commerce" and thus fall outside the scope of the Lanham Act. Unlike the defendants in *Storz,* defendants here are not "discard [ing] every important part" and retaining only the portion of the product that bears the trademark; the components of the stainless steel Cartier watch are still incorporated in the final product. It is true that people viewing the modified watch are likely to be misled as to whether it is a genuine Cartier diamond watch (or at least the customer hopes that they will be), but these downstream viewers do not rely on the Cartier trademark in the same way that the surgeons using an endoscope relied on the representation that it was a genuine "Storz" endoscope. *Id.* at 856 ("A mere repair for an owner's personal use must be contrasted with a complete rebuild where the rebuilt product will be used by a third party ...."); *see also Champion Spark Plugs v. Sanders, 331 U.S. 125, 129, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947)* (explaining that marketing a product under the trademark of another "stakes the reputation of the plaintiff upon the character of the goods" (citation and internal quotation marks omitted)). Nor is there any concern that defendants are engaged in "fraud or palming off" because the modified watch is returned to the same customer at the conclusion of the transaction.

*Champion, 331 U.S. at 130* (suggesting that evidence of "fraud or palming off" would implicate unfair competition). For these reasons, the Court finds that the overall transaction, in which defendants' added diamonds and polished a stainless steel Tank Française watch at the request of a customer who had previously purchased the watch, did not constitute "use in commerce" within the meaning of the Lanham Act.

### c. *Defendants' Advertisements*

**\*9 [9][10]** Cartier also argues that defendants' use of an altered Cartier watch in its advertisements creates **initial interest confusion**. This type of confusion occurs where "potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase." *Jordache Enterprises, Inc. v. Levi Strauss & Co., 841 F.Supp. 506, 514-15 (S.D.N.Y.1993).* "Such **initial interest confusion** is sufficient to infringe a trademark." *Katz v. Modiri, 283 F.Supp.2d 883, 899 (S.D.N.Y.2003); see Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 260 (2d Cir.1987); Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway & Sons, 365 F.Supp. 707, 717 (S.D.N.Y.1973),* aff'd 523 F.2d at 1342 (2d Cir.1975) (finding that where potential purchasers of Steinway pianos were initially interested in Grotrian-Steinweg pianos because of the name, the value of Steinway's trademark could be harmed).

Notably, defendants' newspaper advertisements did not disclose that the watch pictured was not an authentic diamond-encrusted Tank Française watch. A would-be purchaser reviewing the advertisement would reasonably believe that defendants were offering a genuine Cartier item. Only when the customer called or visited the store would the customer discover that the watch was counterfeit. Thus, defendants' use of Cartier's trademark in defendants' advertisements helps defendants gain "crucial credibility during the initial phases of a deal." *Mobil Oil, 818 F.2d at 259.* To the extent defendants used this credibility to promote the sale of non-genuine diamond-encrusted Tank Française watches, this **initial interest confusion** violated Cartier's trademark.

### 3. *Permanent Injunction*

**[11][12]** The standard for a permanent injunction is

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2821535 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

straightforward: To obtain a permanent injunction, Cartier "must demonstrate (1) actual success on the merits and (2) irreparable harm." *Gucci*, 286 F.Supp.2d at 289 (citing *Wojnarowicz v. Am. Family Ass'n*, 745 F.Supp. 130, 148 n. 13 (S.D.N.Y.1990)). As discussed above, the Court finds that offering to purchase a Cartier watch on behalf of a customer and then modifying or arranging for modifications to that watch so that it will resemble a more expensive Cartier watch violates the Lanham Act.

Accordingly, the Court grants Cartier's motion for a permanent injunction against defendants. Defendants are permanently enjoined from marketing new or used Cartier watches that defendants have caused to be altered "in such a way as to deceive the general public as to the origin of the watch's craftsmanship." *Aaron Faber*, 396 F.Supp.2d 356, 361 (S.D.N.Y.2005). The scope of this injunction does not "prevent defendants from providing customization services to owners of Cartier timepieces who on their own initiative seek to personalize their Cartier watches, which they have previously purchased," *id.* at 361, through engraving, changing the bracelet, adding diamonds, are polishing.

## CONCLUSION

*10 For the reasons set forth above, the Court grants plaintiffs' motion [22] for partial summary judgment with respect to liability on its federal trademark infringement claims and grants plaintiffs' motion for a permanent injunction in the form contained herein:

1. Subject to the provisions set forth in Paragraphs 2 and 3 hereof, Defendants Symbolix, Inc. and Ahmed M. Saleh ("Defendants"), their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise are enjoined from altering, modifying, or causing to be altered or modified any "Cartier" watches, or selling, offering for sale, advertising, or distributing any "Cartier" watches that have in any way been altered or modified by any person or entity not authorized to do so by plaintiffs Cartier International, B.V. or Cartier, division of Richemont North America, Inc., including any such watches that have been modified by the setting of diamonds thereon by any person or entity not authorized by Plaintiffs.

2. Engravings and other minor modifications that do

not deceive the general public as to the origin of the watch's craftsmanship shall not constitute "altered or modified" for the purpose of this permanent injunction.

3. Nothing in the foregoing injunction shall prevent Defendants from providing aftermarket services including modifications and alterations to any customer who already owns a Cartier watch and who without solicitation requests service thereof where such service terminates in return of the watch to the same customer upon completion of such service.

SO ORDERED.

> FN1. Defendants nevertheless assert that they do not sell new watches. (Saleh Aff. ¶ 4.)

> FN2. Saleh does not contest that he discussed the sale of a watch with Braunstein but claims that he does not recall any specific details about the conversation. (Saleh Dep. Tr. at 46-7.)

> FN3. Of course, Defendants cannot and do not argue that the newspaper advertisement depicting a counterfeit Cartier watch was created at the behest of the Plaintiffs. Therefore, this consent argument, even if accepted, is fundamentally incomplete in that Plaintiffs could not possibly have consented to all of the infringing behavior at issue in this case.

> FN4. Defendants also raise the "unclean hands" defense rejected by this Court in its decision granting plaintiffs a preliminary injunction. *See Symbolix*, 386 F.Supp.2d at 362. The Court rejects this argument again for the reasons given. *Id.*

S.D.N.Y.,2006.
Cartier v. Symbolix, Inc.
--- F.Supp.2d ----, 2006 WL 2821535 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 548638 (Trial Motion, Memorandum and Affidavit) Plaintiffs Cartier, A Division of Richemont North America, Inc. and Cartier International, B.V.'s Reply Memorandum of Law in Further Support of Motions for Partial Summary Judgment and for Entry of A Permanent Injunction (Jan. 5, 2006)
• 2005 WL 3654056 (Trial Motion, Memorandum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

---- F.Supp.2d ----
---- F.Supp.2d ----, 2006 WL 2821535 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

and Affidavit) Plaintiffs Cartier, a Division of Richemont North America, Inc. and Cartier International, B.V.'s Memorandum of Law in Support of Motions for Partial Summary Judgment and for Entry of a Permanent Injunction (Dec. 1, 2005)
• <u>2005 WL 922985</u> (Trial Pleading) Complaint (Mar. 11, 2005) Original Image of this Document (PDF)
• <u>1:05cv02777</u> (Docket) (Mar. 11, 2005)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw

Not Reported in F.Supp.2d                                                                                 Page 1
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

Briefs and Other Related Documents
Deere & Co. v. MTD Holdings Inc.S.D.N.Y.,2004.
United States District Court,S.D. New York.
DEERE & COMPANY, Plaintiff,
v.
MTD HOLDINGS INC., Formerly Known as MTD
Products, Inc., Defendant.
No. 00 Civ. 5936(LMM).

Feb. 19, 2004.

**Background:** Manufacturer of lawn and garden equipment sued competitor for trademark infringement, false designation of origin and unfair competition under the Lanham Act, and unfair competition under New York law, seeking injunctive relief as well as compensatory and punitive damages.

**Holdings:** On a variety of motions, the District Court, McKenna, J., held that:

(1) colors of green and yellow generally were not entitled to trade dress protection, though the manufacturer was still entitled to protect its specific use of those colors and its overall trade dress;

(2) manufacturer proved that its colors as displayed in a specific pattern had achieved secondary meaning in the marketplace;

(3) genuine issues of material fact existed as to the similarity of the parties' products;

(4) manufacturer failed to prove that competitor acted with bad faith;

(5) manufacturer was barred by the doctrine of laches from asserting its trademark infringement and unfair competition claims with respect to some, but not all, of the competitor's products; and

(6) the competitor failed to establish the defense of acquiescence.

Ordered accordingly.
West Headnotes
[1] Trademarks 382T 1065(3)

382T Trademarks
    382TII Marks Protected
        382Tk1061 Form, Features, or Design of Product as Marks; Trade Dress
            382Tk1065 Particular Cases or Products
                382Tk1065(3) k. Functionality. Most Cited Cases
                (Formerly 382k43)
In the abstract, colors used on manufacturer's lawn and garden equipment, green and yellow, were functional and therefore not entitled to trade dress protection, though the manufacturer was still entitled to protect its specific use of those colors and its overall trade dress; if the manufacturer were able to preclude competitors from using any shade and combination of green and yellow on lawn and garden products, competitors would be placed at a significant non-reputational disadvantage. Lanham Trade-Mark Act, § 43, as amended, 15 U.S.C.A. § 1125(a)(3).

[2] Trademarks 382T 1065(2)

382T Trademarks
    382TII Marks Protected
        382Tk1061 Form, Features, or Design of Product as Marks; Trade Dress
            382Tk1065 Particular Cases or Products
                382Tk1065(2) k. Distinctiveness; Secondary Meaning. Most Cited Cases
                (Formerly 382k478)
Manufacturer of lawn and garden equipment satisfied the first element of its Lanham Act claims of trademark infringement and false designation of origin, distinctiveness, by showing that its use of the green and yellow color combination as displayed in a specific pattern on its lawn and garden equipment had achieved secondary meaning in the marketplace; manufacturer's length of use, advertising expenditures, sales success, media coverage and evidence of consumer recognition, clearly weighed in favor of finding secondary meaning for its trademarks and trade dress at issue. Lanham Trade-Mark Act, § 32, as amended, 15 U.S.C.A. § 1114(1)(a); Lanham Trade-Mark Act, § 43, as amended, 15 U.S.C.A. § 1125(a).

[3] Federal Civil Procedure 170A 2493

170A Federal Civil Procedure

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 2
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

170AXVII Judgment
   170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
         170Ak2493 k. Copyright, Trademark, and Unfair Competition Cases. Most Cited Cases
      (Formerly 382k722)
Genuine issues of material fact, especially with respect to the similarity of the parties' products, precluded summary judgment as to lawn and garden equipment manufacturer's Lanham Act claims of trademark infringement and false designation of origin under the likelihood of confusion analysis. Lanham Trade-Mark Act, § 32, as amended, 15 U.S.C.A. § 1114(1)(a); Lanham Trade-Mark Act, § 43, as amended, 15 U.S.C.A. § 1125(a).

**[4] Antitrust and Trade Regulation 29T ☞37**

29T Antitrust and Trade Regulation
   29TII Unfair Competition
      29TII(A) In General
         29Tk32 Imitation, Simulation, or Resemblance
            29Tk37 k. Color. Most Cited Cases
      (Formerly 382k403 Trade Regulation)
Manufacturer of lawn and garden equipment failed to prove that a competitor acted with bad faith intent to confuse consumers when it adopted a color scheme allegedly similar to that used by the manufacturer, thus defeating the manufacturer's claim for unfair competition under New York law.

**[5] Trademarks 382T ☞1537**

382T Trademarks
   382TVIII Violations of Rights
      382TVIII(D) Defenses, Excuses, and Justifications
         382Tk1533 Delay in Assertion of Rights; Laches
            382Tk1537 k. Prejudice from Delay. Most Cited Cases
      (Formerly 382k388)

**Trademarks 382T ☞1538**

382T Trademarks
   382TVIII Violations of Rights
      382TVIII(D) Defenses, Excuses, and Justifications
         382Tk1533 Delay in Assertion of Rights; Laches
            382Tk1538 k. Effect of Changes in Defendant's Use; Progressive Encroachment. Most

Cited Cases
      (Formerly 382k388)
Manufacturer of lawn and garden equipment was barred by the doctrine of laches from asserting its trademark infringement and unfair competition claims with respect to products of a competitor that had remained substantially the same with respect to the color scheme used for five to seven years, which included the competitor's lawn and garden tractors, walk behind mowers and snow throwers, despite claim that laches did not apply due to the competitor's failure to show prejudice and because the case was one of progressive encroachment; in addition to destroying any goodwill the competitor had built up, forcing it to change its color scheme would cause it great expense, and the products looked substantially the same as they did when they were introduced. Lanham Trade-Mark Act, § 32, as amended, 15 U.S.C.A. § 1114(1)(a); Lanham Trade-Mark Act, § 43, as amended, 15 U.S.C.A. § 1125(a).

**[6] Trademarks 382T ☞1536**

382T Trademarks
   382TVIII Violations of Rights
      382TVIII(D) Defenses, Excuses, and Justifications
         382Tk1533 Delay in Assertion of Rights; Laches
            382Tk1536 k. Length of Delay. Most Cited Cases
      (Formerly 382k387)
Manufacturer of lawn and garden equipment was not barred by the doctrine of laches from asserting its trademark infringement and unfair competition claims with respect to competitor's rear-engine mowers, which were introduced within about two years of the time suit was filed; these products clearly displayed more green than yellow, as compared to other of the competitor's products, even though they had not caused an overall change in the trade dress of the product line so as to constitute progressive encroachment. Lanham Trade-Mark Act, § 32, as amended, 15 U.S.C.A. § 1114(1)(a); Lanham Trade-Mark Act, § 43, as amended, 15 U.S.C.A. § 1125(a).

**[7] Trademarks 382T ☞1534**

382T Trademarks
   382TVIII Violations of Rights
      382TVIII(D) Defenses, Excuses, and Justifications
         382Tk1533 Delay in Assertion of Rights; Laches

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

382Tk1534 k. In General. Most Cited
Cases
        (Formerly 382k385.1)
Manufacturer of lawn and garden equipment
provided no evidence to support its argument that a
competitor acted in bad faith regarding its adoption
of a color scheme for its products, and thus, the
competitor's intent would not bar the assertion of a
laches defense to the manufacturer's trademark
infringement and unfair competition claims. Lanham
Trade-Mark Act, § 32, as amended, 15 U.S.C.A. §
1114(1)(a); Lanham Trade-Mark Act, § 43, as
amended, 15 U.S.C.A. § 1125(a).

[8] Trademarks 382T ☞1539

382T Trademarks
    382TVIII Violations of Rights
        382TVIII(D)    Defenses,    Excuses,    and
Justifications
            382Tk1539 k. Acquiescence. Most Cited
Cases
        (Formerly 382k375.1)
Alleged infringer of lawn and garden equipment
manufacturer's trade dress failed to establish the
defense of acquiescence, absent any evidence that the
manufacturer actively acquiesced in the infringer's
use of green and yellow on its lawn and garden
equipment; mere silence by the manufacturer was
not enough. Lanham Trade-Mark Act, §§ 32(1)(a),
43(a), as amended, 15 U.S.C.A. §§ 1114(1)(a),
1125(a).

*MEMORANDUM AND ORDER*
MCKENNA, J.
*1 Plaintiff Deere & Company ("Deere") brings this
action against Defendant MTD Holdings, Inc.
("MTD")    for    trademark    infringement,    false
designation of origin and unfair competition,
pursuant to Sections 32(a), 15 U.S.C. § 1114, and
43(a), 15 U.S.C. § 1125(a), of the Lanham Act.
Deere also brings suit under New York state law for
unfair competition. Plaintiff seeks injunctive relief, as
well as compensatory and punitive damages.

Presently before the Court are the following motions
which, for the reasons set forth below are disposed of
as follows: (1) Deere's motion for summary judgment
on counts one, two and three and MTD's fourth and
fifth affirmative defenses of acquiescence and
estoppel is granted in part and denied in part; (2)
MTD's motion for summary judgment dismissing the
complaint is granted in part and denied in part; (3)
MTD's motion in limine to exclude the Bunge survey

report is denied for purposes of this motion; <u>FN1</u> (4)
Deere's motion for partial summary judgment
dismissing MTD's seventh affirmative defense of
functionality is denied; and (5) Deere's cross motion
for summary judgment on MTD's third affirmative
defense of laches is denied.

        FN1. Defendant MTD submitted a motion in
        limine to exclude all evidence relating to the
        purported consumer survey conducted by
        John A. Bunge, including his expert report
        and related testimony. (Memorandum in
        Support of Defendant's Motion in Limine
        Concerning    Bunge    Expert    Report    at 1).
        Defendant argues that Plaintiff's consumer
        survey should be excluded under Rule 403
        of the Federal Rules of Civil Procedure
        because it is so flawed in methodology that
        any probative value the survey may have is
        substantially outweighed by its prejudicial
        effect. (*See id.*) The Court has considered
        Defendant's arguments regarding the alleged
        flaws in the Bunge survey in its
        determination of the summary judgment
        motions. However, the Court will not at this
        time address whether or not Mr. Bunge's
        report and related testimony concerning the
        survey results should be excluded at trial.
        Regardless, if any errors are present in the
        methodology used in conducting this survey,
        such errors generally go to the weight of the
        evidence, not its admissibility. *See Trouble
        v. Wet Seal, Inc.,* 179 F.Supp.2d 291, 307
        (S.D.N.Y.2001) (citing *Schering Corp. v.
        Pfizer, Inc.,* 189 F.3d 218, 227-28 (2d
        Cir.1999)).

                        BACKGROUND

The following facts are undisputed unless otherwise
indicated. Plaintiff Deere commenced this action on
August 8, 2000. (Compilation of MTD's Local Civil
Rule 56.1 Statement and Deere's Responses, Color-
Coded to Show Deere's Admissions ¶ 1 ("Comp.
56.1 Stmt.")) Deere is a publically held corporation
headquartered in Moline, Illinois, and generally
manufactures and sells agricultural equipment,
construction equipment and commercial and
consumer lawn and garden equipment throughout the
world. (*Id.* ¶ 2.) Included in its sales of lawn and
garden equipment are lawn tractors, walk-behind
mowers and snow throwers, all products at issue in
this action. (*Id.* ¶ 2.) MTD is a privately owned
company incorporated in 1946 and is headquartered

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

in Valley City, Ohio. (*Id.* ¶ 3.) MTD manufactures and sells lawn and garden equipment under its own brand names, which include the Yard-Man line of products, the subject of this action. (*Id.*)

### I. Deere's Trademarks and Trade Dress

On August 8, 2000, Plaintiff Deere filed a complaint with this Court alleging that MTD's Yard-Man line of lawn and garden outdoor power equipment infringed on certain of Deere's registered trademarks and unregistered trade dress. (*Id.* ¶ 1, 4.) In its supplemental response to Defendant's first set of interrogatories, Deere described its trademarks and trade dress as comprising a green color with yellow trim, including, but not limited to, Deere's trademark consisting of a horizontal yellow stripe on a green machine hood or panel, as covered by U.S. Trademark Registration No. 1,254,339, Deere's trademark consisting of a green vehicle body or frame with yellow wheels, as covered by U.S. Trademark Registration No. 1,502,103, and Deere's Trademark consisting of a green body and yellow wheels, as covered by U.S. Trademark Registration No. 1,503,576. Deere's trade dress further includes John Deere Green and John Deere Agricultural Yellow.

*2 (Binder of Exhibits to the Declaration of Robert D. Owen Submitted in Support of Defendant's Motion for Summary Judgment Ex. J at 3-4 ("Owen's Dec.").) This green and yellow color combination includes a specific shade of green referred to as "John Deere green" or "JD green" and a specific shade of yellow referred to as "John Deere yellow" or "JD yellow." (Comp. 56.1 Stmt. ¶ 6.) The green and yellow shades used by Deere have remained substantially the same since before 1980. (*Id.* ¶¶ 22-25.) MTD disputes Plaintiff's description of its trademarks and trade dress, claiming that Deere has consistently defined its trademarks and trade dress too broadly, never making mention of vehicle bodies, trim or yellow seats. (MTD's Local Civil Rule 56.1 Counterstatement ¶ 2 ("Def. Count. 56.1 Stmt.").) Deere alleges that the entire Yard-Man line of products bearing a green and yellow color combination has infringed Deere's trademarks and trade dress as described above. (Comp. 56.1 Stmt. ¶ 18.)

Deere has three registered trademarks composed of a green and yellow color combination as used on certain agricultural or lawn maintenance products: (1) '339 Registration issued in 1983 describes the mark

as consisting of "a horizontal yellow stripe on a green machine hood or panel"; (2) '103 Registration issued in 1988 describes the mark as consisting of a "green vehicle body or frame with yellow wheels"; and (3) '576 Registration issued in 1988 describes the mark as consisting of "wheeled agricultural, lawn and garden, and material handling machines" in "a bright green color, and a bright yellow color." (Owen's Dec. Ex. D at Ex. 2-4.) MTD had no knowledge of these registrations prior to the filing of this lawsuit. (Plaintiff Deere & Company's Statement of Material Facts Accompanying Plaintiff's Motion for Summary Judgment ¶ 120 ("Pl. 56.1 Stmt.").)

At no time has Deere obtained any registrations for product designs consisting of JD green in combination with other JD yellow parts such as hoods, frames, cutting decks, seats or auger blades. (Comp. 56.1 Stmt. ¶ 29.) In connection with its applications for the above registrations, Deere claimed that its specific use of JD green and JD yellow has established secondary meaning in the marketplace. (*Id.* ¶ 43.) None of Deere's agricultural or lawn care equipment displays an "®" or a "™" symbol in connection with Deere's alleged green and yellow trademarks. (*Id.* ¶¶ 46, 76.) Further, none of Deere's products display notice that its green and yellow color scheme is subject to trademark registration. (*Id.* ¶¶ 47, 77.)

In the past, Deere has used colors other than JD green and JD yellow on some of its lawn and garden equipment. For example, prior to 1998 Deere's walk-behind mowers did not use JD green at all. (*Id.* ¶ 68.) Additionally, for the past thirty years, none of the Deere lawn and garden tractors have had a yellow hood, and, other than blade housings, brand names, leaping dear symbols, stripes and model numbers, none of the lawn or garden tractors utilized a shade of yellow for its body or frame. (*Id.* ¶¶ 71, 72.) All Deere lawn and garden equipment using the JD green and JD yellow color combination have also displayed, in one or more locations, (a) the JOHN DEERE brand name, and (b) Deere's "leaping deer" symbol, both of which are registered trademarks owned by Deere. (*Id.* ¶ 74.) Deere has also manufactured handheld power tools and construction equipment using color combinations other than the green and yellow trademarks and trade dress it seeks to protect in this action. (*Id.* ¶¶ 125-131.)

*3 In addition to its agricultural products, Deere has licenced third parties to make and sell "collateral goods" such as golf shirts, jackets, t-shirts, coffee mugs, toys, fishing lures, dinnerware, serving trays

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

and ink pens with the intention, among other things, of creating awareness for Deere's "core products," *i.e.* its agricultural and consumer outdoor power equipment. (*Id.* ¶ ¶ 82, 83.) In 1995, Deere formed a "Trademark Administration Group" to "expand and promote the use of the John Deere name and trademark in nontraditional products and services" and in conjunction with the Group's formation, increased its emphasis on the production and marketing of "collateral goods." (*Id.* ¶ 85.) All of these collateral products display the John Deere name and/or the leaping deer symbol as well as the green and yellow color combination. (*Id.* ¶ 89.) By 2002, the annual sales of John Deere collateral goods amounted to approximately $200 million. (*Id.* ¶ 86.) Deere claims that its sale of collateral goods has promoted awareness of John Deere trademarks and has caused the public to further associate the green and yellow color combination with Deere. (*Id.* ¶ ¶ 90, 91.) In addition to the collateral goods, Deere has promoted its name and trademarks in various other ways including sponsoring a NASCAR racing car and team (*id.* ¶ ¶ 92-95) and sponsoring the John Deere Classic Golf Tournament (*id.* ¶ ¶ 116-124).

## II. MTD's Yard-Man Product Line

"Yard-Man" is one of the several national brands of lawn and garden power equipment manufactured and sold by MTD. (*Id.* ¶ 135.) The name "Yard-Man" is a registered trademark owned by MTD. (*Id.* ¶ 137.) In addition to the Yard-Man line of products, MTD manufactures and sells a number of other lawn and garden product lines in varying colors. (*Id.* ¶ 138.) Prior to 1992, Yard-Man equipment primarily displayed the colors orangishred with cream or beige. (*Id.* ¶ 140.)

In 1992, MTD decided to reposition its Yard-Man line as a mid-priced national brand sold in the mass retail market. (*Id.* ¶ 141.) Around the same period, MTD also decided to change the appearance of the Yard-Man product line and adopt a new color combination consisting of some variation of green and yellow. (*Id.* ¶ ¶ 142, 144.) MTD's reasons behind changing the Yard-Man lines' appearance, the actual shades of colors used, and whether the new shades and combinations of green and yellow are so similar to Deere's products as to infringe on its trademarks and trade dress, are all matters in dispute between the parties. (*Id.* ¶ ¶ 143, 145, 146.) For example, even at the most basic level, Plaintiff disputes MTD's characterization of the green color used on its products as "metallic blue-green," stating "there is

nothing 'blue' about 'Yard-Man Green.' " (Plaintiff Deere & Company's Statement of Disputed Facts Pursuant to Local Civil Rule 56.1 in Opposition to Defendant's Motion for Summary Judgment ¶ 7 ("Pl. Opp. 56.1 Stmt.").)

*4 Beginning in 1997, and continuing to date, every Yard-Man machine has been labeled "Yard-Man by MTD" and has displayed MTD's trademarked sprig-of-grass logo. (Comp 56.1 Stmt. ¶ 159.) In 1999, MTD began selling the Yard-Man "Yard-Bug" in the United States bearing a green and yellow color combination with the "Yard-Man by MTD" label and MTD's sprig-of-grass logo. (*Id.* ¶ 161, 162, 164.) Since 1993, no other product lines produced by MTD, other than Yard-Man, have displayed a green and yellow color combination. (*Id*. ¶ 168.)

In its Complaint, Deere objects to MTD's green and yellow trade dress as used on certain Yard-Man brand products, including the Yard-Man "lawn and garden tractors, riding mowers, walk-behind mowers, self-propelled mowers and snow blowers." (*Id.* ¶ 416, citing Complaint ¶ 20.)

## III. Likelihood of Confusion

Plaintiff Deere argues that the appearance of MTD's Yard-Man products is so similar to Deere's trademarks and trade dress that it is likely to cause confusion amongst consumers. MTD on the other hand argues that the colors used on Yard-Man products are visibly different from Deere's colors and are unlikely to cause confusion in the marketplace as evidenced by the fact that there has been no actual confusion in the past.

MTD points out that in the past Deere has acknowledged some very important differences between the color scheme used on the Deere products and the color scheme used on Yard-Man products. For example, Deere once represented to the Patent and Trademark Office ("PTO") that the Yard-Man green is a "darker green than the John Deere green" and that the Yard-Man garden tractors have "a yellow color on most of the visible portion of the machine." (*Id.* ¶ 173, 174, 177.) In addition, in 1995, while defending the registration of its trademarks, in response to concerns raised by the PTO that Deere might monopolize the use of the colors green and yellow on lawn and garden equipment, Deere stated that this was not a concern because green and yellow colors, similar to the shades used by Deere, could be used in numerous different

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 6
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

arrangements on a lawn and garden tractor. For example, the colors could be reversed, or applied in various stripes, or polka dots, or even combined in a manner similar to the Yardman machines, ... wherein the machine has a dark blue-green frame and mower deck, with a yellow hood and wheels.

(*Id.* ¶ 181.) Deere maintains that this statement is irrelevant to the instant action because it was made in a different context and made before MTD introduced its predominately green Yard-Man products. (Pl. Opp. 56.1 Stmt. ¶ 181.)

### A. *Actual Confusion*

MTD has been selling its Yard-Man line of products displaying some combination of green and yellow since 1993. (Comp. 56.1 Stmt. ¶ 182.) Since that time, MTD has maintained records of communications to and from actual and potential purchasers of Yard-Man products. (*Id.* ¶ 188.) After conducting a search of all its records, MTD claims that it has been unable to locate even a single customer communication indicating that he/she believed any Yard-Man product was associated, made or sponsored by Deere. (*Id.*) MTD also conducted a search of Deere's Customer Communication Center Database, which also failed to produce any reference to consumer confusion between Yard-Man and Deere products. (*Id.* ¶ 207.) Deere maintains that the fact that a search of its customer database did not turn up any references to consumer confusion is irrelevant, because if any customer inquiries were made to Deere's communication center regarding MTD's Yard-Man products, such inquiries would not have been recorded in the database and, therefore, no record would exist. (Pl. Opp. 56.1 Stmt. ¶¶ 195, 205, 207.)

*5 In September 2002, in connection with this lawsuit, Deere hired John A. Bunge to conduct a consumer survey to test the likelihood of confusion between five categories of Deere's lawn and garden products against the same five categories of MTD's Yard-Man products. (*Id.* ¶¶ 235, 236.) The products used in the survey included a lawn tractor, a rear-engine riding mower, a snow thrower and two walk behind mowers. (Declaration of Anita Tucker Smith in Support of MTD's Motion in Limine Ex. D, M.) The survey interviewed a total of 525 respondents, all of whom had either purchased lawn and garden equipment in the previous year or who were at least somewhat likely to make such a purchase in the coming year. (Pl. 56.1 Stmt. ¶ 112.) In a motion to

exclude the evidence produced by the survey, MTD argues that the methodology used in conducting the survey was so flawed that its results are wholly unreliable. [FN2] (Def. Count. 56.1 Stmt. ¶ 113.)

> FN2. Defendant argues that the survey is fundamental flawed because, among other things, it included (1) improper survey formats, (2) an inappropriate universe of respondents, (3) distortions of the purchase process, and (4) lack of appropriate control and validation procedures. (Def. Count. 56.1 Stmt. ¶ 113.) Although these arguments are not laid out in full in this opinion, as previously stated, the Court considered these arguments for purposes of the parties' motions for summary judgment.

Deere claims that the survey showed that 43.8 percent of the 525 respondents who were interviewed believed that the five categories of Deere and Yard-Man products shown to respondents were either put out by the same company, put out by companies that are associated with each other or that one company had received permission from the other company to produce the products in question. (Pl. 56.1 Stmt. ¶ 113.) MTD argues that, due to various inherent flaws in the survey, this percentage is inflated. (Def. Count. 56.1 Stmt. ¶ 113 .)

In addition to the survey evidence, to show there exists a likelihood of confusion, Deere provided testimony from various Deere dealership employees or sales representatives who purported to identify circumstances where customers exhibited confusion as to the source of MTD products. (Comp. 56.1 Stmt, ¶¶ 237-251, citing Owen's Dec. Exs. EZ, FA, FB.)

### IV. Secondary Meaning

Deere claims that it has spent $492 million from 1992-2001 in advertising and promoting its products bearing Deere's green and yellow trademarks and trade dress both in magazines and newspapers and on television. (Pl. 56.1 Stmt. ¶¶ 3-5.) MTD disputes this fact, arguing that Deere has never provided an actual breakdown of its advertising budget to indicate exactly how much was spent on advertising Deere's products bearing the green and yellow trademarks and trade dress, in comparison to advertising expenses for products bearing other color combinations. (Def. Count. 56.1 Stmt. ¶ 3.) In addition to its advertising expenditures, Deere

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

submitted to the Court numerous magazine and newspaper articles containing media coverage of Deere's agricultural products and its use of green and yellow on such products. (Pl. 56.1 Stmt. ¶ ¶ 15-21.) Whether these articles were unsolicited is a fact which remains in dispute. (Def. Count. 56.1 Stmt. ¶ ¶ 15-21.) Additionally, in the past, Deere has sought to protect its green and yellow trademarks and trade dress by enforcing its rights under the trademark laws, and has been successful in at least one lawsuit. (Pl. 56.1 Stmt. ¶ ¶ 22-24, citing *Unverfeth Mfg. Co., Inc. v. Deere & Co.,* No. C88-7719, 1990 U.S. Dist. LEXIS 18446 (N.D.Ohio, Sept. 28, 1990).)

### A. *Deere's Brand "Revitalization" Program*

**\*6** Since the formation of its Trademark Administration Group in 1995, Deere has made substantial "revitalization" efforts in an attempt to dramatically strengthen the John Deere brand name. (Comp. 56.1 Stmt. ¶ 373.) Included in these revitalization efforts were, among other things, the sale of collateral goods, NASCAR sponsorship and sponsorship of the John Deere Golf Tournament. (*Id.* ¶ 374.) To assist in its marketing efforts, Deere hired Landor Associates ("Landor") to provide advice on how to strengthen brand awareness. (*Id.* ¶ 375.) Among the recommendations given by Landor was that Deere should assert ownership over its green and yellow trademarks and trade dress because "color ownership is a rare and valuable asset that should be leveraged." (*Id.* ¶ 377 .) Deere's brand "revitalization" program was aimed at changing consumers' perceptions of the John Deere "brand" and its perceived "equities," including Deere's alleged "green and yellow color combination." (*Id.* ¶ 382.) Between 1992 and 1996, Deere increased the advertising of its lawn and garden products relative to the amount of advertising done by its competitors. (*Id.* at 383.) During the same time frame, Deere's "share of voice" increased from 24 percent in 1992 to 33 percent in 1996. (*Id.* ¶ ¶ 383, 384.)

### DISCUSSION

### I. Legal Standard

A court may grant summary judgment when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Hermes Int'l v. Lederer De Paris Fifth Avenue, Inc.,* 219 F.3d 104, 107 (2d Cir.2000) (citing

Fed.R.Civ.P. 56(c)). "A dispute is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ' *Nabisco, Inc. v. Warner-Lambert Co.,* 220 F.3d 43, 45 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Furthermore, all inferences must be drawn in favor of the nonmoving party. *Hermes Int'l,* 219 F.3d at 107.

However, "[w]hile all ambiguities in the evidentiary record must be resolved in favor of the nonmoving party, 'the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." ' *Best Cellars, Inc. v. Wine Made Simple, Inc.,* No. 01 Civ 11780, 2003 U.S. Dist. LEXIS 3958, at \*10 (S.D.N.Y. March 11, 2003) (quoting *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998)). Additionally, only disputes over material facts-facts that might affect the outcome of the suit-will preclude the entry of summary judgment. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248).

### II. Functionality

[1] Deere moves for partial summary judgment dismissing MTD's seventh affirmative defense of functionality, claiming that Deere's assertions of ownership over its registered trademarks and unregistered trade dress consisting of green and yellow as applied to its lawn and garden equipment does not unfairly limit other manufacturers' range of adequate alternative designs. (Plaintiff Deere & Company's Memorandum of Law in Support of its Motion for Partial Summary Judgment Dismissing Defendant MTD Products Inc.'s Seventh Affirmative Defense at 1, 3. ("Pl.Func.Mem.").) MTD argues that Deere's trademarks and trade dress are functional because the green and yellow color combination as used on its lawn and garden equipment is a useful product feature, and if Deere were granted exclusive ownership over these colors, other manufacturers would be at a significant non-reputational disadvantage. (MTD's Memorandum of Law in Opposition to Deere's Motion for Summary Judgment Dismissing Functionality Defense at 3, 4 ("Def.Opp.Func.Mem.").)

**\*7** The functionality doctrine "forbids the use of a product's feature as a trademark where doing so will put a competitor at a significant disadvantage because the feature is 'essential to the use or purpose of the article' or 'affects [its] cost or quality." ' *Qualitex*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

_Co. v. Jacobson Products Co._, 514 U.S. 159, 169, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (quoting _Inwood Laboratories, Inc. v. Ives Laboratories, Inc._, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (alteration in _Qualitex_ )). The underlying policy of the functionality doctrine is to preserve competition " 'by ensuring competitors the right to compete effectively." ' _GTFM, Inc. v. Solid Clothing, Inc._, No. 01 Civ. 2629, 2002 U.S. Dist. LEXIS 24620, at *12 (S.D.N.Y. Dec. 27, 2002) (quoting _Valu Engineering, Inc. v. Rexnord Corp._, 278 F.3d 1268, 1277 (Fed.Cir.2002)). "Where trade dress involves an aesthetic feature, that feature is functional 'if the right to use it exclusively would put competitors at a significant non-reputation-related disadvantage." ' _Yurman Designs, Inc. v. Golden Treasure, Imps., Inc._, 275 F.Supp.2d 506, 511 (S.D.N.Y.2003) (quoting _Yurman Design, Inc. v. PAJ, Inc._, 262 F.3d 101, 116 (2d Cir.2001)); _see also Waddington North America Bus. Trust v. EMI Plastics, Inc._, No. 02-CV-3781, 2002 U.S. Dist. LEXIS 16634, at *10 (E.D.N.Y. Sept. 5, 2002) (holding that the functionality doctrine applies even to features of a product that are ornamental, and prevents the exclusive use of functional features that "would put competitors at a significant non-reputation related disadvantage"; _Traffix Devices, Inc. v. Marketing Displays, Inc._, 532 U.S. 23, 33, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (holding that if the product feature is an aesthetic rather than utilitarian feature, it is appropriate to consider whether protecting it from infringement will place competitors at a "significant non-reputation-related disadvantage").

MTD is correct that in an action for trade dress infringement brought under 15 U.S.C. § 1125(a), Congress has placed the burden on the plaintiff to show that its unregistered trade dress is non-functional. _See_ Trademark Amendments Act of 1999 § 5, Pub.L. 106-43 (August 5, 1999), codified at 15 U.S.C. § 1125(a)(3)("In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."). However, the burden to show functionality with respect to Deere's registered trademarks lies with the Defendant. _See id._ at § 1125(a).

After reading the numerous motions submitted in this action, it still remains somewhat of a mystery exactly what Deere seeks to protect. MTD consistently argues throughout its various 56.1 statements and

motion papers that Deere seeks exclusive ownership over the colors green and yellow, and that Deere's definitions of its trademarks and trade dress are too vague and broad. (_See e . g._ Comp. 56.1 Stmt. ¶ 492.) Deere's responses to MTD's arguments have been varied and ambiguous. In some of its motion papers, Deere appears to be arguing it is entitled to exclusive ownership over the green and yellow color combination (_see_ Pl. Func. Mem. at 2, 6 ("granting Deere exclusive rights in its green and yellow color combination would not significantly hinder competition")), while in other motion papers Deere argues that it seeks only to prevent other manufacturers from marketing products bearing trademarks and/or trade dress that are confusingly similar to its own (_see_ Plaintiff Deere & Company's Reply Memorandum of Law in Support of its Motion for Summary Judgment on Defendant MTD Holdings Inc.'s Seventh Affirmative Defense at 1 ("Pl.Func.Rep.Mem.") ("[t]he functionality of green and yellow in general is irrelevant since neither Deere's Trademarks nor Deere's trade dress claim exclusive ownership of green and yellow"); _see also_ Plaintiff Deere & Company's Memorandum of Law in Opposition to Defendant MTD Holdings Inc.'s Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment on Defendant's Third Affirmative Defense at 1 ("Pl. Opp. SJ Mem.") ("MTD ... incorrectly alleges that Deere is seeking to bar all uses of green and yellow rather than merely those that are confusingly similar")). It is important to address this ambiguity now before entering into the likelihood of confusion analysis.

*8 MTD argues that if Deere were able to preclude MTD and other manufacturers from using any shade and combination of green and yellow on lawn and garden products, it and all other manufacturers would be placed at a significant non-reputational disadvantage. (Def. Opp. Func. Mem. at 1.) The Court agrees. If this Court were to allow Deere exclusive ownership rights over the colors green and yellow, other manufacturers could similarly claim ownership over the color combinations used on their own lawn and garden products until there were no alternatives left. This result does not comport with the underlying policies of the Lanham Act, and would place other manufacturers at a "significant non-reputational disadvantage." Therefore, to the extent Plaintiff seeks to assert exclusive ownership over green and yellow, or to prevent other manufacturers from using these colors generally, it simply is not entitled to such broad protection.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

Such a claim is similar to the claim made by the plaintiff in *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76 (2d Cir.1990). In *Wallace*, the plaintiff sought protection under the trademark laws for a basic style and pattern of silverware known as the "baroque" decorative style. *Id.* at 77-78. The Court held that the plaintiff's claims were barred by the doctrine of functionality because plaintiff sought "trademark protection, not for a precise expression of decorative style, but for basic elements of a style that is part of a public domain." *Id.* at 81. The Second Circuit explained that there was "no distinction between a claim to exclude all others from use on silverware of basic elements of a decorative style and claims to generic names, basic colors or designs important to a product's utility." *Id.* Such exclusion the Court held, would significantly hinder other competitors from competing successfully by limiting adequate available alternative designs. *Id.* Similarly, if this Court were to grant Deere exclusive trademark protection over the general use of basic colors (green and yellow), such protection would significantly hinder competition by limiting the range of adequate alternative designs available to other manufacturers. Therefore, under the doctrine of functionality, the Court cannot grant Deere such broad protection.

However, this does not mean that Deere is precluded from seeking to protect its specific trademarks and trade dress of green and yellow as applied to its lawn and garden products, or from preventing other manufacturers from producing and marketing products so similar to its own that they are likely to cause confusion amongst consumers as to the sponsorship or origin of the products. *See id.* at 82 ("Of course, if *Wallace* were able to show secondary meaning in a precise expression of baroque style, competitors might be excluded from using an identical or virtually identical design. In such a case, numerous alternative baroque designs would still be available to competitors.").

*9 MTD's other arguments, including that the use of green and yellow on lawn care equipment is functional because these colors represent the association between lawn and garden products and the natural environment in which they are used (*see* Comp. 56.1 Stmt. ¶ 502), the Court finds unpersuasive.

Therefore, while the Court accepts MTD's argument that green and yellow in the abstract are functional and not entitled to protection, Deere is still entitled to protect its specific use of these colors and its overall trade dress. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir.1995).

For the foregoing reasons, under the doctrine of functionality, Deere cannot establish an exclusive right to the use of the colors green and yellow, and may not prevent MTD from using these colors, as long as they are not used on MTD's lawn and garden equipment in a manner so similar to Deere's use that MTD's products are likely to cause confusion in the marketplace as to their sponsorship or origin.

Accordingly, Deere's motion for partial summary judgment dismissing MTD's affirmative defense of functionality is denied, and MTD's motion for summary judgment is granted to the extent Deere seeks to prevent MTD from using green and yellow in the abstract, *i.e.*, other than as specifically applied to products in a manner likely to cause consumer confusion.[FN3]

> FN3. This conclusion thereby eliminates the need to address Defendant's concern that Deere will corner the market by obtaining exclusive ownership rights over the use of green and yellow on lawn and garden equipment.

### III. Trademark Infringement

The purpose of the Lanham Act is to protect consumers and manufacturers from "deceptive representations of affiliation and origin." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 375 (2d Cir.1997). "[T]he Lanham Act must be construed in light of a strong federal policy in favor of vigorously competitive markets." *Id.* at 379. The Lanham Act prohibits the use of

any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or cause mistake, or to deceive.

15 U.S.C. § 1114(1)(a). The Lanham Act also states that any person who uses in commerce any symbol thatis likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 10
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

15 U.S.C. § 1125(a).

To succeed on a claim of trademark infringement under 15 U.S.C. § 1114(1)(a), or false designation of origin under 15 U.S.C. § 1125(a), a plaintiff must prove the same elements: (1) that the mark is distinctive, either inherently or through secondary meaning, and (2) that there exists a likelihood of confusion.[FN4] *Yurman Design, Inc., 262 F.3d at 115* (citing *Wal-Mart Stores v. Samara Bros., 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000)*). While both factors must be established, the central inquiry is whether there exists a likelihood of confusion, either because consumers are misled or confused as to the source of the goods in question, or there is confusion as to the sponsorship of the junior mark. *La Cibeles, Inc v. Adipar, Ltd.,* No. 99 Civ. 4129, 2000 U.S. Dist. LEXIS 12676, at *11-*12 (S.D.N.Y. Sept. 1, 2000).

> FN4. Claims under § 32 also require a showing that the relevant mark is registered. *Cartier, Inc. v. Four Star Jewelry Creations, Inc.,* No. 01 Civ. 11295, 2003 U.S. Dist. LEXIS 7844, at *23 (S.D.N .Y. May 8, 2003).

**10 Protection of trademarks under § 43 extends to trade dress. See *Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 773, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).* "The concept of trade dress encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer." *Fun-Damental Too, Ltd. v. Gemmy Industries Corp.,* 111 F.3d 993, 999 (2d Cir.1997).

### A. Distinctiveness and Secondary Meaning

[2] To be entitled to protection under the federal trademark laws, a mark must either be inherently distinctive or have acquired secondary meaning. *Yurman Design, Inc., 262 F.3d at 115.* As this Court has previously held, because the trademarks Plaintiff seeks to protect in this action consists solely of colors and because its trade dress is categorized as product design, Plaintiff's trademarks and trade dress are not inherently distinctive. *See Deere & Co. v. MTD Holdings, Inc.,* No. 00 Civ. 5936, 2003 U.S. Dist. LEXIS 19161, at *6-*10 (S.D.N.Y. Oct. 27, 2003). Therefore, in order to establish that its marks and trade dress are distinctive and entitled to protection under the trademark laws, Deere must show

secondary meaning. *Id.* Secondary meaning means that " 'in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself." ' *Yurman Design, Inc., 262 F.3d at 115* (quoting *Wal-Mart, Inc., 529 U.S. at 210-11* (alteration in *Yurman* )).

The determination of whether a trademark or trade dress has acquired secondary meaning is a factual inquiry "requiring consideration of the following factors: (1) advertising expenditures, (2) consumer studies linking the mark to the source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Waddington North America Business Trust,* 2002 U.S. Dist. LEXIS 16634, at *15 (citing *Centaur v. Communications, Ltd. v. A/S/M Communications, Inc., 830 F.2d 1217, 1222 (2d Cir.1987)*); *see also Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,* 973 F.2d 1033, 1041 (2d Cir.1992). No single factor will be determinative and the fundamental question, "is whether 'the primary significance of the [mark] in the minds of the consuming public is not the product but the producer." ' *Bristol-Myers Squibb Co., 973 F.2d at 1041* (quoting *Centaur Communications, 830 F.2d at 1221*). The secondary meaning inquiry is the same for trademarks and trade dress. *Id.* at 1042.

Deere's length of use, advertising expenditures, sales success, media coverage and evidence of consumer recognition, clearly weigh in favor of finding secondary meaning for Deere's trademarks and trade dress at issue. Deere has been using its green and yellow color combination in a specific pattern on its agricultural products since the early 1900s and on its lawn and garden products since 1963. (Plaintiff Deere & Company's Memorandum of Law in Support of its Motion for Summary Judgment on Deere's Trademark Infringement (Count I), Federal Unfair Competition (Count II) and New York Unfair Competition (Count III) Claims and MTD's Fourth and Fifth Affirmative Defenses at 15, citing Exs. 10-12 Deere's U.S. Trademark Registrations ("Pl. SJ Mem.").) From 1992 through 2001 alone, Deere spent $492 million on advertising products bearing the green and yellow trade dress ($166 million on advertising agricultural products and $326 million on advertising its lawn and garden products), and has unquestionably become known for its use of such color combinations and overall trade dress. (*Id.* at 10.) MTD argues there is no evidence that the media coverage submitted by Deere was unsolicited; however, it seems unlikely that all of the media attention submitted was solicited by Deere. (Pl. SJ

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 11
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

Mem. Ex. 22.) Furthermore, the Bunge consumer survey submitted by Deere in support of its contention that there exists a likelihood of confusion, while possibly problematic in terms of some of the methodology used, at the very least does support the fact that an overwhelming majority (approximately 91.2 percent) of the respondents identified the Deere products as being made by the Deere Company. (*Id.* Ex. 8 at 3.)

**\*11** In addition, Deere's sales success also supports a finding of secondary meaning. From 1992 through 2001, Deere sold approximately $43.3 billion worth of equipment bearing its green and yellow trade dress ($26 million of agricultural equipment and $17.3 billion of consumer & commercial equipment). (*Id.* at 12; *see also* Pl. Opp. SJ Mem. at 25, citing Pl. SJ Mem. Exs. 21, 95.) Finally, even one of MTD's surveys shows that when lawn tractor owners and prospective purchasers are asked to name lawn tractor brands, John Deere comes to minds most frequently. (Pl. SJ Mem. Ex. 61 at M030500 .)

Accordingly, Deere has satisfied the first element of a trademark claim, distinctiveness, by showing that its use of the green and yellow color combination as displayed in a specific pattern on its lawn and garden equipment has achieved secondary meaning in the marketplace.

### B. Likelihood of Confusion

**[3]** While distinctiveness of a mark is an important element in a case for trademark infringement, the central inquiry is whether the public is likely to be confused as to the source or sponsorship of the products in question. *See La Cibeles, Inc.*, 2000 U.S. Dist. LEXIS 12676, at \*11-\*12. The Second Circuit has set forth the following eight non-exclusive factors, first enunciated by Judge Friendly in *Polaroid Corp. v. Polarad Electronic Corp.*, 287 F.2d 492, 495 (2d Cir.1961), to be considered when determining whether a likelihood of confusion exists: (1) the strength of plaintiff's mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will bridge the gap; (5) actual confusion; (6) the defendant's intent in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group.[FN4] *See Nabisco*, 220 F.3d at 46. None of the eight Polaroid factors are dispositive of the likelihood of confusion inquiry and the " 'court should focus on the ultimate question of whether consumers are likely to be

confused." ' *Id.* at 46 (quoting *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 584 (2d Cir.1993)). Moreover, " 'a likelihood of confusion means a probability of confusion; it is not sufficient if confusion is merely possible." ' *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 121 (2d Cir.2001) (quoting *Estee Lauder, Inc. v. Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir.1997)); *see also Streetwise Maps, Inc. v. VanDam, Inc.,*, 159 F.3d 739, 743 (2d Cir.1998) ("To support a finding of infringement, a probability of confusion, not a mere possibility, must exist. A probability of confusion may be found when a large number of purchasers likely will be confused as to the source of the goods in question." (internal citations omitted)).

> **FN5.** The Second Circuit has held that the court should apply the same likelihood of confusion considerations in both trademark infringement and trade dress infringement cases. *See Cumberland Packing Corp. v. Monsanto Co.*, 32 F.Supp.2d 561, 568 (E.D.N.Y.1999) (citing *Bristol-Myers Squibb Co.*, 973 F.2d at 1043).

" 'Questions regarding likelihood of confusion are normally factual in nature,' given the complexity of the test and the likelihood of material factual disputes about a number of the factors." *Best Cellars*, 2003 U.S. Dist. LEXIS 3958, at \*28 (quoting *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 116 (2d Cir.1984)). Therefore, " 'if a factual inference must be drawn to arrive at a particular conclusion on a Polaroid factor, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve the issue on summary judgment." *Id.* at 30 (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir.1996)).

### 1. Strength of the Marks

**\*12** The strength of a mark or trade dress is "measured by its distinctiveness or the degree to which it indicates the source or origin of the product," ... and "should be examined in its commercial context." *Bristol Myers Squibb Co.*, 973 F.2d at 1044 (citations omitted). In support of the strength of its mark, Plaintiff has provided numerous newspaper and magazine articles indicating brand awareness and press coverage of its green and yellow trademarks and trade dress. (*See* Pl. SJ Mem. Exs.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.