Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

22-24.) Whether or not these articles were solicited or unsolicited remains in dispute between the parties. (Pl. 56.1 Stmt. ¶ ¶ 15-21; Def. Opp. 56.1 Stmt. ¶ ¶ 15-21.) Regardless, as discussed previously, it is clear that Deere's products have received a good deal of media attention, have high consumer brand awareness and have enjoyed great sales success. In addition, both parties have provided the court with various brand awareness studies which all seem to indicate that Deere has a high level of recognition amongst the public. Furthermore, from 1992-2001, Deere spent approximately $492 million in advertising and marketing its products bearing its various trademarks including its green and yellow color combination, John Deere name and leaping deer logo.

Accordingly, in light of all the evidence submitted, it can fairly be said that Deere's trademarks and trade dress, including its use of the JD green and JD yellow color combination as applied to its lawn and garden equipment, are relatively strong marks in the industry and weigh in favor of Deere's trademark infringement claims.

### 2. Similarity of the Parties' Marks

When analyzing whether two marks are confusingly similar, the court must " 'appraise the overall impression created by ... the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers.' " *Nabisco Inc., 220 F.3d at 47* (quoting *Streetwise Maps, Inc., 159 F.3d at 744); see also Cumberland Packing Corp., 32 F.Supp.2d at 569* ("The relevant inquiry is not how many details the two [products] share. It is whether the similarities create the same general, overall impression such as to make likely the requisite confusion among the appropriate purchasers."). "Courts are instructed to proceed very carefully with respect to the similarity of the overall impression of trade dress, because issues of consumer confusion are normally factual in nature and thus rarely appropriate for summary judgment." *Best Cellars, Inc.*, 2003 U.S. Dist. LEXIS 3958, at *48-49 (citing *Universal City Studios, 746 F.2d at 116).*

While Defendant argues that the green and yellow colors used on its Yard-Man Products are visibly different from the green and yellow colors used on the Deere products (Comp. 56.1 Stmt. ¶ ¶ 8, 9), Plaintiff argues that, even if the colors alone are distinguishable, the commercial impression created

by the color combinations are confusingly similar (Pl. Opp. 56.1 Stmt. ¶ 8, 9). It is undisputed that both Plaintiff's and Defendant's trade dress consists of some combination of green and yellow. However, it is greatly disputed exactly what shades of these colors are used, whether these colors have remained consistent over time, and whether the use of these colors results in an overall similarity between the products. All of these material disputes weigh against the grant of summary judgment for either party.

*13 In addition, Defendant argues that even if there were a possibility that consumers could initially be confused as to the source of the products in question, the presence of MTD's name and sprig of grass logo prominently displayed on all of its products would dispel any potential confusion that Deere manufactured the Yard-Man products. (Memorandum in Support of Defendant's Motion for Summary Judgment at 12-13 ("Def. SJ Mem.").) While MTD is correct that when a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened, *see W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 573 (2d Cir.1993); see also Nabisco, 220 F.3d at 46* (defendant's "prominent use of its well-known house brand ... significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products"); *Bristol-Myers Squibb Co., 973 F.2d at 1046* ("the prominent presence of well known trade names goes far toward countering any suggestion of consumer confusion arising from any of the other Polaroid factors"), and here each product in question bears the name "Yard-Man by MTD" and MTD's sprig of grass logo, Defendant has not provided sufficient evidence leading to only one possible conclusion that the presence of MTD's name and logo on its Yard-Man products would immediately distinguish the line from other lines of lawn and garden equipment, specifically Deere products. *See Bristol-Myers Squibb Co., 973 F.2d at 1047* ("the junior user's trade name may less strongly identify a particular source than the 'Tylenol' name at issue here" and therefore, may have "less force in countering other similarities between two trade dresses").

Therefore, because reasonable consumers could believe that the similarities between Plaintiff's and Defendant's products outweigh the differences or vice versa, whether the products are similar enough to sustain a trademark claim is a genuine issue of material fact in dispute and therefore inappropriate for summary judgment in favor of either party.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 13
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

### 3. Proximity of the Products & Bridging the Gap

The proximity of the products inquiry considers whether and to what extent the parties compete in the same market. *Waddington North America Business Trust*, 2002 U.S. Dist. LEXIS 16634, at *21. "Bridging the gap concerns the need to protect a plaintiff's interest in being able 'to enter a related field at some future time,' even if plaintiff's and defendant's products do not presently compete in the same field." *Id.* at *21-*22 (quoting *Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167, 1172 (2d Cir.1976)).

For many years, Deere has positioned itself as a "premium brand" of lawn and garden products which have primarily been sold through John Deere dealerships. (Comp. 56.1 Stmt. ¶ ¶ 260, 261.) Alternatively, MTD's Yard-Man line of products have generally been sold in the mass channel, at stores such as Lowe's, Home Depot and Wal-Mart, with some sales at hardware stores such as True Value. (*Id.* ¶ 267.) Deere initially sought to compete in the mass channel with its Sabre and Scotts brands of lawn and garden products and continued to seek to compete in that market in 2003 with its introduction of the "100 Series." (*Id.* ¶ ¶ 268-273.) The "100 Series" products are available at Home Depot as well as John Deere dealerships. (*Id.* ¶ 273.) Prior to 2003, the lowest-priced Deere lawn tractor retailed for approximately $1999 (*id.* ¶ 286) while the lowest-priced MTD lawn tractor retailed for much less (*id.* at 253).

**\*14** Therefore, while each manufacturer produces similar products, each company sells in slightly different markets, Deere in the premium market, and MTD in the mid-priced market. However, although differently priced, the products are often compared with one another in consumer reports and each company targets the same national audience with the products it manufactures, those seeking to purchase equipment to maintain their lawns and gardens. (*See* Owen's Dec. Exs. DS-DZ.) Thus, although the parties sell their products in slightly different markets, the companies are generally in direct competition with each other when it comes to the sale of their lawn and garden equipment. Accordingly, there is no gap to be bridged.

### 4. Actual Confusion

Plaintiff has introduced testimony and affidavits from Deere dealership representatives and other sales representatives indicating that there have been instances in the past of customer confusion over the source of MTD's products. (Pl. SJ Mem. Exs. 5-7.) For example, Randal Worzalla, an employee at Rapids True Value Hardware, recounted two incidents of customer confusion. The first of these incidences involved a woman who, while looking at a Yard-Man display said, "look at the John Deere's," took a closer look and then said "oh these aren't John Deere, they're Yard-Man." (*Id.* Ex 5; *see also id.* Ex. 7 (customer asking if Yard-Man was made by John Deere). However, "[i]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed such inquiries are arguably premised upon a lack of confusion between the products such as to inspire the inquiry itself." *Nora Beverages, Inc.*, 269 F.3d at 124 (finding inquiries made by distributers to plaintiff spring water seller sales managers regarding whether plaintiff was affiliated with other spring water sellers in the industry did not show actual confusion). Furthermore, "there is a difference between isolated expressions of momentary confusion and confusion that leads to actual purchasing decisions." *Trustees of Columbia University In The City of New York v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 747 (S.D.N.Y.1997); *see also La Cibeles, Inc.*, 2000 U.S. Dist. LEXIS 12676, at *31-*32.

Plaintiff has not introduced any evidence showing even a single instance where a customer purchased an MTD lawn or garden product under the erroneous assumption that it was manufactured by Deere or vice versa. In fact, the only evidence offered by Plaintiff that could possibly satisfy the actual confusion factor is the consumer survey conducted by John A. Bunge. However, at the very least, this survey is far from representative of the purchasing process. Accordingly, this factor weighs in MTD's favor.

#### a. *Initial and Post-Sale Confusion*

As Plaintiff argues, in some circumstances, infringement can be based upon confusion that creates initial customer interest or post-sale confusion, even if such confusion does not result in the actual sale of a product. *See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway & Sons*, 523 F.2d 1331, 1341-42 (2d Cir.1975); *see also* McCarthy on Trademarks § 23:6 (4th Ed.2000). Initial interest confusion can support a finding of a likelihood of confusion even though the purchaser becomes aware of the source's actual identity and no

purchase is made as a result of the confusion. *Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.*, 269 F.3d 270, 294 (3rd Cir.2001). The Seventh Circuit has analogized initial interest confusion to a "bait and switch" type of situation where a junior user creates a similar product to a senior user's mark hoping to capitalize on any goodwill the senior user has created to attract consumers to its products. *Id.* (citing *Dorr-Oliver Inc. v. Fluid-Quip, Inc.*, 94 F.3d 276, 382 (7th Cir.1996)).

**\*15** At the very least, "[p]roduct relatedness and level of care exercised by consumers are relevant factors in determining initial interest confusion." *Id.* at 296. Additionally, most of the cases where a court has found initial interest confusion or post-sale confusion supported of a finding of a likelihood of confusion, involved essentially identical marks and/or evidence of intentional deception on the part of the defendant. *See e.g. Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir.1987); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf.* 523 F.2d at 1341-42; *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir.1986). Neither of these elements are present here.

While evidence of initial interest confusion is not irrelevant to the likelihood of confusion analysis in this case, the evidence provided by Deere does not weigh heavily in favor of finding a likelihood of confusion. Unlike the cases cited above, while the products in this case may be similar, they certainly are not identical. Furthermore, as explained below, Deere has not provided any evidence that MTD adopted its new color scheme with the intention of trading off of Deere's goodwill. In fact, the only evidence Plaintiff has provided to support its conclusion that there is a probability of initial interest confusion, is anecdotal testimony from various Deere employees and sales representatives who recounted a few instances where customers exhibited initial confusion as to the affiliation or sponsorship of MTD's Yard-Man products. (*See* Pl. SJ Mem. Ex. 5-7.) First, this evidence potentially raises issues of bias because all of the testimony comes from Deere employees or sales representatives. Second, and more importantly, even if these instances occurred, there is no evidence that this initial confusion led any of these customers to consider purchasing an MTD product at all, let alone because of its allegedly similar look to Deere products. Additionally, Plaintiff has not provided any evidence that MTD adopted its green and yellow color combination with the intention of deceiving consumers and/or capitalizing on Deere's goodwill.

Finally, all of the products at issue in this action are expensive items-a fact which tends to heighten the degree of care used by consumers when making purchasing decisions. *See La Cibeles, Inc.*, 2000 U.S. Dist. LEXIS 12676, at \*38. This heightened degree of care works to dispel any possible initial confusion, were such confusion to exist. Therefore, while Plaintiff has provided some minimal evidence of initial consumer confusion, this evidence is certainly not sufficient for a grant of summary judgment. At most, it creates a possible issue of fact for trial.

Similarly, while post-sale confusion is also actionable under the Lanham Act, *see Lois Sportswear, U.S.A., Inc.*, 799 F.2d at 873, the only evidence Plaintiff has provided that post-sale confusion has occurred or could occur in the future is a quote in a magazine article by a Lowe's employee stating that, "because of MTD's green and yellow color, from across the street, your neighbor's going to think you own a Deere." (Pl. SJ Mem. Ex. 4 at 2 .) This one statement is certainly not conclusive evidence that there exists a probability of post-sale confusion sufficient for a grant of summary judgment.

### 5. Intent

**\*16** Under the Polaroid intent factor, the Court must consider "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Nora Beverages, Inc.*, 269 F.3d at 124 (quoting *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir.1991)). "While intentional copying can raise a presumption of consumer confusion, it is also true that the intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product. Only the latter form of imitation is bad-faith copying." *Best Cellars Inc.*, 2003 U.S. Dist. LEXIS 3958, at \*42 (citing *Paddington Corp. v. Attiki Imports & Distributors, Inc.*, 996 F.2d 577, 586 (2d Cir.1993); *Streetwise Maps, Inc.*, 159 F.3d at 745.); *see also Regal Jewelry Co. v. Kingsbridge International, Inc.*, 999 F.Supp. 477, 492 (S.D.N.Y.1998) ("By itself, the act of copying a product's packaging does not create an inference that a defendant intended to cause confusion with the senior user's product."; *Tough Traveler, Ltd. v. Outbound Products*, 989 F.Supp. 203, 215 (N.D.N.Y.1997) ("It cannot automatically be inferred that intentionally copying a plaintiff's trade dress is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

for the purpose of deceiving or confusing consumers as to the source of the product.").

MTD maintains that it never intended to copy Deere's trademarks or trade dress or capitalize on Deere's goodwill. (Def. SJ Mem. at 38-41.) In fact, various MTD employees have testified that they believed they were coming up with a look that was "distinct and different" from anything on the market. (See e.g. Pl. SJ Mem. Ex. 45 at 58.) Furthermore, MTD has provided the Court with a variety of reasons for adopting the new Yard-Man colors in 1992, including the facts that the colors represented scenes from nature such as grass and sunshine, that the colors were functional, as green does not show grass stains and yellow seats do not get hot in the sun, that green was considered a hot new color on Dupont's Automotive Color Popularity Report, and that the two colors looked good together. (Id. Ex. 35 at 22-23.) See W.W.W. Pharmaceutical, 984 F.2d at 575 ("[g]ood faith can be found if a defendant has selected a mark which reflects the product's characteristics").

Alternatively, the only evidence Plaintiff has produced to refute Defendant's explanations and to show MTD adopted green and yellow in bad faith with the intention of capitalizing on Deere's goodwill, is the simple fact that MTD knew that Deere used green and yellow on its lawn and garden products at the time MTD adopted its new Yard-Man color scheme in 1992. Even if the Court were to find MTD in fact copied Deere's products, which the Court has not, this evidence alone falls short of showing that MTD intended to promote confusion between the products or appropriate Deere's goodwill. Tough Traveler, 989 F.Supp. 203, 215 ("in the absence of evidence, apart from proof of copying, that the defendant sought to confuse consumers, bad faith should not be inferred simply from the fact of copying"). Accordingly, because there is no evidence that MTD acted with a bad faith intent to confuse consumers when it adopted its new Yard-Man color scheme in 1992, the Court will not presume bad faith.

### 6. Quality of Defendant's Products

**\*17** This element " 'is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." ' Trustees of Columbia University, 964 F.Supp. at 748 (quoting Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 398 (2d Cir.1995)). Plaintiff Deere has not introduced any

evidence showing that MTD's products have jeopardized its reputation in the marketplace or that MTD's use of green and yellow on its products has caused the Plaintiff to lose any revenue. Additionally, there is no evidence that Deere's internal business plans have ever characterized MTD's products as lacking in quality or durability, but instead have generally characterized "quality" as a "competency" of MTD. (Comp. 56.1 Stmt. ¶ 313-314.) Therefore, this factor does not assist Plaintiff in its claim.

### 7. Sophistication of Consumers

"The more sophisticated the consumers, the less likely they are to be misled by similarity in marks." TCPIP Holding Co. v. Haar Communications, Inc., 244 F.3d 88, 102 (2d Cir.2001). When analyzing the sophistication of customers, the court must consider " 'the general impression of the ordinary purchaser, buying under normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." ' Merriam-Webster, Inc. v. Random House, Inc., 35 F.3d 65, 72 (2d Cir.1994) (quoting McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126, 1137 (2d Cir.1979)).

The lawn and garden products at issue in this litigation are expensive items not normally subject to impulse buying.[FN6] Additionally, when purchasing these products, a customer would require at least some interaction with sales personnel, who presumably would be able to dispel any possible initial confusion as to the source of the products in question, were such confusion even to exist. Therefore, due to the size of the investment being made and the likelihood of involvement of sale personnel in the purchasing process, purchasers of lawn maintenance equipment would most likely exercise a high degree of care, which is usually adequate to avoid confusion. La Cibeles, Inc., 2000 U.S. Dist. LEXIS 12676, at \*38 ("Individuals purchasing costly products are likely to exercise a high degree of care."). Accordingly, this factor weighs in MTD's favor.

FN6. In 2003 price ranges for the various relevant categories of Yard-Man equipment are as follows: (a) Garden Tractors: $2,299.99-$3,899.99; (b) Lawn Tractors: $1,299.99-$2,299.99; (c) Rear-engine riding mower: $1,199.99; (d) Walk-behind mowers: $189.99-$499.99; and (e) Snow

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

Throwers: $169.99-$2,499.99. (Comp. 56 .1 Stmt. ¶ 253.) In 2003 price ranges for similar Deere's products are as follows: (a) Garden Tractors: $4,299-$12,599; (b) SpinSteer Tractors: $2,999-$4,199; (c) Lawn Tractors: $1,499-$4,249; (d) Rear-engine riding mower: $1,999-$2,249; (e) Walk-behind snow throwers: $589-$2,149; (f) Walk-behind mowers: $399-$839. (*Id.* ¶ 254.)

### 8. Balancing the Polaroid Factors

After considering all the factors individually, a court is required to weigh all the factors as a whole. "Some confusion is always possible; but there must be some threshold quantum that crosses from mere possibility into a probability." *We Media, Inc. v. General Electric Co.,* 218 F.Supp.2d 463, 479 (S.D.N.Y.2002). Because, as set forth above, there exists a variety of material issues of fact, especially with respect to the similarity of the parties' products, both Plaintiff's and Defendant's motions for summary judgment as to counts one and two pursuant to the Lanham Act under the likelihood of confusion analysis are denied.

### IV. Unfair Competition Under New York Law

**\*18** [4] "The essence of unfair competition under New York common law, is the bad-faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Jeffrey Milstein, Inc.,* 58 F.3d at 34 (internal quotations and citations omitted). To establish a claim for common law unfair competition under New York law, a plaintiff must show that: (1) the defendant acted in bad faith; and (2) there exists either actual confusion (if party seeks money damages), or likelihood of confusion (if party seeks only equitable relief). *Id .* at 34-35.

As explained above, because the Court has found that Plaintiff has not provided any evidence that MTD acted in bad faith, Plaintiffs' claim for unfair competition under New York law fails as a matter of law. Accordingly, Defendant's motion for summary judgment with respect to count three, common law unfair competition, is granted.

### V. Laches, Progressive Encroachment, Acquiescence and Estoppel

### A. *Laches and Progressive Encroachment*

[5] MTD moves for summary judgment on its third affirmative defense of laches, arguing that Deere's claims of trademark and trade dress infringement are barred by Deere's unreasonable and prejudicial delay in bringing this action. (Def. SJ Mem. at 63.) The defense of laches "is available against both Lanham Act claims and New York state law claims of trademark infringement and unfair competition." *Harley-Davidson, Inc. v. O'Connell,* 13 F.Supp.2d 271, 279 (N.D.N.Y.1998) (citing *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1040-41 (2d Cir.1980)). Although laches is an equitable defense, it can be applied in a trademark infringement action to bar both injunctive relief and monetary damages. *Id.*

"To make out a defense of laches, the defendant must show (1) that the plaintiff had knowledge of defendant's use of its marks, (2) that plaintiff inexcusably delayed in taking action, and (3) that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights by its delay in bringing suit." *Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.,* 88 F.Supp.2d 188, 196 (S.D.N.Y.2000). The Second Circuit has held that a presumption of laches will arise in a trademark action if the plaintiff fails to bring suit within the six-year statute of limitations period used in New York state law fraud actions. See *Harley-Davidson,* 13 F.Supp.2d at 279 (citing *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 191-92 (2d Cir.1996)). This six-year period will begin to run once the plaintiff is aware of the facts underlying its cause of action. *Id.*

MTD claims that Deere has been aware of the current Yard-Man green and yellow color scheme since 1993, seven years prior to the filing of this action, and Deere does not dispute this fact.[FN7] MTD claims that by the end of 1994, it had sold over $100 million in Yard-Man products bearing the Yard-Man colors in question (Comp. 56.1 Stmt. ¶ 389), and by February 1997, Deere was aware that MTD was spending millions of dollars annually to advertise its Yard-Man products (*id.* ¶ 425). MTD further claims that Deere has in the past and up until today considered MTD to be one of its principal competitors in the market for lawn and garden tractors, walk-behind mowers and other outdoor power equipment. (*Id.* ¶ 391.) Plaintiff does not dispute these facts, but argues that while it has been aware of the Yard-Man color scheme since 1993,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

over the years these colors have changed, encroaching slowly upon Deere's trademarks and trade dress over time. (Pl. Opp. 56.1 Stmt ¶ ¶ 412-414.) MTD contends that the Yard-Man colors have not changed since they were adopted in 1992. (Comp. 56.1 Stmt. ¶ 418.)

> FN7. In its response to Defendant's 56.1 statement, Deere acknowledged that by July 1993 it knew MTD was selling Yard-Man products in Yard-Man green and yellow, but argues that the color scheme as used by MTD on its Yard-Man line of products has changed over the years becoming closer and closer to infringing Deere's products over time. (Pl. Opp. 56.1 Stmt. ¶ 392.)

*19 In March 1994, MTD launched a national advertising campaign including a national television commercial directly comparing Yard-Man and Deere lawn tractors. (Id. ¶ 402.) Within weeks of the initial airing of the commercial, Deere sued MTD alleging Lanham Act violations, unfair competition and dilution. (Id. ¶ 408.) The complaint contained no allegations of trademark infringement with respect to MTD's use of its green and yellow color scheme. (Id. ¶ 411.) MTD argues that if Deere had a problem with its use of green and yellow on the Yard-Man line of products, it could have easily raised these claims during the 1994 action. (Def. SJ Mem. at 64-65.) Because Deere did not raise these issues then, or for many years thereafter, MTD argues Deere should not have the right to assert these claims now. (Id.) Plaintiff claims that MTD's assertions are misleading because MTD's use of green and yellow on its Yard-Man products has changed since its Amended Complaint was filed in 1994, slowly encroaching on Deere's trademarks and trade dress over time. (Comp. 56.1 Stmt. ¶ ¶ 412-414.)

Deere notes that in the past it has always protected its trademarks and trade dress by actively policing the similar use of green and yellow by other manufactures. See e.g. Unverfeth Mfg. Co. v. Deere & Co., No. C88-7719, 1990 U.S. Dist. LEXIS 18446 (N.D.Ohio, Sept. 28, 1990). However, Deere admits that other than its in-house counsel stating during the 1994 lawsuit that MTD was "coming close to infringing [Deere's] color trademark registrations," Deere has never communicated a single complaint or objection to MTD concerning the colors used on its Yard-Man line of products. (Comp. 56.1 Stmt. ¶ 423.) Hence, MTD manufactured Yard-Man products bearing a green and yellow trade dress for seven

years before Deere made even a single objection.

In light of these facts, MTD argues that Deere's delay in bringing the instant action now as opposed to the early 1990s has substantially increased the costs and risks to MTD if it were now forced to change its Yard-Man colors. (Def. SJ Mem. at 67-68.) MTD spent seven years and a significant amount of money prior to the filing of this lawsuit marketing and promoting the Yard-Man line of products bearing Yard-Man green and yellow. (Comp 56.1 Stmt. ¶ 444 .) These marketing efforts, costing approximately $22 million, included the use of television and print advertisements, as well as sponsorship of various events, such as sporting events and award contests, all to raise awareness of the Yard-Man brand. (Id. ¶ ¶ 451-456.) These advertising expenditures break down to approximately $1.1 million from 1992-1994 and almost $21 million from March 1994-September 2001. (Id. ¶ ¶ 455, 456.) Therefore, had Deere raised these objections in their 1994 lawsuit, much of MTD's advertising expenses could have been avoided.

Deere argues that MTD cannot assert the laches defense because it has failed to show the company will suffer any prejudice. The Court finds this argument unpersuasive. In addition to destroying any goodwill MTD has built up for over 10 years, forcing MTD to change its Yard-Man color scheme at this stage would cause the company great expense. (Id. ¶ ¶ 458-465.) Not only would MTD have to spend significant funds promoting a new product line with a new color scheme, it would also lose all the inventory it currently possesses bearing Yard-Man green and yellow. (Id.) Furthermore, according to MTD, a change in the appearance of the product line now may jeopardize existing contracts it has with distributors such as Wal-Mart. (Def. SJ Mem. at 67, 68.) The Court finds that the culmination of these facts would in fact be prejudicial to MTD.

*20 Deere next argues that the defense of laches does not apply because this is a case of progressive encroachment. The Second Circuit has held that a defendant may not raise the defense of laches where he has "progressively encroached" upon the plaintiff's marks. See ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C., 314 F.3d 62, 68 (2d Cir.2002). Progressive encroachment will excuse a plaintiff's delay, "[w]here a defendant begins use of a trademark or trade dress in the market, and then directs its marketing or manufacturing efforts such that it is placed more squarely in competition with the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 18
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

plaintiff." *Hermes Int'l v. Lederer de Paris Fifth Avenue, Inc.,* 50 F.Supp.2d 212, 223 (S.D.N.Y.1999). Under the circumstances of this case, the Court also finds this argument to be unpersuasive.

When Defendant first introduced its new Yard-Man product line bearing the green and yellow color scheme in 1993, the line consisted mainly of walk-behind mowers and lawn and garden tractors. (Owen's Dec. Ex. O 1993). Deere's argument of progressive encroachment would indicate that Deere did not consider the Yard-Man products first produced in 1993 to be infringing, but that over time Defendant's product line changed, moving closer to infringing on Deere's trademarks and trade dress with the introduction of products such as its snow throwers and rear-engine riding mowers. (Pl. Opp. 56.1 Stmt. ¶ ¶ 412-414.) Deere's examples include Yard-Man snow throwers introduced in 1995, Yard-Man attachments and accessories introduced in 1997, and rear-engine riding mowers introduced in 1998 (Yard-Bug) and 2000(ZTR). Deere argues that these products display more green than yellow on the body and have caused the entire line to progressively encroach on Deere's trademarks and trade dress.

However, other than the Yard-Bug and the ZTR, all of the Yard-Man products at issue in this litigation, including the lawn and garden tractors, walk-behind mowers and snow throwers, look substantially the same today with respect to their trade dress as they did when they were introduced.[FN8] At the time this lawsuit was filed, these products had been on the market, promoted by MTD, for at least five years and in some cases seven years. (*See* Owen's Dec. Ex. O.) Furthermore, if Deere found MTD's use of these colors infringing, at the very least, it had the opportunity to assert these claims in 1994 when it brought a lawsuit against MTD for trademark infringement and dilution in connection with the 1994 commercial. However, Deere did not object then, nor did Deere object at any time in the many years that followed until this action was filed in 2000. Deere's five to seven year delay, during which time MTD spent millions of dollars promoting its Yard-Man product line bearing the colors green and yellow, was clearly unreasonable. Furthermore, Deere's unreasonable delay would certainly be prejudicial to MTD were Deere able to assert these claims now. The loss of money spent on advertising and promoting its products, the loss of goodwill created over the past ten years, along with the amount of money that would have to be spent promoting a new product line with a different color, would all cause significant monetary loss to MTD.

FN8. Upon reviewing MTD's product brochures from 1993-2003, the Court is convinced that much of the Yard-Man products line has remained substantially the same, especially with respect to the color scheme used, since the products were introduced in 1993 and 1995, including the lawn and garden tractors, walk-behind mowers and snow throwers. (*See* Owen's Dec. Ex. O.)

**\*21** Accordingly, Deere is barred by the doctrine of laches from asserting its trademark infringement and unfair competition claims with respect to MTD's Yard-Man products that have remained substantially the same with respect to the color scheme used since 1993 and 1995, including its lawn and garden tractors, walk behind mowers and snow throwers.

[6] MTD's rear-engine mowers however, are a different story. When these products were introduced in 1998 and 2000, they clearly displayed more green than yellow, as compared to other MTD Yard-Man products. But while these products themselves may infringe on Deere's trademarks and trade dress, they have not caused an overall change in the trade dress of the Yard-Man product line and do not constitute progressive encroachment. The color combination and pattern used today on all other MTD Yard-Man products at issue in this litigation look almost exactly the same as at the time of their introduction in 1993 and 1995 (*See* Owen Dec. Ex. O 1993, 1995, 2003), and there is no indication that these two products (ZTR and Yard-Bug) have caused or will cause MTD to change the overall look of its trade dress, by making green rather than yellow the predominant color. MTD merely introduced new and different products into the market that may be closer to Plaintiff's trademarks and trade dress than the other MTD Yard-Man products. Furthermore, in addition to possibly displaying a color combination closer to Deere's trademarks and trade dress, these products were introduced much closer to the filing of this lawsuit. Therefore, laches will not bar Plaintiff's claims as to MTD's rear-engine riding mowers, specifically the Yard-Bug and ZTR. However, whether or not these products are confusingly similar to Deere's products and therefore infringing remains a question of fact to be analyzed under the eight Polaroid factors as explained above.[FN9]

FN9. Defendant no longer offers for sale the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 19
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

ZTR rear-engine riding mower and only sold this product during the 2000 selling season. (MTD's Local Civil Rule 56.1 Counterstatement to Deere's Statement of Material Facts Accompanying its Cross-Motion for Summary Judgment on MTD's Third Affirmative Defense (Laches) ¶ 23). Therefore, Plaintiff's claim for injunctive relief as to this product is moot. However, Deere may have a claim for damages with respect the ZTR, if a trier of fact were to find MTD infringed upon Deere's trademarks and trade dress with the production and marketing of this product.

[7] Lastly, Plaintiff argues that even if Defendant shows an unreasonable, prejudicial delay, the Second Circuit has established that "laches is not a defense against injunctive relief when the defendant intended the infringement." *Hermes Int'l,* 219 F.2d at 107 (quotations and citation omitted). Plaintiff is correct that to succeed with a laches defense, Defendant must have acted in good faith because " 'he who comes into equity must come with clean hands .' " *Id.* (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)). However, as discussed previously, Plaintiff has not provided the court with any evidence, other than the fact that MTD knew of Deere's color scheme and reputation when it adopted its Yard-Man colors, that Plaintiff adopted the Yard-Man colors in bad faith with the intent of confusing the public or capitalizing on Deere's goodwill. Alternatively, MTD has provided testimony from numerous witnesses explaining the reasons behind its adoption of green and yellow for its Yard-Man line of products, including the associations the colors have with nature and their functionality. Because Plaintiff has not provided any evidence to support its argument that Defendant acted in bad faith, Defendant's intent will not bar the assertion of the laches defense.

\*22 Accordingly, Defendant's summary judgement motion with regards to its laches defense is granted as to the Yard-Man lawn and garden tractors, walk-behind mowers and snow throwers, all of which have remained substantially the same with respect to the color combination and pattern used since 1993 and 1995 respectively. However, Defendant's motion is denied as to MTD's rear-engine mowers, specifically the Yard-Bug introduced in 1998, and the ZTR introduced in 2000. Whether these products are likely to cause confusion in the marketplace is a question of fact inappropriate for summary judgment.

Consequently, Plaintiff's motion for summary judgment on Defendant's third affirmative defense of laches is denied.

### B. *Acquiescence*

[8] To establish the defense of acquiescence, three elements must be established: "(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Profitness Physical Therapy Ctr.,* 314 F.3d at 67 (quotations and citation omitted). "The distinguishing feature of the acquiescence defense is the element of active or explicit consent to use of an allegedly infringing mark." *SunAmerica Corp. v. Sun Life Assurance Co. of Can.,* 77 F.3d 1325, 1338 (11th Cir.1996); *see also Profitness Physical Therapy Ctr.,* 314 F.3d at 67-68.

The only evidence Defendant has offered in support of its argument that Plaintiff actively acquiesced to MTD's use of green and yellow on its lawn and garden equipment is that Deere did not raise these trademark infringement issues in its 1994 infringement action against MTD. (MTD's Memorandum of Law in Opposition to Deere's Motion for Summary Judgment at 69-72 ("Def. Opp. SJ Mem.") .) While these facts may support a defense of laches, silence is far from "active acquiescence." Therefore, because Defendant does not offer any evidence that Deere actively acquiesced in MTD's use of green and yellow on its lawn and garden equipment, Plaintiff's motion for summary judgment as to Defendant's fourth affirmative defense of acquiescence is granted.

### C. *Estoppel*

MTD argues that Deere's claims against MTD are estopped: (1) judicially by representations made in publicly filed documents when Deere obtained and defended its Trademark registrations; and (2) equitably by the limits of Deere's alleged trademarks and trade dress. (Def. Opp. SJ Mem. at 62-69.)

### 1. Judicial Estoppel

"Judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by that party in a prior

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
(Cite as: Not Reported in F.Supp.2d)

legal proceeding ... A party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner." *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F.Supp.2d 273, 303 (S.D.N.Y.2002). In support of its defense of judicial estoppel, MTD argues that in order to overcome initial rejections by the PTO's hearing examiner, Deere made representations to the Trademark Trial and Appeal Board intending to narrow the scope of its proposed registrations. (Def. Opp. SJ Mem. at 63.) During those proceedings Deere argued that it was not seeking to register green and yellow colors generally, but only JD Green and JD Yellow. (*Id.* at 64.) MTD goes on to argue that in this action Deere asserts that its three trademark registrations encompass different shades of yellow and green in entirely different configurations. (*Id.*)

*23 The defense of judicial estoppel is now moot due to the Court's previous finding under the doctrine of functionality that Plaintiff is not entitled to seek exclusive ownership over green and yellow in the abstract, but may only seek to prevent other manufacturers from using colors so similar to its own that they are likely to cause confusion in the marketplace as to the origin or sponsorship of the products. Accordingly, Defendant's defense of judicial estoppel is dismissed as moot.

### 2. Equitable Estoppel

MTD also argues that Plaintiff should be barred from asserting its trademark infringement claims under the doctrine of equitable estoppel. (Def. Opp. SJ Mem. at 64.) To establish the defense of equitable estoppel MTD must show: (1) Deere made a representation of fact to MTD with reason to believe MTD would rely on it; (2) MTD reasonably relied on it; (3) to its detriment. *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 725 (2d Cir.2001). In support of its argument, MTD claims that the fact that Deere never objected to MTD's use of the Yard-Man colors in the past, and specifically during the 1994 action, despite knowing since 1993 these colors were being used, entitles MTD to dismissal on grounds of equitable estoppel. (Def. Opp. SJ Mem. at 65-69.) MTD claims that Deere implicitly acknowledged that MTD was not infringing on its trademarks and trade dress with its Yard-Man color scheme. Because Defendant has already prevailed on these arguments under its laches defense, any further discussion of equitable estoppel would be redundant. Accordingly,

Defendant's defense of equitable estoppel is dismissed as moot.

### CONCLUSION

For the reasons set forth above, (1) MTD's motion for summary judgment is granted in part-insofar as (a) Deere seeks to prevent MTD from using the colors green and yellow (in the abstract, as discussed under "Functionality," *supra* ), (b) Deere's claims relate to MTD's products other than the Yard-Bug introduced in 1998 and the ZTR introduced in 2000 (as discussed under "Laches and Progressive Encroachment," *supra* ), and Deere asserts a claim for unfair competition under New York law (Amended Complaint, Count III), all of which claims are dismissed-and otherwise denied, and (2) Deere's motions for summary judgment are granted as to MTD's fourth affirmative defense of acquiescence and MTD's fifth affirmative defense of estoppel, and otherwise denied. MTD's motion *in limine* (*see* n. 1, *supra* ) insofar as it relates to trial will be disposed of before or at trial as may be determined at a pretrial conference.

So Ordered.

S.D.N.Y.,2004.
Deere & Co. v. MTD Holdings Inc.
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009

Briefs and Other Related Documents (Back to top)

• 2003 WL 23951474 (Trial Motion, Memorandum and Affidavit) Plaintiff Deere & Company's Reply Memorandum of Law in Support of Its Cross-Motion for Summary Judgment on Defendant MTD Holdings Inc.'s Third Affirmative Defense (Sep. 25, 2003)
• 2003 WL 23951470 (Trial Motion, Memorandum and Affidavit) Plaintiff Deere & Company's Reply Memorandum of Law in Support of Its Motion for Summary Judgment on Deere's Trademark Infringement (Count I), Federal Unfair Competition (Count II) and New York Unfair Competition (Count III) Claims and MTD's Fourth a nd Fifth Affirmative Defenses (Sep. 05, 2003)
• 2003 WL 23951473 (Trial Motion, Memorandum and Affidavit) Plaintiff Deere & Company's Reply Memorandum of Law in Support of Its Motion for Summary Judgment on Defendant MTD Holdings Inc.'s Seventh Affirmative Defense (Sep. 05, 2003)
• 2003 WL 24163218 () Exhibits in Support of Plaintiff Deere & Company's Reply Memorandum of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 324890 (S.D.N.Y.), 70 U.S.P.Q.2d 1009
**(Cite as: Not Reported in F.Supp.2d)**

Law in Support of its Motion for Summary Judgment
on Deere's Trademark Infringement (Count I).
Federal Unfair Competition (Count II) and New York
Unfair Competition (Count III) Claims and MTD's
Fourth and Fifth Affirmatiive Defenses Declaration
of S. Lloyd Smith Volume 1 of 1, Exhibits 97-103
(Apr. 14, 2003) Original Image of this Document
with Appendix (PDF)
• 1:00cv05936 (Docket) (Aug. 10, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                        Page 1
Not Reported in F.Supp.2d, 2003 WL 22439778 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
<u>Briefs and Other Related Documents</u>
Deere & Company v. MTD Holdings
Inc.S.D.N.Y.,2003.Only the Westlaw citation is
currently available.
United States District Court,S.D. New York.
DEERE & COMPANY, Plaintiff,
v.
MTD HOLDINGS INC., Formerly Known as MTD
Products, Inc., Defendant.
No. 00 Civ. 5936(LMM).

Oct. 28, 2003.

Manufacturer of lawn care equipment brought
trademark action against competitor, alleging
trademark infringement, unfair competition in
violation of state and federal laws, and violations of
Federal Trademark Dilution Act (FTDA) and New
York anti-dilution statute. The District Court, <u>2002
WL 1837402,</u>granted competitor's motion to dismiss
dilution claims, and adhered to that determination on
reconsideration, <u>2002 WL 31357692</u>. Manufacturer
moved to amend its complaint, and competitor
moved to amend its answer and add affirmative
defense and counterclaim. The District Court,
<u>McKenna,</u> J., held that: (1) proposed amendments of
FTDA claim would be futile; (2) competitor was
entitled to amend its answer to add affirmative
defense of abandonment; and (3) district court lacked
jurisdiction over competitor's proposed counterclaim
alleging violation of state unfair competition law.

Motions granted in part and denied in part.
West Headnotes
**[1] Trademarks 382T ⚷⚷1472**

382T Trademarks
   382TVIII Violations of Rights
     382TVIII(B) Dilution
      382Tk1472 k. Trade Dress. <u>Most Cited
Cases</u>
     (Formerly 382k366)
Under proposed amendment of federal dilution claim
asserted by manufacturer of lawn and garden
equipment, by which manufacturer asserted that it
was seeking to protect its green and yellow
trademarks rather than to protect green and yellow
colors in the abstract, mark for which manufacturer
sought protection was still simply combination of
colors that lacked inherent distinctiveness required

for protection under Federal Trademark Dilution Act
(FTDA), regardless of whether manufacturer could
show that its use of green body and yellow trim on its
equipment had acquired secondary meaning, and
therefore proposed amendment of claim was futile.
Lanham Trade-Mark Act, § 43(c)(1), <u>15 U.S.C.A. §
1125(c)(1)</u>; <u>Fed.Rules Civ.Proc.Rule 15(a), 28
U.S.C.A.</u>

**[2] Trademarks 382T ⚷⚷1589**

382T Trademarks
   382TIX Actions and Proceedings
     382TIX(B) Pleading
      382Tk1589 k. Amended and Supplemental
Pleadings. <u>Most Cited Cases</u>
     (Formerly 382k562.1)
Under manufacturer's proposed amendment of
dismissed federal dilution claim, which repleaded
claim as one seeking protection under Federal
Trademark Dilution Act (FTDA) for manufacturer's
green and yellow trade dress as applied to its lawn
and garden equipment in specific and arbitrary
manner, proposed claim fell into product design,
rather than product packaging, subcategory of trade
dress claims, inasmuch as it concerned application of
green and yellow colors to products themselves, and
therefore, in light of rule that precluded product
design from being inherently distinctive, proposed
amendment did not cure legal defect of lack of
inherent distinctiveness, rendering proposed
amendment futile. Lanham Trade-Mark Act, §
43(c)(1), <u>15 U.S.C.A. § 1125(c)(1)</u>; <u>Fed.Rules
Civ.Proc.Rule 15(a), 28 U.S.C.A.</u>

**[3] Trademarks 382T ⚷⚷1589**

382T Trademarks
   382TIX Actions and Proceedings
     382TIX(B) Pleading
      382Tk1589 k. Amended and Supplemental
Pleadings. <u>Most Cited Cases</u>
     (Formerly 382k562.1)
Competitor's allegations that manufacturer of lawn
and garden equipment had abandoned its alleged
green and yellow trademark rights with respect to its
walk-behind lawn mowers for longer than statutory
three-year period stated prima facie claim of
abandonment, and therefore competitor was entitled
to amend its answer in manufacturer's trademark
infringement action to add affirmative defense of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22439778 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

abandonment. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127; Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[4] Trademarks 382T ☞1589**

382T Trademarks
   382TIX Actions and Proceedings
     382TIX(B) Pleading
      382Tk1589 k. Amended and Supplemental Pleadings. Most Cited Cases
      (Formerly 382k565)
Competitor's proposed counterclaim against manufacturer of lawn and garden equipment for alleged violation of state unfair competition law was governed by provision of counterclaim/cross-claim rule applicable to counterclaims that matured or were acquired after pleader served a pleading, rather than by provision applicable to counterclaims omitted from original pleading through oversight, inadvertence, or excusable neglect, given that proposed counterclaim was based on information and materials acquired during discovery, subsequent to competitor's filing of its answer. Fed.Rules Civ.Proc.Rule 13(e, f), 28 U.S.C.A.

**[5] Federal Courts 170B ☞24**

170B Federal Courts
   170BI Jurisdiction and Powers in General
     170BI(A) In General
      170Bk20 Ancillary and Incidental Jurisdiction
      170Bk24 k. Cross-Claims and Counterclaims. Most Cited Cases
      (Formerly 382k545)
Competitor's proposed counterclaim for unfair competition in violation of state law did not arise out of same transaction or occurrence as underlying dispute, which involved lawn equipment manufacturer's allegations that competitor had infringed upon its trademarks in violation of federal trademark laws, in that proposed counterclaim required inquiry into separate facts concerning actions taken by manufacturer against competitor to protect its purported trademarks, and therefore proposed counterclaim was permissive, rather than compulsory, and did not come within district court's supplemental jurisdiction. 28 U.S.C.A. § 1367; Fed.Rules Civ.Proc.Rule 13(a), 28 U.S.C.A.

**[6] Federal Courts 170B ☞24**

170B Federal Courts

170BI Jurisdiction and Powers in General
   170BI(A) In General
     170Bk20 Ancillary and Incidental Jurisdiction
     170Bk24 k. Cross-Claims and Counterclaims. Most Cited Cases
     (Formerly 382k545)
District court lacked jurisdiction, in lawn equipment manufacturer's trademark infringement action, over competitor's proposed counterclaim alleging that manufacturer had violated state unfair competition law when counterclaim was permissive claim outside court's supplemental jurisdiction and competitor offered no alternative basis for jurisdiction. 28 U.S.C.A. § 1367; Fed.Rules Civ.Proc.Rule 13(a), 28 U.S.C.A.

**[7] Trademarks 382T ☞1589**

382T Trademarks
   382TIX Actions and Proceedings
     382TIX(B) Pleading
      382Tk1589 k. Amended and Supplemental Pleadings. Most Cited Cases
      (Formerly 382k565)
Even assuming that jurisdiction existed over competitor's proposed new counterclaim against lawn equipment manufacturer for alleged violation of state unfair competition law, competitor was not entitled to amend its answer to assert counterclaim, inasmuch as manufacturer's trademark infringement action was too far along to allow new issues and legal claims that would require additional discovery and further delay ultimate disposition of action, and competitor retained right to assert claim in separate proceeding. Fed.Rules Civ.Proc.Rules 13, 15(a), 28 U.S.C.A.

*MEMORANDUM AND ORDER*

MCKENNA, J.

**\*1** For the reasons set forth below, the parties' pending motions to amend are disposed of as follows: (1) Plaintiff's motion to amend its complaint is denied; (2) Defendant's motion to amend its answer and add an affirmative defense is granted; and (3) Defendant's motion to amend its answer and add a counterclaim is granted in part and denied in part.

BACKGROUND

The facts of this case were set forth in *Deere & Company v. MTD Products, Inc.,* No. 00 Civ. 5936, 2002 U.S. Dist. LEXIS 14799, at \*2-\*3 (S.D.N.Y. Aug. 9, 2002).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22439778 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

## STANDARD OF REVIEW

Leave to amend a pleading "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). When deciding a motion to amend, a court "should consider such factors as undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party and futility of the amendment." *Cartier, Inc. v. Four Star Jewelry Creations, Inc.,* No. 01 Civ. 11295, 2003 U.S. Dist. LEXIS 7844, at *6 (S.D.N.Y. May 8, 2003) (citations and quotations omitted). A proposed amendment to a pleading is considered futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6). *See Oneida Indian Nation v. City of Sherrill,* 337 F.3d 139, 168 (2d Cir.2003) (citing *Ricciuti v. NYC Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)).

## I. PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT

Plaintiff moves pursuant to Federal Rule of Civil Procedure 15(a) to amend its complaint, specifically its federal dilution claim brought under 11 U.S.C. § 1125(c), in order to overcome the Court's previous dismissal of its claim under that statute, in *Deere & Company,* 2002 U.S. Dist. LEXIS 14799, at *2-*3. For the following reasons, Plaintiff's proposed amendment to its complaint would be futile and therefore, the motion is denied.

### A. *Federal Trademark Dilution Act of 1995*

[1] In relevant part, the Federal Trademark Dilution Act of 1995, Pub.L. No. 104-98, 109 Stat. 985 (1996), provides that:
The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125(c)(1). To receive protection under the Act, a mark must be both famous and distinctive. *See Deere,* 2002 U.S. Dist. LEXIS 14799, at *5 (citing 15 U.S.C. § 1125(c)(1); *TCPIP Holding Co., Inc. v. Haar Comm., Inc.,* 244 F.3d 88, 98 (2d Cir.2001)). To satisfy the requirement of

distinctiveness, the Second Circuit has held that a mark must be "inherently distinctive ." *Id.* (citing *TCPIP Holding,* 244 F.3d at 98; *New York Stock Exchange, Inc. v. New York, New York Hotel, L.L.C.,* 293 F.3d 550, 557 (2d Cir.2002)). Therefore, acquiring distinctiveness through secondary meaning will not satisfy the distinctiveness requirement under the federal dilution statute. *See id.*

*2 "The inherent distinctive quality of a mark has long been an important standard in trademark law." *TCPIP Holding,* 244 F.3d at 93. Traditionally, distinctiveness of marks has been measured according to a scale described by Judge Friendly in *Abercrombie & Fitch, Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976), which lists as follows the levels of distinctiveness of marks, from least to most distinctive: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *TCPIP Holding,* 244 F.3d at 93. Plaintiff argues that a mark of yellow and green as applied to its lawn care products is specific and arbitrary and therefore, inherently distinctive and entitled to protection under the federal dilution statute. (Plaintiff Deere & Company's Memorandum of Law in Support of its Motion to Amend the Complaint at 3-4 ("Pl.Br.")). However, while a mark can be arbitrary because it has no logical relationship to the product, it nonetheless can have a low level of distinctiveness because it is common. *See Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 216 (2d Cir.1999). Plaintiff arbitrarily decided to apply the colors green and yellow, which alone are not inherently distinctive, to the body of its products in a specific manner, and allegedly has become known for the use of such colors and design in the lawn care industry. (Pl. Br. at 3.) However, even if the public may now recognize these colors and design as associated with John Deere lawn care products, this fact does not make the color combination and pattern inherently distinctive. *See id.* ("A mark that, notwithstanding its fame, has no distinctiveness is lacking the very attribute that the antidilution statute seeks to protect. The antidilution statute seeks to guarantee exclusivity not only in cases where confusion would occur but throughout the realms of commerce.")

Plaintiff's claim under the federal dilution statute was originally dismissed by this Court under *Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995), and *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000), in which the Supreme Court held that the use of color alone could not be inherently distinctive. *See Deere,* 2002 U.S. Dist.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22439778 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

LEXIS 14799, at *6 (citing *Qualitex,* 514 U.S. at 162-63; *Wal-Mart,* 529 U.S. at 211 ("With respect to at least one category of mark-color-we have held that no mark can ever be inherently distinctive")). Under *Qualitex* and *Wal-Mart,* this Court held that, color can be protected only through attaining secondary meaning, and because to qualify for protection under the federal dilution statute a showing of "inherent distinctiveness" is required, Plaintiff's claim must fail as a matter of law. *Id.* at *6-*8.

Plaintiff now seeks to cure this legal defect by repleading its federal dilution claim and arguing that it is not seeking to protect green and yellow in the abstract, but seeks protection for "Deere's Green and Yellow trademarks and Deere's Green and Yellow Trade Dress" as "applied to its lawn and garden equipment in a specific and arbitrary manner, namely a green body or frame with yellow trim." (Pl. Br. at Ex. A ¶ ¶ 47, 49.) However, assuming that Plaintiff could show that its mark has acquired secondary meaning, the requirement in the Act that the mark be inherently distinctive "cannot be satisfied by the mere fact that the public has come to associate the mark with the source." *TCPIP Holding,* 244 F.3d at 98. The mark Plaintiff seeks to protect in the proposed amended complaint is still simply a combination of colors, which the Supreme Court has held can never be inherently distinctive. *See Qualitex,* 514 U.S. at 162-63; *Wal-Mart,* 529 U.S. at 211.

*3 [2] Similarly, repleading the claim as "trade dress" does not cure the legal defects inherent in Plaintiff's original federal dilution claim. Trade dress comprises the overall image of a product, which " 'may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.' " *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 765, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (quoting *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983)). Within the category of trade dress, the Supreme Court has created two subcategories-product packaging and product design.[FN1] *See Walmart,* 529 U.S. at 209. Product packaging consists of the overall image of the packaging or labeling of a product, while product design consists of the overall image of the product itself such as its size, shape, color or color combinations. *Id.*

> FN1. Traditionally, the category of "trade dress" was thought to consist of only a product's labeling or packaging; however,

today, trade dress has been expanded to encompass the design of a product as well. *See Walmart,* 529 U.S. at 209.

Here, Plaintiff Deere seeks protection for its use of green and yellow as applied to certain lawn care products it manufactures. Because the green and yellow colors are applied to the product itself, Plaintiff's trade dress would fall into the product design category rather than the packaging or labeling category. Although Plaintiff briefly argues this is not a product design case, a trade dress claim can only be categorized as product design or product packaging, and there is no argument made that the color scheme and design Plaintiff seeks to protect is a package or a label. However, even if this were a close case, the Supreme Court has held that because differentiating between product packaging and product design can be difficult, "the courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." *Wal-Mart,* 529 U.S. at 215.

In *Walmart,* the Supreme Court held that product design, like color, could never be inherently distinctive because the design of a product does more than serve as a source indicator. *See id.* at 212. The Court found that:

The fact that product design almost invariably serves purposes other than source identification not only renders inherent distinctiveness problematic; it also renders application of an inherent-distinctiveness principle more harmful to other consumer interests. Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness.

*Id.* at 213.

Therefore, whether Deere seeks to protect its use of the colors green and yellow in the abstract or whether it seeks protection for its trade dress of green and yellow as it is applied in a specific and arbitrary manner to its lawn care products, it will not have the advantage of inherent distinctiveness, and therefore cannot state a claim under the federal dilution statute. Accordingly, allowing Plaintiff to amend its complaint would be futile as its dilution claim would still fail as a matter of law. Thus, Plaintiff's motion to amend its complaint is denied.[FN2]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN2. When Congress enacted the Federal Dilution Act in 1996 it afforded owners of famous trademarks greater protection from possible infringement. *See TCPIP Holding, 244 F.3d at 95.* Under the Act, an owner of a qualified, famous mark may enjoin infringing users regardless of competition or confusion. *See id.* (citing 15 U.S.C. § 1127 ("providing that dilution may be found 'regardless of the presence or absence of ... (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception' ")). The Second Circuit found that "[a]gainst a background of policies that strongly disfavor marks lacking inherent distinctiveness, according them only narrow protection, we think it highly unlikely that Congress intended to extend to such marks the expanded rights conferred by the Dilution Act [,]" and, therefore, "the Dilution Act accords its special, broad protection only to marks that have a significant degree of distinctiveness." *Id.* Were this Court to afford Plaintiff protection under the federal dilution statute for its use of green and yellow as applied to its lawn care equipment, specifically green body with yellow trim, Plaintiff could bring an infringement action against anyone using similar colors in similar patterns in any industry. This result does not seem to conform with the legislative policies underlying the federal dilution statute.

## II. DEFENDANT'S MOTION FOR LEAVE TO AMEND ITS ANSWER AND ADD AN AFFIRMATIVE DEFENSE

*\*4* Defendant moves to amend its answer and add an affirmative defense of abandonment pursuant to Federal Rules of Civil Procedure 8(c) and 15(a), claiming Plaintiff abandoned its alleged trademark rights with respect to its use of the green and yellow color scheme on its walk-behind lawn mowers. (Memorandum of Law in Support of Defendant MTD Holdings Inc's, Formerly Known as MTD Products Inc, Motion for Leave to Amend Answer to Add Affirmative Defense at 1 ("Def.Aff.Def.Br.")). As stated above, under Rule 15(a) a motion to amend an answer should be granted, unless there exists factors such as undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party or futility of the amendment. *See Cartier, Inc.,* 2003 U.S. Dist. LEXIS 7844, at \*6.

### A. *Abandonment*

[3] 15 U.S.C. § 1127 provides in relevant part that a mark shall be deemed abandoned [w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

*Id.* There are two elements to a claim of abandonment: (1) nonuse and (2) intent not to resume use. *See Silverman v. CBS, Inc.,* 870 F.2d 40, 45 (2d Cir.1989) (citing *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1043 (2d Cir.1980)). Under the statute, three consecutive years of nonuse creates a rebuttable presumption that a trademark owner has abandoned its trademark. *See* 15 U.S.C. § 1127; *see also Citigroup Inc. v. City Holding Co.,* 99 Civ. 10115, 2003 U.S. Dist. LEXIS 1845, at \*44 (S.D.N.Y. Feb. 7, 2003). "[W]here the statutory presumption of abandonment has been established by nonuse for more than [three] consecutive years, the trademark owner must demonstrate that circumstances do not justify the inference of intent not to resume use." *Emmpresa Cubana Del Tabaco v. Culbro Corp.,* 213 F.Supp.2d 247, 268 (S.D.N.Y.2002). While presumption of nonuse for three consecutive years shifts the burden of production, the ultimate burden of proof as to both elements will remain with the party claiming the abandonment defense. *Id.* at n. 36.

Defendant MTD claims that Plaintiff abandoned its alleged green and yellow trademark rights, as applied to its lawn care equipment, only with respect to its walk-behind lawn mowers. (Def. Aff. Def. Br. at 1.) Although Defendant has not cited any case law, nor is the Court aware of any, where a court has held a trademark owner abandoned its mark with respect to a single product while continuing to use the mark on other similar products, whether or not the defense of abandonment can apply to a single product only is not a question that can be resolved on a motion to amend an answer. Similarly, whether or not Plaintiff intended to resume using its trademark on its walk-behind mower after its anniversary period concluded is also a question to be resolved at a later date.

*\*5* Therefore, while the Court has no opinion at this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22439778 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

time as to the validity of Defendant's abandonment defense with respect to Plaintiff's walk-behind mower, because Defendant has alleged that Plaintiff abandoned its mark with respect to this product for longer than the required three year statutory period, it has alleged prima facie evidence of a claim for abandonment under 15 U.S.C. § 1127. Furthermore, because Rule 15(a) is a liberal standard and "shall be freely given when justice so requires," Fed.R.Civ.P. 15(a), Defendant's motion for leave to amend its answer and add an affirmative defense of abandonment with respect to Plaintiff's walk-behind mower is granted.

### III. DEFENDANT'S MOTION FOR LEAVE TO AMEND ITS ANSWER AND ADD A COUNTERCLAIM

Defendant MTD moves pursuant to Federal Rules of Civil Procedure 13(f) and 15(a) to amend its answer to: "(1) replead its Ninth and Tenth Affirmative Defenses of unclean hands and trademark misuse, to bring them into conformity with MTD's Amended Response to Plaintiff's Second Set of Interrogatories; and (2) to bring a counterclaim under Ohio unfair competition law." (Memorandum of Law in Support of Defendant MTD Products Inc's Motion for Leave to Amend its Answer and Add a Counterclaim at 1 ("Def.CC.Br.")). For the reasons set forth below, Defendant's motion is granted in part and denied in part.

#### A. *Defendant's Motion to Add a Counterclaim Under Rule 13*

[4] Rule 13 of the Federal Rules of Civil Procedure governs the pleading of counterclaims and cross-claims. *See* Fed.R.Civ.P. 13. Under the subsections of Rule 13, Rule 13(f) applies to a counterclaim that was omitted from a party's original pleading through "oversight, inadvertence or excusable neglect," Fed.R.Civ.P. 13(f), while Rule 13(e) applies to a counterclaim "which either matured or was acquired by the pleader after serving a pleading," Fed.R.Civ.P. 13(e). Defendant argues that the pleading of its counterclaim is governed by Rule 13(f), is compulsory, and falls within the Court's ancillary jurisdiction as it arises out of the same transaction or occurrence as the underlying dispute currently pending before the Court. (Reply Memorandum of Law in Support of Defendant MTD Products Inc's Motion for Leave to Amend its Answer and Add a Counterclaim at 9.) Plaintiff contends that Defendant

did not acquire the counterclaim until after it had filed an answer and therefore its claim is governed by Rule 13(e) rather than Rule 13(f) and is permissive in nature rather than compulsory. (Plaintiff Deere & Company's Memorandum in Opposition to Defendant's Motion for Leave to Amend its Answer and Add a Counterclaim at 3.)

Defendant's proposed counterclaim is based on information and materials admittedly acquired during discovery, subsequent to the filing of its answer. (Def. CC. Br. at 3.) While some of the facts discovered may have occurred prior to the answer being filed, Defendant states it "could not have made these allegations when it served its Answer in May 2001." (*Id.*) Accordingly, MTD's counterclaim is governed by Rule 13(e).

*6 [5] However, whether the counterclaim should be pled under Rule 13(f) or 13(e) is not determinative to this motion. For a counterclaim to be considered a compulsory counterclaim under Rule 13(a), and therefore fall within the Court's supplemental jurisdiction, the claim must arise out of the same transaction or occurrence as the underlying dispute. Fed.R.Civ.P. 13(a). The claims currently pending before the Court involve an inquiry into facts to determine whether MTD has infringed upon Plaintiff Deere's alleged trademarks in violation of the federal trademark laws. Alternatively, Defendant's counterclaim would require an inquiry into the actions allegedly taken by Plaintiff Deere against MTD in pursuit of protecting its alleged trademarks. These claims involve different inquiries and a separate set of facts, and the determination of the trademark infringement issues underlying the dispute would not resolve the issues set forth in Defendant's counterclaim. Accordingly, the counterclaim must be considered permissive as it does not arise out of the main occurrence or transaction in issue, the alleged trademark infringement. *See 2001 Inc. v. Novaglas Corp.*, 60 F.R.D. 649, 650 (E.D.N.Y.1973). If the Court were to allow MTD's counterclaim at this stage, there would be a host of new issues presented, possibly requiring additional discovery, which would further delay the disposition of this action.

[6][7] Thus, because the proposed counterclaim does not arise out of the same transaction or occurrence as the underlying dispute, it is permissive rather than compulsory, and for the Court to hear its claim MTD must provide an independent basis of federal jurisdiction. *See Jones v. Ford Motor Credit Comp.*, No. 00 Civ. 8330, 2002 U.S. Dist LEXIS 10902, at *4 (S.D.N.Y. June 14, 2002) (citing *Harris v.*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22439778 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

*Steinem,* 517 F.2d 119, 121-22 (2d Cir.1978)). Because this is a state law claim and MTD has not asserted an alternative basis for jurisdiction other than the Court's supplemental jurisdiction under 28 U.S.C. § 1367, this Court has no jurisdictional basis upon which to hear Plaintiff's counterclaim.[FN3] Accordingly, Defendant's motion to amend its answer to add a counterclaim is denied.

> FN3. Even if Defendant were able to assert an independent ground for federal jurisdiction, such as diversity, this Court in its discretion would still deny Defendant's motion to amend its answer to add the state law unfair competition claim. This case is too far along in the process to add new issues and legal claims, which would lead to additional discovery further delaying the ultimate disposition of this case. *See Tommy Hilfiger Lic. Inc. v. Bradlees Inc.,* No. 99 Civ. 4677, 2002 U.S. Dist. LEXIS 377, at * 21 (S.D.N.Y. Jan. 11, 2002) (citing *Gucci America, Inc. v. Exclusive Imports International,* 2001 U.S. Dist. LEXIS 67, at *6 (S.D.N.Y. Jan. 9, 2001) (denying leave to add new counterclaims where the counterclaims were factually remote from the plaintiff's claim and would result in additional discovery and the prolongation of the litigation); *BPW Rhythmic Records, L.L.C. v. CDNow, Inc.,* 2000 U.S. Dist. LEXIS 15526, at *1 (S.D.N.Y. Oct. 12, 2000) (striking new claims impermissibly added without the court's permission where the new claims sought to inject entirely new issues which would require additional discovery and delay the resolution of the action)). Defendant will not suffer prejudice from the Court's denial of its motion to amend, because Defendants's proposed state law claim for unfair competition is permissive and therefore, MTD maintains the right to assert its claim in a separate proceeding.

### B. *Defendant's Motion to Amend its Ninth and Tenth Affirmative Defenses*

Because in its papers submitted to the Court, Plaintiff opposes only Defendant's motion to file a counterclaim and does not set forth any arguments opposing Defendant's motion for leave to file an amended answer to supplement its ninth and tenth affirmative defenses of unclean hands and trademark

misuse, Defendants motion to replead these two affirmative defenses is granted. [FN4]

> FN4. The only discussion Plaintiff includes in its opposition brief regarding MTD's motion to amend its ninth and tenth affirmative defenses, is that these two defense are subject to Plaintiff's pending motion to strike. The Court is aware of Plaintiff's motion and will consider its arguments after Defendant amends its answer.

So Ordered.

S.D.N.Y.,2003.
Deere & Company v. MTD Holdings Inc.
Not Reported in F.Supp.2d, 2003 WL 22439778 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2003 WL 23951474 (Trial Motion, Memorandum and Affidavit) Plaintiff Deere & Company's Reply Memorandum of Law in Support of Its Cross-Motion for Summary Judgment on Defendant MTD Holdings Inc.'s Third Affirmative Defense (Sep. 25, 2003)
• 2003 WL 23951470 (Trial Motion, Memorandum and Affidavit) Plaintiff Deere & Company's Reply Memorandum of Law in Support of Its Motion for Summary Judgment on Deere's Trademark Infringement (Count I), Federal Unfair Competition (Count II) and New York Unfair Competition (Count III) Claims and MTD's Fourth a nd Fifth Affirmative Defenses (Sep. 05, 2003)
• 2003 WL 23951473 (Trial Motion, Memorandum and Affidavit) Plaintiff Deere & Company's Reply Memorandum of Law in Support of Its Motion for Summary Judgment on Defendant MTD Holdings Inc.'s Seventh Affirmative Defense (Sep. 05, 2003)
• 2003 WL 24163218 () Exhibits in Support of Plaintiff Deere & Company's Reply Memorandumi of Law in Support of its Motion for Summary Judgment on Deere's Trademark Infringement (Count I). Federal Unfair Competition (Count II) and New York Unfair Competition (Count III) C laims and MTD's Fourth and Fifth Affirmaiive Defenses Declaration of S. Lloyd Smith Volume 1 of 1, Exhibits 97-103 (Apr. 14, 2003) Original Image of this Document with Appendix (PDF)
• 1:00cv05936 (Docket) (Aug. 10, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

161 U.S.P.Q. 243                                                                                    Page 1
1969 WL 9573 (E.D.N.Y.), 161 U.S.P.Q. 243
(Cite as: 161 U.S.P.Q. 243)

C

FIELD ENTERPRISES EDUCATIONAL
CORPORATION
v.
COVE INDUSTRIES, INCORPORATED

District Court, E. D. New York

66-C-742

Decided Feb. 14, 1969
United States Patents Quarterly Headnotes

**TRADEMARKS**
**[1] Acquisition of marks--Use by plurality of persons (§ 67.085)**
  Prior use of word or phrase, unless abandoned, vitiates claim to exclusive use of word by later user.-- Field Enterprises Educational Corp. v. Cove Industries, Inc. (DC ENY) 161 USPQ 243.

**TRADEMARKS**
**[2] Infringement--In general (§ 67.431)**
**Marks and names subject to ownership-- Secondary meaning (§ 67.523)**
  Some words, fanciful or coined, bear so little relation to product which they identify that they are entitled to protection against all users; these are commonly denominated "strong" marks; others are either descriptive or closely related to product and, therefore, are entitled to no protection unless they have acquired a secondary meaning, i.e., public has learned to identify name of product with its source or origin; distinction is basic to concept of trademark protection, since it is reputation of manufacturer and interest of public in not being deceived as to source of goods which law seeks to protect.--Field Enterprises Educational Corp. v. Cove Industries, Inc. (DC ENY) 161 USPQ 243.

**TRADEMARKS**
**[3] Marks and names subject to ownership -- Descriptive -- Particular marks (§ 67.5081)**
**Marks and names subject to ownership -- Secondary meaning (§ 67.523)**
  "World Book" is descriptive as applied to encyclopedia, but has acquired a secondary meaning sufficient to entitle it to protection under trademark

laws.--Field Enterprises Educational Corp. v. Cove Industries Inc. (DC ENY) 161 USPQ 243.

**TRADEMARKS**
**[4] Infringement--Tests of (§ 67.439)**
  Relevant inquiry on question of trademark infringement is whether there is confusing similarity between marks.--Field Enterprises Educational Corp. v. Cove Industries, Inc. (DC ENY) 161 USPQ 243.

**TRADEMARKS**
**[5] Infringement--In general (§ 67.431)**
**Marks and names subject to ownership--In general (§ 67.501)**
  It is undesirable that words in common use be given a monopoly under trademark laws; for this reason, a distinction is made for purposes of determining infringement between primary and secondary uses; while secondary use may be protected, use of common word in its primary sense may not be; since use of "World" in "Illustrated World Encyclopedia" is in its primary sense, there is no infringement of "World Book."--Field Enterprises Educational Corp. v. Cove Industries, Inc. (DC ENY) 161 USPQ 243.

**UNFAIR COMPETITION**
**[6] Unfair competition, trademarks and trade names compared (§ 68.95)**
  Unfair competition law, since it protects more than mere name, may give broader protection than trademark law.--Field Enterprises Educational Corp. v. Cove Industries, Inc. (DC ENY) 161 USPQ 243.

**TRADEMARKS**
**[7] Pleading and practice in courts--State law considered (§ 53.73)**
**Registration--In general (§ 67.731)**

**UNFAIR COMPETITION**
**In general (§ 68.01)**
  State law applies in unfair competition action; since term of federal trademark protection is theoretically perpetual (assuming no abandonment), use of state unfair competition law to protect trademark registrants does not result in conflict with policy stated in Sears v. Stiffel, 376 U.S. 225, 140 USPQ 524, and Compco v. Day-Brite, 376 U.S. 234, 140

COPR. © 2006 The Bureau of National Affairs, Inc.

161 U.S.P.Q. 243                                                                    Page 2
1969 WL 9573 (E.D.N.Y.), 161 U.S.P.Q. 243
(Cite as: 161 U.S.P.Q. 243)

USPQ 528; where there is no federal policy in favor of creating a body of material in public domain, there can be no conflict created by state policy of restricting unfair competition, granting greater protection than that available under federal trademark law.--Field Enterprises Educational Corp. v. Cove Industries, Inc. (DC ENY) 161 USPQ 243.

## UNFAIR COMPETITION

### [8] Appearance of goods or labels--In general (§ 68.201)

Names--In general (§ 68.701)

State law requires more than simple forbearance from using name of competitor; where there is substantial similarity in packaging or advertising, with likelihood of misappropriation of good will or misrepresentation as to source, and a resultant possibility of confusion in trade, relief may be had from unfair competition; New York courts ask whether there is sufficient similarity between products as to lead to reasonable likelihood of confusion among purchasers; such criteria as price, degree of competition, methods of distribution, and other identifying names, marks, or symbols, as well as outward appearance, must be considered.--Field Enterprises Educational Corp. v. Cove Industries, Inc. (DC ENY) 161 USPQ 243.

## UNFAIR COMPETITION

### [9] Accounting -- Accounting refused (§ 11.10)

Accounting is not justified where it is clear that loss of property emanating from unfair competition would be entirely speculative and unsupported by evidence. -- Field Enterprises Educational Corp. v. Cove Industries, Inc. (DC ENY) 161 USPQ 243.

## UNFAIR COMPETITION

### [10] Estoppel--Affecting accounting or injunction (§ 35.05)

It would be unjust to require compensation for possible minor unfair competition where defendant expended money in advertising its product and attempting to build up good will for it during years when plaintiff remained quiescent.--Field Enterprises Educational Corp. v. Cove Industries, Inc. (DC ENY) 161 USPQ 243.

*244 Action by Field Enterprises Educational Corporation against Cove Industries, Incorporated, for trademark infringement in which defendant counterclaims to cancel trademark registrations. Relief sought in complaint denied; counterclaim dismissed.

PAUL, WEISS, GOLDBERG, RIFKIND, WHARTON & GARRISON (JAY H. TOPKIS, NEALE M. ALBERT, and GEORGE P. FELLEMAN of counsel) all of New York, N. Y., for plaintiff.

JEROME BAUER (HERBERT H. GOODMAN of counsel) both of Mineola, N. Y., for defendant.

WEINSTEIN, District Judge.

Plaintiff, Field Enterprises Educational Corp. (Field), publisher of the "World Book Encyclopedia," brings this action for trademark infringement and unfair competition against the defendant, Cove Industries, Inc. (Cove), publisher of the "Illustrated World Encyclopedia." Field seeks an injunction preventing Cove's use of the word "World" in connection with the sale of encyclopedias; it also seeks damages and an accounting for losses resulting from trademark infringement and unfair competition.

Cove has raised several defenses. First, it attacks the validity of Field's trademark, asserting that the word "World" was in common use before the adoption of plaintiff's mark, and that the words "World Book" are merely descriptive. Second, Cove claims that Field is estopped to assert its claims because of laches. Finally, Cove maintains that there has been no infringement, even if the registered trademark is valid, because of a lack of similarity between the phrases "World Book" and "Illustrated World." In a counterclaim Cove asks that Field's Trademark Registration Numbers 761,657 and 794,812 be declared void, and that an order issue directing the Commissioner of Patents to cancel those Trademark Registrations.

For the reasons indicated below, neither side is entitled to affirmative relief. A dismissal of the complaint is not warranted but the counterclaim should be dismissed.

### I. FACTS

The plaintiff's trademark, "World Book," was entered on the Principal Register of the United States Patent Office as a mark for books on December 17, 1963, with Registration Number 761,657. The same phrase was entered as a trademark for books and publications on August 24, 1965, with Registration Number 794,812.

Plaintiff, or its predecessors, have published a

COPR. © 2006 The Bureau of National Affairs, Inc.

161 U.S.P.Q. 243
1969 WL 9573 (E.D.N.Y.), 161 U.S.P.Q. 243
(Cite as: 161 U.S.P.Q. 243)

Page 3

"World Book Encyclopedia" since 1917; the name has been in uninterrupted use for the same publication for more than fifty years. "Illustrated World Encyclopedia" has been published by defendant, or its predecessors, under its present title for only ten years, since 1959.

There have been at least ten publications, in addition to "World Book" and "Illustrated World," in the encyclopedia field in which the word "World" appears as part of the title (the dates during which these reference works were published, or are being published, are given in parentheses): "New World Cultural Library" (1962-1964); "New Wonder World Encyclopedia" (1959- *245 1962); "Our Wonder World" (1914-1930); "Our Wonderful World" (1955-date); "Universal World Reference Encyclopedia" (1963-date); "World Educator Encyclopedia" (1963-date); "World Scope Encyclopedia" (1945-1963); "World Wide Encyclopedia" (?-date); "World Wide Illustrated Encyclopedia" (1935-1939); "World University Encyclopedia" (1963-date). See Reference Books Research Publications Inc., General Encyclopedias in Print, 1965, at 42 and passim. (1965). All told, when Trademark Registration Number 761,657 was issued in 1963, there were at least five other encyclopedias then being published which incorporated the word "World" in their titles. With the exception of the years between 1930 and 1935, there has been a continuous history of the use of the word "World" in the titles of encyclopedias other than plaintiff's dating back to at least 1914--some years before "World Book" was first published. "World Book" appears to have acquiesced in the use of the word "World" by other manufacturers throughout its publishing history. In addition, disclaimers of trademark rights to the exclusive use of the word "World," were made at trial.

Prior to first use by plaintiff in 1917, the "World Book Company" of Yonkers, New York used the term. But this prior use was abandoned many years before Field applied for registration.

Field's and Cove's publications are now intended for somewhat different, but overlapping, intellectual and price markets. At least as to price, this was not true before 1965. As is indicated below, Cove's price and marketing changes in about 1965 may have created some confusion in the minds of prospective buyers, but this danger of confusion is not, at the moment, substantial.

At the present time, the price of Cove's "Illustrated World Encyclopedia" is approximately forty dollars.

It is sold in department stores and other retail outlets. But before 1964 "Illustrated World Encyclopedia" was sold from house-to-house at approximately one hundred ten dollars. For a short period in 1964 and 1965, after the selling price was reduced from $109.90 to $34.95, "Illustrated World" was advertised in "publisher's sensational closeout sales." Some copy reads, in part:

> "famous          highly-illustrated          WORLD
> ENCYCLOPEDIA. This 21-volume set sells
> nationally in this same edition, for $109.90)"

"World Book Encyclopedia" presently sells at prices ranging between one hundred eighty and two hundred dollars; within the past ten years, it has not sold at a price lower than one hundred forty dollars. It is sold on a "door-to-door" basis by salesmen dealing with individual purchasers. Field controls the distribution of its product until it reaches the ultimate consumer.

"Illustrated World" is published in at least one edition that is very similar to the "Aristocrat" edition published by "World Book." Both are bound in yellow parchment fabric with a green and gold spine. Both are heavily illustrated. "World Book" is published in twenty volumes, "Illustrated World" in twenty-one. Both utilize contributors with scholarly backgrounds, and both print the names of these contributors on the title pages of their publications. Both are arranged alphabetically. As far as physical characteristics are concerned, the only significant difference lies in the size of the volumes; "World Book" is substantially thicker, and slightly taller.

The differences between the two, beyond mere superficial physical appearance, are striking. "Illustrated World Encyclopedia" is written for readers below the lower grades of high school. "World Book" by contrast, attempts to appeal to all age groups above the grade school level; it is not recommended for use by children in lower elementary grades. Reference Books Research Publications, Inc., General Encyclopedias in Print, 1965, at 15 (1965). Field conducts an extensive and continuous revision program, and publishes an updated supplement annually. In addition, the entire work is reprinted semi-annually, with current changes incorporated in the text. It would appear that this is not the case with "Illustrated World," although changes are made in later editions. In short, it may be said that as to content, format and accuracy, the "World Book" is obviously superior as a reference book to the "Illustrated World Encyclopedia" for those who have successfully completed grade school.

COPR. © 2006 The Bureau of National Affairs, Inc.

Field has expended an estimated $17,000,000 over the last ten years for advertising its products bearing the "World Book" trademark. Although Cove has also advertised its work, it has not expended sums approaching those spent by Field.

Prior to 1955 there would have been some danger of confusion of the two works on the part of an unwary purchaser. With the reduction in price and change in marketing methods of Cove's product, the possibility of confusion has become unlikely.

Reference has already been made to *246 the "closeout" advertising in 1964 and 1965. During this transitional period it was not unlikely that at least some of Field's customers concluded that the superior product they had bought, or were contemplating buying, was the same as the one being "closed out" at some one hundred dollars less than "The World Book" price. There has been no evidence that this source of confusion existed after 1965.

Field was aware of Cove's use of the title "Illustrated World" and a similar format at some time prior to 1960, possibly in 1958 or 1959. Instead of protesting or attempting in any way to prevent defendant's use of that title, Field permitted Cove to continue on its course for over five years before bringing suit. No explanation has been offered for this delay. Since it is likely that defendant was aware of the extensive use by other publishers of the use of the word "World," it is reasonable to conclude that Cove considered itself justified in the use of its title "Illustrated World Encyclopedia." There has been no evidence suggesting bad faith or intent to defraud plaintiff on the part of Cove.

## II. THE PRESUMPTION OF TRADEMARK VALIDITY

Use of a registered trademark for a continuous five-year period after registration, and while "there is no proceeding involving said rights pending" is required before that mark becomes incontestable and before there is a conclusive presumption of a registrant's exclusive right to use a registered trademark. 15 U.S.C. § § 1065, 1115(b). The registration of "World Book" as a trademark was accomplished less than five years before this action was commenced. Thus registration must be regarded merely as prima facie evidence of Field's exclusive right to use the phrase in connection with books or publications. The defendant is not precluded from proving "any legal or equitable defense which might have been asserted if such mark had not been registered." 15 U.S.C. §

1115(a).

## III. TRADEMARK INFRINGEMENT

Although Field has established a prima facie case for its exclusive right to use the trademark "World Book" by the introduction of the Certificates of Registration, the defenses of prior use, use of descriptive words, and lack of similarity must be considered on the question of trademark infringement.

### A. Prior Use

[1] It is a fundamental concept in the law of trademarks and trade names that prior use of a word or phrase, unless abandoned, will vitiate any claim to an exclusive right to the use of those words by a later user. Columbia Mill Co. v. Alcorn, 150 U.S. 460, 14 S. Ct. 151 (1893).

In light of the extensive use of the word "World" in other encyclopedias, as well as the disclaimers of exclusivity of the right to use this word, prior use prevents a successful claim to exclusive rights in the word "World." It does not, however, preclude the assertion of rights in the phrase "World Book" unless there was prior use of this specific combination of words or some other ground for invalidating the trademark registration. Since the phrase "World Book" has not been in use for some forty years by any other company in a related field before the registration of the phrase by the plaintiff, any prior use by anyone other than Field has been abandoned for purposes of the trademark statutes. Gruelle v. Molly-'Es Doll Outfitters, 94 F.2d 172, 175, 36 USPQ 82, 84-85 (3d Cir. 1937), cert. denied, 304 U.S. 561, 58 S. Ct. 943 (1938). Prior use does not invalidate plaintiff's trademark.

### B. The Use of Descriptive Words

[2] Another tenet of the law of trademarks and trade names is that known as "hierarchy of trademarks." Farmers' Educational & Coop. Union v. Farmers' Educational & Coop. Union, Iowa Div'n., 141 F.Supp. 820, 824, 110 USPQ 531, 533-534 (S.D. Iowa 1956), aff'd 247 F.2d 809, 114 USPQ 382 (8th Cir. 1957). Some words, fanciful or coined, bear so little relation to the product which they identify that they are considered entitled to protection against all users. These are commonly denominated "strong" marks. Others are either descriptive or closely related to the product which they identify, and are therefore entitled to no protection unless they have acquired a secondary meaning—that is to say, the public has learned to identify the name of the product with its source or

COPR. © 2006 The Bureau of National Affairs, Inc.

161 U.S.P.Q. 243
1969 WL 9573 (E.D.N.Y.), 161 U.S.P.Q. 243
(Cite as: 161 U.S.P.Q. 243)

origin. Warner Bros. Pictures v. Majestic Pictures Corp., 70 F.2d 310, 21 USPQ 405 (2d Cir. 1934); Fishler v. Twentieth Century-Fox Film Corp., 159 F.Supp. 215 116 USPQ 310 (S.D. Cal. 1958). The distinction is basic to the concept of trademark protection, since it is the reputation of the manufacturer and the interest of the public in not being deceived as to the source of the goods which the law seeks to protect. 3 Callman, Unfair Competition and Trademarks 1057 (1965 Cu. Supp.); Clairol Inc. v. Gillette Co., 270 F.Supp. 371, 376, 154 USPQ 466, 468-469 (E.D. N.Y. 1967), *247 aff'd, 389 F.2d 264, 156 USPQ 593 (2d Cir. 1968).

[3] It is clear that the title "World Book" is neither fanciful nor coined. The words relate in a fairly descriptive way to the work itself, denoting that the publication makes available the relevant knowledge of the world. This is a terse rephrasing of the dictionary definition of an encyclopedia:

"1 A work containing information on all subjects, or exhaustive of one subject; a cyclopedia. * * * 3 The entire circle of knowledge." Funk & Wagnalls Standard Dictionary 417 (Int'l ed. 1966).

The "weakness" of the name "World Book" is emphasized by the proliferation of titles of encyclopedic works which make use of the word "World." In such a situation, unless the name "World Book" has attained some secondary meaning which would cause the public to identify the source of the work, no trademark right could validly be said to subsist in that name. "Titles of copyrighted works are not protected against their use by others unless they are distinctive and have acquired a secondary meaning." Alexander v. Irving Trust Co., 132 F.Supp. 364, 368, 106 USPQ 74, 77 (S.D. N.Y.), aff'd, 228 F.2d 221, 108 USPQ 24 (2d Cir. 1955), cert. denied, 350 U.S. 996, 76 S. Ct. 545, 108 USPQ 456 (1956).

Based upon the evidence, the phrase "World Book" has acquired a secondary meaning sufficient to entitle it to protection under the trademark laws. The long and continued use of the name, widespread use of the book (3 1/2 to 4 million sets were sold in the last ten years), as well as the amounts spent for promotion and advertising, support this conclusion. See Annot., 150 A.L.R. 1067, 1083 (1944). Finally, the approval which has been accorded the work within educational circles should also be considered as bearing upon the likelihood of an increased familiarity on the part of

the public. A highly praised work is more likely than not to be known to the public by name. In this connection, "World Book" is:

"RECOMMENDED by the Subscription Books Committee of the American Library Association both as a children's and young people's encyclopedia for use in the home and in school and public libraries, and as a general encyclopedia for home use serving adults for ready reference. RECOMMENDED FOR FIRST PURCHASE in the Standard Catalog for High School Libraries and the Children's Catalog. ON THE APPROVED LIST OF EVERY STATE AND PROVINCE maintaining such lists." Reference Books Research Publications, Inc., General Encyclopedias in Print, 1965, at 16 (1965).

### C. Similarity

[4] In addition to showing that its trademark is entitled to protection, the plaintiff must also show that it has been infringed. On the claim of trademark infringement the relevant inquiry is whether the material protected by trademark--here, the phrase "World Book"--has been infringed by the defendant's choice of title. That is, is there a confusing similarity between the names "World Book" and "Illustrated World"?

As noted above, the words "World" and "Book" are basically descriptive of the product involved. In light of the extensive use of each word in the encyclopedia publishing field, it is doubtful that either, standing alone, could be the subject of a valid trademark. Since the only word that is identical in the titles "World Book" and "Illustrated World" is "World," it may be assumed that it is the use of this word which the plaintiff finds objectionable (either alone or in conjunction with "Illustrated" or "Encyclopedia," or both). As already pointed out, this word is extremely "weak," in the trademark sense. See, e.g., Palmer v. Gulf Pub. Co., 79 F.Supp. 731, 78 USPQ 349 (S.D. Cal. 1948) ("World Petroleum"); cf. Field Enterprises Educational Corp. v. Grosset & Dunlap, Inc., 256 F.Supp. 382, 150 USPQ 517 (S.D. N.Y. 1966) ("How and Why" trademarks not infringed by "How and Why Wonder Books").

[5] It is undesirable that words in common use be given a monopoly under the trademark laws. For this reason, a distinction is made for purposes of determining infringement between primary and secondary uses. While the secondary use may be protected, the use of a common word in its primary sense may not be. Jean Patou, Inc. v. Jacqueline Cochran, Inc., 201 F.Supp. 861, 133 USPQ 242

COPR. © 2006 The Bureau of National Affairs, Inc.

(S.D. N.Y. 1962), aff'd 312 F.2d 125, 136 USPQ 236 (2d Cir. 1963); see also Barton v. Rex-Oil Co., 2 F.2d 402, 404 (3d Cir. 1924). Here, it is apparent that the word "World" has been used by the defendant in its primary sense, i.e., pertaining to the earth and its contents. There has been no trademark infringement.

## IV. UNFAIR COMPETITION

### A. Injunctive Relief

[6] Although there has been no infringement, this does not dispose of the claim against Cove for unfair competition. *248 Trademark law must be distinguished from the law of unfair competition. The latter, since it protects more than the mere name, may give broader protection. As Judge Bonsal has pointed out:

"The essential element of a trademark is the exclusive right of its owner to use a word or device to distinguish his product. On the other hand, a claim of unfair competition considers the total physical image given by the product and its name together." Jean Patou, Inc. v. Jacqueline Cochran, Inc., 201 F.Supp. 861, 863, 133 USPQ 242, 245 (S.D. N.Y. 1962), aff'd 312 F.2d 125, 136 USPQ 236 (2d Cir. 1963).

[7] The law of New York is to be applied in this claim for unfair competition. Flexitized, Inc. v. National Flexitized Corp., 335 F.2d 774, 780, 142 USPQ 334, 338-339 (2d Cir. 1964), cert. denied. 380 U.S. 913, 85 S. Ct. 899, 144 USPQ 780 (1965). The decisions of the Supreme Court in Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S. Ct. 784, 140 USPQ 524 (1964), and Compco Corp. v. Day-Brite Lighting, Inc. 376 U.S. 234, 84 S. Ct. 779, 140 USPQ 528 (1964), do nothing to change this rule. In those cases, the concern expressed related to the use of state unfair competition laws as a means of extending the effective term of patent protection. While these cases may apply by analogy to the use of common law copyright (Goldstein, Federal System Ordering of the Copyright Interest, 69 Colum. L. Rev. 49 (1969)), they have no bearing in the area of trademark. Since the term of federal trademark protection is theoretically perpetual (assuming no abandonment), use of state unfair competition law to protect trademark registrants would not result in conflict with the federal policy "of allowing free access to copy whatever the federal patent and copyright laws have in the public domain." Compco Corp. v. Day-Brite Lighting, Inc., 376

U.S. 234, 237, 84 S. Ct. 779, 782, 140 USPQ 528, 530 (1964). Where there is no federal policy in favor of creating a body of material in the public domain, there can be no conflict created by a state policy of restricting unfair competition, granting greater protection than that available under federal trademark law.

[8] State law would appear to require more from a competitor than simple forbearance from using the name of a competitor. Where there is a substantial similarity in packaging or advertising, with a likelihood of misappropriation of good will or misrepresentation as to source, and a resultant possibility of confusion in the trade, relief may be had under unfair competition. Distillerie Flli Ramazzotti, S.P.A. v. Banfi Products Corp., 52 Misc.2d 593, 276 N.Y.S. 2d 413, 421-22, 151 USPQ 551 (Sup. Ct. 1966).

"The critical question is whether customers are, or may be, misled." Jean Patou, Inc. v. Jacqueline Cochran, Inc., 201 F.Supp. 861, 863, 133 USPQ 242, 245 (S.D. N.Y. 1962), aff'd, 312 F.2d 125, 136 USPQ 236 (2d Cir. 1963). See also Coca-Cola Co. v. Snow Crest Beverages, 64 F.Supp. 980, 985, 68 USPQ 437, 441-442 (D. Mass. 1946). New York courts ask whether there is sufficient similarity between products to lead to a reasonable likelihood of confusion among purchasers. Fischer v. Blank, 138 N.Y. 244, 33 N.E. 1040 (1893); Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co., 3 App.Div.2d 227, 159 N.Y.S. 2d 606, 610, 112 USPQ 489 (1st Dep't 1957), reargument denied, 3 App.Div. 833, 161 N.Y.S. 2d 829, and 3 App.Div.2d 833, 161 N.Y.S. 2d 830 (1st Dep't 1957). Prospective purchasers are "not required to carry in [their] memory, at all times, the exact details of the package so that [they] will be able, at the time of purchase, to differentiate such two items." Distillerie Flli Ramazzotti, S.P.A. v. Banfi Products Corp., 52 Misc.2d 593, 276 N.Y.S.2d 413, 422, 151 USPQ 551, 556 (Sup. Ct. 1966). Such criteria as price, degree of competition, methods of distribution, and other identifying names, marks, or symbols, as well as outward appearance, must be considered.

In light of the different methods of distribution, sales price and quality, it is doubtful that the public would easily be confused by the two encyclopedias. Unfair competition has not been shown by any proof of experts, surveys or individual complaints since 1965. The plaintiff is not entitled to the issuance of an injunction against the continuation of defendant's trade practices.

COPR. © 2006 The Bureau of National Affairs, Inc.

161 U.S.P.Q. 243
1969 WL 9573 (E.D.N.Y.), 161 U.S.P.Q. 243
(Cite as: 161 U.S.P.Q. 243)

Had the advertising of defendant's work as one formerly selling at over one hundred ten dollars continued, the case would be quite different. While this action, coupled with the high degree of similarity between the works, undoubtedly constituted unfair competition, it has been discontinued (even before this action was commenced). There is no reason to award injunctive relief now when there is no immediate threat of injurious activity.

*249 **B. Damages and Accounting**

In addition to injunctive relief, Field has requested both damages and an accounting against Cove for loss of profits caused by unfair competition.

[9] Relief in the form of damages or an accounting is not granted as a matter of course. Where it appears clear that the loss of property emanating from the unfair competition would be entirely speculative, and unsupported by evidence, an accounting is not justified. Cf. Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co., 3 App.Div. 2d 227, 159 N.Y.S.2d 606, 112 USPQ 489 (1st Dep't 1957), reargument denied, 3 App.Div.2d 833, 161 N.Y.S.2d 829 and 3 App.Div.2d 833, 161 N.Y.S.2d 830 (1st Dep't 1957). Here, the possible unfair competition was extremely limited in time; there is proof of just a few instances where purchasers might have been misled by the 1964-65 advertisements. No loss of sales has been shown. The remedies of damages or of an accounting are unjustified. Field's damages were at the most de minimis.

Additionally, Field is estopped from obtaining an accounting for profits by laches. Defendant's good faith, plaintiff's delay, the equities of the case, and the implication of abandonment of a demand for an accounting "in the absence of its being urged" at the trial by any evidence, all support denial of monetary relief. Victory Chain v. Rosenberg, 10 Misc.2d 382, 174 N.Y.S.2d 46, 53 (Sup. Ct. 1958). See also Shaffer v. Rector Well Equipment Co., 155 F.2d 344, 69 USPQ 298 (5th Cir. 1946); Fruit Industries v. Bisceglia Bros. Corp., 101 F.2d 752, 754, 40 USPQ 445, 446-447 (3d Cir. 1939); Kay Dunhill, Inc. v. Dunhill Fabrics, Inc., 44 F.Supp. 922, 935, 53 USPQ 231, 242-243 (S.D. N.Y. 1942); Cohn & Rosenberger v. Kaufman & Ruderman, 280 App.Div. 241, 113 N.Y.S.2d 62, 94 USPQ 13 (1st Dep't 1952).

[10] Finally, where the defendant has expended money in advertising its product and attempting to build up good will for its own encyclopedia during

the years when Field remained quiescent, it would be unjust and inequitable to require compensation for possible minor injuries in the past.

### V. THE APPROPRIATE REMEDY

For the reasons already stated, neither party is entitled to any affirmative relief. Cove's unfair advertising campaign of 1964-65 does not seem to have been repeated and apparently resulted from a non-recurring change in its merchandising practices.

Ordinarily this conclusion would suggest dismissal of both complaint and counterclaim. But both parties remain in active competition with respect to an overlapping market at approximately the junior-high school level and the physical similarity of their volumes provides a continuing danger that defendant may relapse into some form of its earlier advertising campaign. A dismissal of the complaint would then require plaintiff to commence a new action.

The collateral estoppel effect of a judgment of dismissal would not be completely clear in view of changed circumstances required to be alleged and proved in the new action. Restatement of Judgments § 68(2) and Comments j, o, and q. See also Speed Products Co., Inc. v. Tinnerman Products, Inc., 222 F.2d 61, 67-68, 105 USPQ 173, 176-178 (2d Cir. 1955) (collateral estoppel not applied); Seven-Up Co. v. Bubble-Up Corp., 312 F.2d 472, 136 USPQ 210 (CCPA 1963) (collateral estoppel applied to doctrine of laches); Gottesman v. General Motors Corp., 221 F.Supp. 488, 491-92 (S.D. N.Y. 1963) (distinction between ultimate facts and mediate data).

While, in a new action, the court could take judicial notice of this litigation, courts have generally been reluctant to extend the doctrine to specific findings of fact. Cf. 9 Wigmore, Evidence 570 (3d ed. 1940) ("practical notoriety and certainty of the fact"); McCormick, Evidence 702 (1954) (informal presentation approved); South Shore Land Co. v. Peterson, 38 Cal. Rep. 392, 402, 403 (Dist. Ct. App. 1964) (prior proceeding in federal court noticed); Meck v. Allen Properties, Inc., 206 Misc. 251, 132 N.Y.S.2d 674 (1954) (prior action between same parties relied upon for map used by court).

An effective procedure, cheaper for both parties than a new action should unfair competition be threatened again, would be to retain foot-of-the-decree jurisdiction. Speedy relief could then be obtained by a motion in the present action brought on by order to show cause. Such a practice represents a slight departure from normal judicial usage but is

COPR. © 2006 The Bureau of National Affairs, Inc.