161 U.S.P.Q. 243
1969 WL 9573 (E.D.N.Y.), 161 U.S.P.Q. 243
**(Cite as: 161 U.S.P.Q. 243)**

Page 8

supported by the general power of federal courts as inheritors of the flexible authority of equity.

Usually an injunction is granted subject to the right of the parties to apply for a modification where, for example, changed conditions make it "no longer equitable that the judgment should have prospective application." Rules of Civil Procedure, Rule 60(b)(5); United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460 (1932); 7 Moore's Federal Practice PP 60.16[6], 60.26[4]. But in *250 terms of the court's continuing jurisdiction, little turns on whether the original decree was negative, affirmative, or merely passive as in the instant case. If there is a substantial possibility that the act sought to be enjoined may be repeated, the matter is not necessarily mooted. Papaliolios v. Durning, 175 F.2d 73, 75 (2d Cir. 1949); 6A Moore's Federal Practice P 57.13. Where, as here, a full trial has been required to determine both relevant and material facts and the parties can benefit from a declaratory judgment, a dismissal for mootness is not mandated. See Borchard, Declaratory Judgments 428-30 (2d ed. 1941). There is some discretion to weigh the continuing needs of the parties.

> "[W]hen coercive relief only is sought but is deemed ungrantable or inappropriate, the court may sua sponte, if it serves a useful purpose, grant instead a declaration of rights." Original Committee Note of 1937 to Rule 57, 6A Moore's Federal Practice P 57.01[2].

Explicit recognition of the power to grant declaratory judgments includes leave to grant a new decree based on the original judgment "after notice and hearing, against any adverse party whose rights have been determined." 28 U.S.C. § 2202. Whether a declaration is sought in the complaint is, of course, not material in considering the court's powers. Rules of Civil Procedure, Rule 54(c). Nor does the power to grant a new decree depend upon whether the court's judgment is phrased in terms of declaration of rights.

There is no need in the present state of affairs to declare the rights and duties of the parties in more detailed form than has been done in this memorandum. It suffices to deny all relief sought in the complaint without costs or disbursements and to dismiss the counterclaims.

So ordered.

E.D.N.Y.

161 U.S.P.Q. 243

END OF DOCUMENT

COPR. © 2006 The Bureau of National Affairs, Inc.

Intellectual Property Library
ISSN 1526-8535

Source: USPQ, 2d Series (1986 - Present) > U.S. Court of Appeals, Second Circuit > Mana Products Inc.
v. Columbia Cosmetics Mfg. Inc., 36 USPQ2d 1176 (2d Cir. 1995)

## Mana Products Inc. v. Columbia Cosmetics Mfg. Inc., 36 USPQ2d 1176 (2d Cir. 1995)

36 USPQ2d 1176
Mana Products Inc. v. Columbia Cosmetics Mfg. Inc.
U.S. Court of Appeals Second Circuit
No. 94-7868
Decided September 19, 1995
65 F3d 1063

### Headnotes

**TRADEMARKS AND UNFAIR TRADE PRACTICES**

**[1] Types of marks -- Trade dress as mark -- Secondary meaning (▶ 327.0703)**

**JUDICIAL PRACTICE AND PROCEDURE**

**Procedure -- Summary judgment -- Trademarks and unfair trade practices (▶ 410.3305)**

Granting motion of defendant for summary judgment on issue of whether plaintiff's product is inherently
distinctive is not generally favored in trade dress infringement action brought under Lanham Act, since
producer has endless options for packaging its products, so that trade dress is often arbitrary or fanciful
and thus inherently distinctive, and since issue of whether there is likelihood of confusion, which is often
more significant, is usually question of fact.

**TRADEMARKS AND UNFAIR TRADE PRACTICES**

**[2] Types of marks -- Trade dress as mark -- Secondary meaning (▶ 327.0703)**

**Types of marks -- Trade dress as mark -- Labeling and appearance of goods (▶ 327.0704)**

Plaintiff has failed to establish that trade dress of its black makeup compacts is inherently distinctive,
since trade dress is inherently distinctive only if its intrinsic nature serves to identify particular source for
product, since both plaintiff and defendant purchased same plastic compact cases from independent
manufacturers, since other cosmetics manufacturers have used identical packaging, since compacts' size
and shape, considered as whole, are common characteristics of entire genre of makeup compacts, and
since mirrors, tins and makeup inside compacts are at best descriptive in cosmetics industry; trade dress
must therefore be shown to have acquired secondary meaning in order to be protected.

**[3] Types of marks -- Trade dress as mark -- Secondary meaning (▶ 327.0703)**

Plaintiff has failed to show that trade dress of its black makeup compacts has acquired secondary
meaning, even though plaintiff claims to have spent over $3 million in advertising its products and has
submitted affidavit of customer as evidence, since party's advertising budget is only one of many factors
probative of secondary meaning, since single affidavit of single customer is insufficient to show that trade
dress identifies plaintiff as source of product, since plaintiff has failed to submit any consumer surveys or
information as to relative market share of its cosmetics, unsolicited media coverage, or amount of time
that compacts made exclusive use of claimed design, and since color black does not act as symbol to
distinguish plaintiff's compacts from those of its competitors, in that many cosmetic companies sell black
compacts.

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as
permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Intellectual Property Library
ISSN 1526-8535

## Case History and Disposition

Appeal from the U.S. District Court for the Eastern District of New York, Amon, J.

Action by Mana Products Inc. against Columbia Cosmetics Mfg. Inc., for trade dress infringement under Lanham Act's Section 43(a), 15 USC 1125(a), and for unfair competition and dilution under state law. From grant of summary judgment for defendant, plaintiff appeals. Affirmed.

### Attorneys

Edward C. Kramer, Darryl J. Kramer, and Samuel Frankel, of Kramer & Kramer, New York, N.Y., for plaintiff-appellant.

Eugene P. Devany and Ronald S. Galasi, of Curtis, Zaklukiewicz, Vasile, Devine & McElhenny, Merrick, N.Y., for defendant-appellee.

### Judge

Before Oakes and Cardamone, senior circuit judges, and Altimari, circuit judge.

### Opinion Text

#### Opinion By:

Cardamone, S.J.

This is an appeal in a trademark case. Plaintiff Mana Products, Inc. (Mana) appeals from a judgment entered August 3, 1994 in the United States District Court for the Eastern District of New York (Amon, J.), that granted summary judgment to defendants Columbia Cosmetics Mfg. Inc., (Columbia) and dismissed plaintiff's complaint for trade dress infringement under the Lanham Act, 15 U.S.C. Sections 1051-1127(a) (1988), the New York state common law of unfair competition, and the New York Anti- dilution statute, N.Y. Gen. Bus. Law Section 368-d (McKinney 1984). Mana alleged that

Columbia sold and continues to sell a line of cosmetics that in every significant way is a copy of Mana's makeup products. The Lanham Act claims were dismissed on a finding that the trade dress of Mana's black compact makeup cases was not inherently distinctive, nor had it acquired secondary meaning within the private label cosmetics market. Mana's state law claims were dismissed for similar reasons.

### BACKGROUND A. *Facts*

Mana and Columbia are in the business of manufacturing and selling at wholesale a line of "private label" cosmetic products to beauty salons and other retailers throughout the United States. Customers purchase "private label" products from Mana and Columbia, affix their own brand name labels to the products, and then resell them to their retail consumers.

In its complaint Mana alleged it developed lines of cosmetic products with certain designs, word designations, and color combinations, and created catalog numbers, price lists, and advertisements that

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Intellectual Property Library
ISSN 1526-8535

identify its products to the private label cosmetics market. Exhibits of its sales materials and advertisements were appended to the complaint. The complaint did not refer specifically to these exhibits, nor did it detail examples of copying or identify those products that Columbia allegedly infringed. From 1979 through 1982, Mana further stated, Columbia was an authorized distributor of Mana's products in the private label cosmetics industry, but in 1982 began marketing a competing line of cosmetic products infringing on the trade dress of Mana's makeup products.

## B. *Prior Legal Proceedings*

As a result of this competition from a former distributor, plaintiff, also known as Your Name Cosmetics Inc. (Your Name), filed a complaint on August 28, 1990 seeking injunctive relief and monetary damages against defendant. When Columbia moved for summary judgment submitted in response the affidavit of Sharon Garment, Mana's vice-president of marketing, and appended four photographs of Mana's and Columbia's black compacts and copies of two advertisements. Mana also submitted the affidavit of Jane Rosen, the owner of a cosmetics business, to prove inherent distinctiveness and actual confusion in the cosmetics market. Ms. Rosen was surprised to find that Mana and Columbia were two totally separate and unrelated companies.

Noting that Mana's complaint contained broad allegations that Columbia had copied the geometric shape and color of Mana's compacts and the exotic names used to describe the various shades of color included in those cosmetic kits, the district court concentrated primarily on Mana's claims with respect to the black compacts, the photographs of which had been submitted by Ms. Garment. The four photographs were the only evidence submitted by plaintiff as proof of the alleged infringement.

Additionally, during the hearing on the motion for summary judgment, Columbia's counsel stated that defendant had changed all of its products' color names and catalog numbers. Judge Amon inquired whether the copying of the shape of the compacts and its color arrangements were at the heart of Mana's claims. Counsel for plaintiff answered, "It's the cases along with the color of the cases -- the black cases -- the shape of the case and the size -- the inside mold which is the same as ours . . . and the color combinations of cosmetics." From this answer the district judge determined that Mana had abandoned its claims regarding the other allegedly infringing products and had thereby narrowed its claims to include only the similar size, shape, and color of certain powder, blush, and eye shadow compacts that comprise a portion of both parties' product lines.

Based on the Supreme Court's test for trade dress infringement, Judge Amon ruled that Mana had not shown its black makeup compacts were distinctive. Hence, she found it unnecessary to decide whether a likelihood of confusion existed between plaintiff's and Columbia's compacts. The trial court found nothing about the compacts' total image -- comprising its basic rectangular design, arrangement of mirrors, makeup tins inside the compacts and the color combinations of the tints and black color cases -- was inherently distinctive. Instead, it concluded the black compact cases were generic because Mana did not design them, but instead purchased the plastic cases used as its compacts from independent manufacturers in the open market. Mana conceded that similar plastic cases can be purchased from a number of independent manufacturers.

As a result of the district court judge's inquiries, plaintiff focused more precisely on appeal what it considers an infringement of its products. First, it thinks Columbia's Ultimate Skin Achievement Program (USA) products have the identical logo and container that Mana uses on its European Skin Protection (ESP) products. But Mana's photo depiction of its ESP products did not

**Page 1178**

offer any visual evidence revealing the alleged similarity with the USA logo or container. Columbia's label and logo are on the back of the products and are not seen in the photographs.

Second, Mana maintains that Columbia "unfairly imitated" its vinyl kits. Yet, Nikos Mouyiaris, Mana's president, admitted in a deposition that the packaging for Columbia's travel kits -- similar to Mana's vinyl

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Intellectual Property Library
ISSN 1526-8535

kits -- are generic in the industry.

Third, plaintiff asserts defendant infringed on its trade dress by packaging cosmetics in similar jars, caps, and other containers, but at the same time generally concedes that it was itself using generically available packaging materials.

Fourth, plaintiff states Columbia infringed on its catalog numbers and names for color combinations. Mana refers to defendant's use of 12 colors of eye shadow tint sets, 12 colors of powder blush-on, and seven colors of duo blush-on. Columbia's counsel acknowledged that before 1990 Columbia used two percent of the one thousand catalog numbers and about 18 out of 200 or 300 color combinations. Additionally, a deposition of Rachel Randel, Columbia's president, revealed that before defendant manufactured its own products and was purchasing Mana's products, it included Your Name's product name, colors, and numerical code within its price list. After Columbia ceased buying Your Name products it continued this practice. However, after initiation of the instant litigation, all color names and catalog numbers were changed. Mana did not contest Columbia's assertion that it had stopped using Mana's color names and catalog numbers and that any conceivable infringement other than the alleged copying of the makeup compacts was "inconsequential."

Finally, Mana believes Columbia was infringing a series of black makeup compacts each containing either powder, blush, or eyeshadow. Plaintiff referred to the four color photographs of Mana's and Columbia's compacts that showed the arrangement of the rectangular inserts and the color schemes to prove the infringement of its black compact cases. In the photographs, all of the compacts are black with no decorative features except for two of Mana's compacts with white tops. The compacts are all rectangular or square shaped with mirrors and makeup tins inside. Although the compacts are the same size, the makeup colors and textures of the tints look somewhat different.

Before this appeal, Columbia nevertheless admitted its compacts' shape, size and colors are essentially the same in appearance and trade dress as Mana's compacts. "He used them, I used them, 50 other companies use them. Anyone that the plastic manufacturer sells to uses them." In a deposition, Ms. Randel stated that she made decisions on packaging based upon what she could "get in the industry." She further declared that to her knowledge, compacts are manufactured in a "square, rectangle [shape], that's it."

With respect to the other proof plaintiff offered, the district court ruled that Ms. Rosen's affidavit and Mana's assertion of spending $3 million for advertising were insufficient to prove that Mana's trade dress had acquired a secondary meaning in the market. Judge Amon therefore granted defendant's motion for summary judgment and dismissed plaintiff's complaint. From this judgment Mana appeals. We affirm.

## DISCUSSION I Lanham Act

During oral argument before us Mana's counsel centered his arguments around the alleged infringement of Mana's makeup compacts with respect to shape, color of makeups, and the black color of the compact as the basis for plaintiff's claims. When counsel was asked for visual evidence showing that Columbia copied Mana's trade dress for other products and its display, counsel offered only Ms. Rosen's affidavit stating that at a single trade show she thought Columbia's products were Mana's. In view of the lack of proof with respect to the trade dress of Mana's other products, discussion will focus only on whether Columbia infringed Mana's trade dress for its black compacts.

The Lanham Act expanded the private common law right of action for commercial injuries resulting from deceptive advertising and marketing. 15 U.S.C. Sections 1051-1127 (1988). Section 43(a) of the Act, 15 U.S.C. Section 1125(a), provides that:

> [a]ny person who shall affix . . . in connection with any goods . . . or containers for goods, . . . any false description or representation, including words or other symbols . . . shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Intellectual Property Library
ISSN 1526-8535

description or representation.

Lanham Act, 15 U.S.C. Section 1125(a) (1988) (current version at 15 U.S.C. Section 1125(a)(1) (1994)).

Congress enacted this trademark legislation to protect consumers and trademark owners. It was the legislature's aim to ensure

**Page 1179**

that when consumers purchase a product they like, one that bears a familiar trademark, they may be confident the product they ask for is the one they will get. That is, a consumer may minimize his search. The Act also protects trademark owners. As trademark owners have expended time and money in presenting their products to the public, they are entitled to have their investment protected from misappropriation by pirates and cheats. *See* S. Rep. No. 1333, 79th Cong., 2d Sess. 3-5 (1946). Congress believed that protecting trademarks fosters fair competition, assures that consistent quality of trademarked goods may be maintained over time, and secures to trademark owners their reputation and goodwill. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.* , 469 U.S. 189, 198 [ 224 USPQ 327 ] (1985).

Section 43(a) of the Lanham Act extends protection to trade dress, *see Two Pesos, Inc. v. Taco Cabana, Inc.* , 112 S.Ct. 2753, 2760 [ 23 USPQ2d 1081 ] (1992) ("Section 43(a) provides no basis for distinguishing between trademark and trade dress."), and it furnishes a civil action for trade dress infringement. *See Coach Leatherware Co., Inc. v. AnnTaylor, Inc.* , 933 F.2d 162, 168 [ 18 USPQ2d 1907 ] (2d Cir. 1991); *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.* , 659 F.2d 695, 702 [ 212 USPQ 904 ] (5th Cir. Unit B Oct. 1981), *cert. denied* , 457 U.S. 1126 (1982). The term trade dress refers to how a product looks, its total image, or its overall appearance. As such, it includes a product's "composition and design, including size, shape, color, texture and graphics." *Coach Leatherware Co.* , 933 F.2d at 168; *Stormy Clime Ltd. v. ProGroup, Inc.* , 809 F.2d 971, 974 [ 1 USPQ2d 2026 ] (2d Cir. 1987).

To prevail in a trade dress infringement suit under the Lanham Act, plaintiff must first prove that its identifying mark is itself inherently distinctive *or* that it has become distinctive by acquiring a secondary meaning. Second, plaintiff must show that a likelihood of confusion exists between its product and the defendant's. *See Two Pesos* , 112 S.Ct. at 2758. Finally, eligibility for protection of an identifying mark also depends on its nonfunctionality. Functionality is defined as the quality essential to the product's purpose. *Id* . at 2760 ("a design is legally functional, and thus unprotectable, if it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection."); *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.* , 456 U.S. 844, 850 n.10 [ 214 USPQ 1 ] (1982) ("feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.").

Defendant bears the burden of proving functionality as a defense to plaintiff's claim of infringement. *See LeSportsac, Inc. v. K Mart Corp.* , 754 F.2d 71, 76 [ 225 USPQ 654 ] (2d Cir. 1985). The Lanham Act does not protect functional packaging and commonplace product design because competition would be "stifled by the exhaustion of a limited number of trade dresses." *Two Pesos* , 112 S.Ct. at 2760-61. Since the district court did not find Mana's trade dress distinctive, it did not reach or decide the issues of likelihood of confusion or functionality. Thus, discussion turns next to the issue of distinctiveness.

## II Distinctiveness

Distinctiveness, the first element that must be proved in a trade dress infringement cause of action, split the Circuits until the Supreme Court resolved the matter in *Two Pesos* , 112 S.Ct. at 2759-60. We had required a plaintiff seeking trade dress protection to establish distinctiveness by showing that its product acquired a secondary meaning in the marketplace. *Id* . at 2759-60; *Stormy Clime* , 809 F.2d at 974. The Fifth Circuit held to the contrary that a demonstration of secondary meaning is not required in every trade dress infringement action. *See Chevron* , 659 F.2d at 702.

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Intellectual Property Library
ISSN 1526-8535

In 1992 the Supreme Court in *Two Pesos* rejected our approach and adopted the Fifth Circuit's view that trade dress should be categorized in the same manner as trademarks and, accordingly, secondary meaning is not required where a trade dress is a distinctive identifying mark. *See* 112 S.Ct. at 2760. "The general rule regarding distinctiveness is clear: an identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Id*. at 2758 (citing *Restatement (Third) of Unfair Competition* Section 13 (Tent. Draft No. 2 (1990)). If a trade dress is inherently distinctive, it is not necessary to establish that a product has acquired secondary meaning in the marketplace because the packaging itself "is capable of identifying products or services as coming from a specific source." *Id*. at 2760.

In *Abercrombie & Fitch Co. v. Hunting World, Inc.* , 537 F.2d 4, 9 [ 189 USPQ 759, 769] (2d Cir. 1976), Judge Friendly classified trademarks for purposes of their protection in categories according to ascending degrees of inherent distinctiveness. These

**Page 1180**

categories are: "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Id*. Trade dress later embraced these same classifications. *See Two Pesos* , 112 S.Ct. at 2760. Generic marks refer "to the genus of which the particular product is a species" and are not entitled to trade dress protection. *Park 'N Fly* , 469 U.S. at 194 (quoting *Abercrombie* , 537 F.2d at 9). Marks that simply describe a product are not inherently distinctive, and plaintiff must prove that its descriptive mark has acquired secondary meaning to satisfy the first prong of the Lanham Act trade dress analysis. *See* 469 U.S. at 196. Suggestive and arbitrary or fanciful marks are inherently distinctive. Hence, these marks always satisfy the first element of the test for trade dress protection.

In addition, a product's distinctiveness is based upon the way in which the trade dress, when viewed as a whole, appears to the observer, not on a single aspect of its design; that is to say, trade dress today encompasses a broad concept of how a product presented to the public looks, including its color, design, container, and all the elements that make up its total appearance. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.* , 58 F.3d 27, 32 [ 35 USPQ2d 1284 ] (2d Cir. 1995). Mana insists that while its compacts may include generic design elements, the overall combination of the design, that is, its total impression is inherently distinctive.

[1] Granting a defendant's motion for summary judgment in an infringement action brought under the Act on the issue of whether plaintiff's product is or is not inherently distinctive is not generally favored. This is the general rule because a producer has endless options when packaging its products, so often trade dress will be arbitrary or fanciful and thus inherently distinctive. The often more significant question -- whether there is a likelihood of confusion -- is usually a question of fact. *See Chevron Chemical* , 659 F.2d at 703.

Yet here, where it is the custom in a particular industry to package products in a similar manner, a trade dress done in that style is likely to be generic. In other words, when the possibilities of the ultimate trade dress for a product are limited and the trade dress is therefore in commonplace use, it is unlikely that consumers will view the trade dress as distinctive of the goods or services of a particular seller. *See* Restatement (Third) of Unfair Competition Section 13 cmt. d (1995). In the compact industry, nothing about a rectangular or square shape or black color is "striking, unusual, or otherwise likely to differentiate the products of a particular producer. . . ." *Id*.

[2] The district court properly concluded that plaintiff failed to establish that its black makeup compacts were inherently distinctive. A trade dress is inherently distinctive if its "intrinsic nature serves to identify a particular source of a product." *Two Pesos* , 112 S.Ct. at 2757. Mana's arguments are unconvincing because the record shows that both plaintiff and defendant purchased the same plastic compact cases from independent manufacturers. Mana admits that "similar models of each of the components comprising the cosmetics packaging of plaintiff can be purchased by other companies" and are widely available. When it is readily allowed that other cosmetic distributors and retailers have used the identical packaging or containers, it defies simple logic to suggest that the packaging was inherently distinctive.

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Intellectual Property Library
ISSN 1526-8535

To avoid having its products categorized as generic, Mana maintains that the color of the inserts and the compact itself were distinctive. However, the total impression of plaintiff's compacts cannot be described as suggestive, arbitrary, or fanciful. As a whole, the compacts' size and shape -- with their rectangular and square designs -- are common characteristics of the entire genre of makeup compacts. The mirrors, tins, and the makeup inside the compacts are at best, descriptive, in the cosmetics industry. Consequently, Mana's makeup compacts are not inherently distinctive. Since they are at best descriptive, then they must have acquired secondary meaning in order to be distinctive and therefore protected.

### III Secondary Meaning

Whether a trade dress has acquired secondary meaning is a factual matter subject on review to the clearly erroneous test. *See Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.* , 973 F.2d 1033, 1043 [ 24 USPQ2d 1161 ] (2d Cir. 1992). Plaintiff must prove a given trade dress has acquired secondary meaning. "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories* , 456 U.S. at 851 n.11; *Blisscraft of Hollywood v. United Plastics Co.* , 294 F.2d 694, 697 [ 131 USPQ 55 ] (2d Cir. 1961) (to establish secondary meaning, plaintiff must show design is "mark of distinction identifying the source of the article and that purchasers are moved to buy it because of its source."); *see* Restatement (Third) of Unfair Competition Section 13 cmt. e (1995).

**Page 1181**

One of Mana's principal arguments in this litigation is that its cosmetic compacts are entitled to trademark protection because of their color: black. While there is no fixed rule for the amount of proof necessary to prove secondary meaning, in the case of a color mark for a trade dress the burden is heavy because color marks by their very nature are not generally distinctive. *See In re Owens-Corning v. Fiberglas Corp.* , 774 F.2d 1116, 1127 [ 227 USPQ 417 ] (Fed.Cir. 1985).

In fact, at one time it was accepted that trademark protection could not be granted for color alone. *See* Richard J. Berman, Note, *Color Me Bad: A New Solution to the Debate Over Color Trademark Registration* , 63 Geo. Wash. L.Rev. 111 (1994). Sweeping away that barrier the Federal Circuit in *In re Owens-Corning* , 774 F.2d at 1116, permitted Owens-Corning to register the color pink for its insulation material. And now the debate over whether color alone may be a valid trademark has been put to rest earlier this year in *Qualitex Co. v. Jacobson Products Co. Inc.* , 115 S.Ct. 1300 [ 34 USPQ2d 1161 ] (1995). *See also Fabrication Enterprises, Inc. v. The Hygenic Corporation* , No. 94-7745, slip op. 6537 [ 35 USPQ2d 1753 ] (2d Cir. Aug. 22, 1995). In *Qualitex* the Supreme Court could not discern any "obvious theoretical objection" -- based on the purposes of trademark law -- why color alone should not obtain protection where the color attains secondary meaning, thereby identifying a particular product as to its source. *Qualitex* , 115 S.Ct. at 1303.

In light of the Supreme Court's decision in *Qualitex* , color is today capable of obtaining trademark status in the same manner that a descriptive mark satisfies the statutory definition of a trademark, by acting as a symbol and attaining secondary meaning. In *Qualitex* , the Supreme Court held that the green-gold color of plaintiff's dry cleaning press pads qualified as a trademark under the broad terms of the Lanham Act. The Court reasoned that "over time, customers may come to treat a particular color on a product or its packaging . . . as signifying a brand. And, if so, that color would have come to identify and distinguish the goods -- i.e. 'to 'indicate' their 'source' -- much in the way that descriptive words on a product . . . can come to indicate a product's origin." *Id* . at 1303. In this instance, the Court found that although the green-gold color may not be inherently distinctive, it has developed secondary meaning. *Id* .

In determining whether the consuming public for a particular product had associated that product, designated by its mark, with its source, certain elements must be assessed. These elements are: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Intellectual Property Library
ISSN 1526-8535

coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Centaur Communications, Limited v. A/S/M Communications, Inc.* , 830 F.2d 1217, 1222 [ 4 USPQ2d 1531 ] (2d Cir. 1987).

[3] Unlike *Qualitex* , Mana has not proved the existence of secondary meaning in its trade dress. First, plaintiff claimed to have spent over $3 million in advertising its products. However, a plaintiff's advertising budget is only one of the factors probative of secondary meaning. *See McGregor-Doniger Inc. v. Drizzle Inc.* , 599 F.2d 1126, 1133 n.4 [ 202 USPQ 81 ] (2d Cir. 1979). Second, Mana submitted the affidavit of Jane Rosen as evidence of secondary meaning. This single affidavit of a single customer at a single tradeshow is insufficient to show that a specific trade dress for a particular product connects Mana as the source of the product. Plaintiff failed to submit any consumer surveys, information as to the relative market share of its cosmetics, unsolicited media coverage, or the amount of time that the compacts made exclusive use of the challenged design. Absent this sort of information Mana failed to raise a material issue of fact as to whether its compacts had acquired secondary meaning in the marketplace.

Further, although color may be a protected trademark, it is not always so protected. The color black does not act as a symbol and distinguish Mana's compacts from its competitors. It does not identify plaintiff as the source because there are countless numbers of cosmetic companies that sell black compacts. The district court properly recognized that the color black could not reasonably be given protection since it would be analogous to "according trade dress protection to a product's 'plain brown wrapper' merely because it did not have to be brown." We agree that black is as common a color for a makeup case as brown is for a paper bag. As Mana's trade dress is not inherently distinctive and it has failed to acquire a secondary meaning, it is not distinctive.

Therefore, we need not examine the second required element -- a likelihood of confusion between plaintiff's and competitor's products -- or analyze arguments as to reverse confusion between the two trade dresses. For the same reason there is no need to discuss the possible defense of functionality. Having ruled that dismissal of plaintiff's complaint should be *affirmed*, plaintiff's

**Page 1182**

request that the state law claims be restored is moot.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is *affirmed*.

- End of Case -

Copyright 2006, The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Westlaw

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2811711 (N.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Page 1

Briefs and Other Related Documents
Rescuecom Corp. v. Google, Inc.N.D.N.Y.,2006.Only the Westlaw citation is currently available.

United States District Court,N.D. New York.
RESCUECOM CORPORATION, Plaintiff,
v.
GOOGLE, INC., Defendant.
No. 5:04-CV-1055 (NAM/GHL).

Sept. 28, 2006.

**Background:** Computer services franchising company sued Internet search engine operator, alleging operator's practice of allowing advertisers to bid on keywords, including trademarks, that an Internet user could enter as a search term, constituted federal and common law trademark infringement, false designation of origin, federal and state law dilution, and tortious interference. Search engine operator filed motion to dismiss.

**Holdings:** The District Court, Norman A. Mordue, Chief Judge, held that:

(1) search engine operator's alleged capitalizing on good will of company's trademark by marketing it to competitors as a keyword to generate operator's own advertising revenues was not trademark use;

(2) company's allegation that search engine operator's practice prevented Internet user from reaching company's website, even if true, would not entitle company to relief under the Lanham Act;

(3) allegation that search engine operator's practice altered search results did not show trademark use;

(4) operator's internal use of company's trademark to trigger sponsored links was not a use of a trademark; and

(5) court would decline to exercise supplemental jurisdiction over company's state law claims.

Motion granted.

**[1] Trademarks 382T ⚖0**

382T Trademarks
To prevail on a trademark infringement claim or a false designation of origin claim under the Lanham Act, a plaintiff must establish that: (1) it has a valid mark that is entitled to protection under the Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale or advertising of goods or services, without the plaintiff's consent. Trademark Act of 1946, § § 32(1)(a), (5), 43(a)(1), 15 U.S.C.A. § § 1114(1)(a), (5), 1125(a)(1).

**[2] Trademarks 382T ⚖0**

382T Trademarks
A trademark use is one indicating source or origin. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

**[3] Trademarks 382T ⚖0**

382T Trademarks
Even if Internet search engine operator was capitalizing on the good will of computer services franchising company's trademark by marketing it to competitors as a keyword to generate operator's own advertising revenues, competitors believed operator was authorized to sell company's trademark, or that Internet users viewing competitors' sponsored links were confused as to whether sponsored links belonged to or emanated from company, none of these facts, alone or together, established trademark use; although facts could suffice to satisfy the "in commerce" and likelihood of confusion requirements at the pleading stage, without an allegation of trademark use in the first instance, they could not sustain a cause of action for trademark infringement.

**[4] Trademarks 382T ⚖0**

382T Trademarks
Allegation of computer services franchising company that Internet search engine operator's practice of allowing advertisers to bid on keywords, including trademarks, that an Internet user could enter as a search term, prevented an Internet user from reaching company's website, even if true, would not entitle company to relief under the Lanham Act, absent an allegation that search engine operator made a trademark use of company's trademark in the first

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2811711 (N.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

instance. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

**[5] Trademarks 382T** 🔑 0

382T Trademarks
Allegation of computer services franchising company that Internet search engine operator's practice of allowing advertisers to bid on keywords, including trademarks, that an Internet user could enter as a search term, altered search results did not show trademark use, under the Lanham Act, absent further allegation that company's trademark was displayed in any sponsored links about which company was concerned, or that search engine operator's activities prevented a link to company's website from appearing on the search results page. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

**[6] Trademarks 382T** 🔑 0

382T Trademarks
Internet search engine operator's internal use of computer services franchising company's trademark to trigger sponsored links was not a use of a trademark within the meaning of the Lanham Act, absent allegation that search engine operator placed company's trademark on any goods, containers, displays, or advertisements, or that its internal use was visible to the public. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

**[7] Trademarks 382T** 🔑 0

382T Trademarks
To establish trademark dilution under the Lanham Act, plaintiffs must show: (1) their mark is famous within the meaning of the statute; and (2) defendant's use caused actual dilution of the mark. Lanham Trade-mark Act, § 43(c)(1), 15 U.S.C.A. § 1125(c)(1).

**[8] Trademarks 382T** 🔑 0

382T Trademarks
Computer services franchising company, which could prove no set of facts showing trademark use in the first instance by Internet search engine operator, could not maintain separate action for trademark dilution under the Lanham Act. Lanham Trade-mark Act, § 43(c)(1), 15 U.S.C.A. § 1125(c)(1).

**[9] Federal Courts 170B** 🔑 0

170B Federal Courts
District court, having dismissed federal claims which provided basis for its jurisdiction in dispute between computer services franchising company and Internet search engine operator, would decline to exercise supplemental jurisdiction over company's state law claims for trademark infringement, trademark dilution, tortious interference with economic advantage. 28 U.S.C.A. § 1367(c)(3); McKinney's General Business Law § 360-l.

Rescuecom Corporation, Edmund J. Gegan, Esq., of counsel, Syracuse, NY.
Hunton & Williams LLP, Shawn Patrick Regan, Esq., of counsel, New York, NY.

**MEMORANDUM-DECISION AND ORDER**
NORMAN A. MORDUE, Chief Judge.

**I. INTRODUCTION**

**\*1** Defendant Google, Inc., moves to dismiss plaintiff Rescuecom Corporation's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. Defendant contends that selling "Rescuecom", plaintiff's trademark, to plaintiff's competitors as a keyword that triggers the appearance of links to their websites among the search results an Internet user receives when he or she enters "Rescuecom" in Google, defendant's Internet search engine,[FN1] is not a trademark "use" within the meaning of the Lanham Act, 15 U.S.C. § 1051 et seq. Thus, defendant argues, plaintiff can prove no set of facts entitling it to relief on its trademark infringement claim (Count I), false designation of origin claim (Count II), federal dilution claim (Count III), common law trademark infringement claim (Count IV), or state law dilution claim (Count V), all of which require proof of trademark use. Defendant also seeks dismissal of plaintiff's tortious interference claim (Count VI) for failure to state a claim. Plaintiff opposes defendant's motion.

**II. The Complaint**

The Court accepts as true the following facts from the complaint: Plaintiff is a computer services franchising business. Its 67 franchises offer repair, consulting, networking, and Internet services. Plaintiff offers its franchisees the use of its trademarks and business system, which includes a 24/7/365 telephone answering service, a dispatch

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2811711 (N.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

service, and customer service.

In 1998, plaintiff filed and registered "Rescuecom" as its trademark with the United States Patent and Trademark Office. Through great expense and care, plaintiff has become well known and famous in its market and has gained a reputation for excellence and outstanding service to customers and franchisees. As a result, its trademark is a valuable business asset.

Plaintiff's main website's domain name is Rescuecom.com. Plaintiff conducts a substantial amount of its business over the Internet, and receives an average of 17,000 to 30,000 visitors to its websites each month. Plaintiff advertises over the Internet, and through Google. Because plaintiff's services are computer related its potential franchisees and customers use the Internet to do business and search for goods and services. Plaintiff's famous name and trademark, as well as its reputation for excellence, distinguish its goods and services from its competition and lead potential franchisees and customers to search for Rescuecom Corporation specifically through a variety of means, including Google.

There are two primary ways an Internet user can find a particular company's website. An Internet user may either guess that the company uses its name or trademark as its domain name, and enter that domain name into an Internet browser, or enter the company's name or trademark into an Internet search engine such as Google.

Google is located at the domain name Google.com. Defendant claims Google is the most popular search engine on the Internet and that it maintains proprietary, patented, software which lists websites in order of relevance to the Internet user's search terms. The search results are often voluminous and list thousands of websites.

*2 From an Internet user's search terms, defendant can ascertain the subject, company, goods, or services in which the Internet user is interested. According to the complaint, "[t]his allows Google to obtain a significant percentage of its profit from the sale of 'contextual advertising', that is advertising space which allows companies to place their advertising in front of consumers who have already identified themselves as interested in products or services similar to theirs." One of the programs defendant offers is "AdWords". Using AdWords, an advertiser can bid on terms (keywords) an Internet user might enter as a search term on

Google. Defendant then links the advertisement and hyperlink (sponsored link) to the keyword the advertiser purchased. When an Internet user enters the keyword, it triggers the sponsored link to appear on the search results page either to the right or immediately above the search results. Another program defendant offers is "Keyword Suggestion Tool", which it uses to recommend keywords to advertisers.

Defendant does not always identify sponsored links as advertisements and it designs those appearing at the top of the search results to look like part of the "non-sponsored" search results. As a result, Internet users may infer, based on a sponsored link's appearance at the top of the list of search results, that a sponsored link is the most relevant website among the search results. An Internet user can "click" on the sponsored link with a mouse to go to the advertiser's website. Advertisers pay defendant based on the number of clicks the sponsored link receives.

Rescuecom is an often searched term on the Internet. Plaintiff submits thousands of keywords to defendant, including Rescuecom, alone and in combination with other words. Consequently, when an Internet user enters Rescuecom into Google as a search term, one of plaintiff's sponsored links appears above or to the right of the search results.

Many of plaintiff's competitors advertise their services on the Internet and have submitted plaintiff's trademark to defendant's AdWords program as a keyword. Defendant is aware that plaintiff is in the business of computer services franchising and computer service, repair, maintenance, and consulting. Defendant, through its "Keyword Suggestion Tool", has recommended Rescuecom to plaintiff's competitors as a keyword in order to make plaintiff's competitors' advertising more successful and to generate more profits for defendant by intercepting and diverting plaintiff's customers and potential customers.

### III. DISCUSSION

#### A. Standard-Rule 12(b)(6)

When considering a motion to dismiss a complaint under Rule 12(b)(6), a court " 'must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2811711 (N.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

complaint liberally.' " _Gregory v. Daly_, 243 F.3d 687, 691 (2d Cir.2001) (quoting _Conley v. Gibson_, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A court may not dismiss an action "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." _Conley_, 355 U.S. at 45-46. " '[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " _Todd v. Exxon Corp._, 275 F.3d 191, 198 (2d Cir.2001) (quoting _Scheuer v. Rhodes_, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

### B. Trademark Infringement-15 U.S.C. § 1114(1)

*3 [1] Defendant seeks dismissal of plaintiff's trademark infringement claim (Count I) and false designation of origin claim (Count II) on the basis that the complaint fails to allege that defendant's use of plaintiff's mark, Rescuecom, is an actionable "trademark use". To prevail on a trademark infringement claim under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) [FN2] or a false designation of origin claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1),[FN3] "a plaintiff must establish that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) 'in connection with the sale ... or advertising of goods or services,' 15 U.S.C. § 1114(1)(a), (5), without the plaintiff's consent." _1-800 Contacts v. When U.com, Inc._, 414 F.3d 400, 406-407 (2d Cir.2005). The plaintiff must also show that the defendant's use of that mark "is likely to cause confusion ... as to the affiliation, connection, or association of [the defendant] with [the plaintiff], or as to the origin, sponsorship, or approval of [the defendant's] goods, services, or commercial activities by [the plaintiff]." 15 U.S.C. § 1125(a)(1)(A).

Although the Second Circuit has not considered whether the purchase or sale of a trademark as a keyword that triggers the appearance of an advertisement is a trademark infringement, see _1-800 Contacts_, 414 F.3d at 411-12 (distinguishing the defendant's internal use of a trademark to trigger a "pop-up" advertisement to appear from "internet advertising companies," that " 'sell' keyword trademarks to ... customers or otherwise manipulate which category-related advertisement will pop up in response to any particular terms on the internal directory."), several district courts have reached different conclusions on this issue. _Compare GEICO v. Google, Inc._, 330 F.Supp.2d 700 (E.D.Va.2004) (denying the defendant Internet search engines' motion to dismiss finding that the plaintiff adequately alleged that the defendants' use of plaintiff's trademark, GEICO, as a keyword to advertisers was a "use in commerce" and likely to cause confusion), _claim dism'd, Order_, Dec. 15, 2004 (dismissing Lanham Act claim following bench trial on finding no likelihood of confusion), _Edina Realty, Inc. v. The MLSOnline.com_, Civ. 04-4371, 2006 WL 737064 (D.Minn. Mar.20, 2006) (denying the defendant's motion for summary judgment finding that the defendant's purchase of the plaintiff's trademark as a keyword to prompt the appearance of defendant's sponsored link advertisements was a "use in commerce"), _Edina Realty, Inc. v. The MLSOnline.com_, Civ. 04-4371, 2006 WL 1314303 (D.Minn. May 11, 2006) (_Edina II_ ) (denying motion for reconsideration), _Rescuecom Corp. v. Computer Troubleshooters USA, Inc._, 1:04-CV-03499 (N.D.Ga. Sept. 16, 2005) (declining to dismiss the complaint which alleged that the defendant's purchase of the plaintiff's trademark from an Internet search engine as a keyword that would generate the appearance of the defendant's sponsored link was a "use in commerce" concluding that in view of the novel legal question presented, and the unsettled state of the law, resolution should await a factually developed record), _Google v. American Blind & Wallpaper Factory, Inc._, C 03-05340, 2005 WL 832398 (N.D.Cal. Mar.30, 2005) (denying Google's motion to dismiss in view of the unsettled state of the law and in order to await factual development of the record), and _800-JR Cigar, Inc., v. Goto.com, Inc._, Civil Action No. 00-3179, 2006 WL 1971659, *8 (D.N.J. July 13, 2006) (denying summary judgment finding a question of fact as to whether the defendant "pay-for-priority" Internet search engine used the plaintiff's trademark within the meaning of the Lanham Act because there was evidence that the defendant accepted bids on the plaintiff's trademark from the plaintiff's competitors, ranked paid advertisers before "natural" listings among the search results, and suggests the plaintiff's trademarks to the plaintiff's competitors), _with Merck & Co., Inc. v. Mediplan Health Consulting, Inc._, 425 F.Supp.2d 402, 415 (S.D.N.Y.2006) (_Merck I_ ) (granting the defendants' motion to dismiss claims regarding the defendants' purchase of the plaintiff's trademark "ZOCOR" as a keyword from Internet search engines, holding that the defendants' purchase of the trademark was an "internal use" and did not constitute a "trademark use" because the defendants did not place the plaintiff's marks "on any goods or containers or displays or associated documents, or use them in any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2811711 (N.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Page 5

way to indicate source or sponsorship"), *and Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, NO. 05 CIV 3650, 2006 WL 1418616 (S.D.N.Y. May 24, 2006) (*Merck II* ) (denying motion for reconsideration). Plaintiff urges the Court to apply the reasoning set forth in *GEICO* and *Edina Realty* and deny defendant's motion to dismiss.

**\*4** In *GEICO*, the court denied the defendant search engines' motion to dismiss finding that the plaintiff adequately alleged trademark use by asserting that when the "defendants sell the rights to link advertising to plaintiff's trademarks, defendants are using the trademarks in commerce in a way that may imply that defendants have permission from the trademark holder to do so." 330 F.Supp.2d at 704.[FN4] In *Edina Realty*, the defendant real estate brokerage firm (and the plaintiff real estate brokerage firm's direct competition), purchased "Edina Realty", the plaintiff's trademark, as a keyword from Internet search engines and used it in hidden links and hidden text on its website. 2006 WL 737064 at \* 1. There, the court denied the defendant's motion for summary judgment finding that the defendant's purchase of the plaintiff's trademark as a keyword (to generate its ads) was a "use in commerce." *Id.* at \*3.

In *1-800 Contacts* the Second Circuit found the court's rationale in *GEICO*, which "seemingly based a finding of trademark 'use' on the confusion such 'use' was likely to cause", "put the cart before the horse." 414 F.3d at 412. The court explained:
Not only are "use," "in commerce," and "likelihood of confusion" three distinct elements of a trademark infringement claim, but "use" must be decided as a threshold matter because, while any number of activities may be "in commerce" or create a likelihood of confusion, no such activity is actionable under the Lanham Act absent the "use" of a trademark.

*Id.* (quoting 5 U.S.C. § 1114) (citing *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir.2001) (PETA)). Thus, to the extent GEICO and *Edina Realty* base findings of trademark use on allegations of a likelihood of confusion or commercial use of a mark, they are inconsistent with the law of the Second Circuit which specifies that trademark use, in commerce, and likelihood of confusion are three separate elements. *Id.*

[2] "A 'trademark use' ... is one indicating source or origin". *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 583 (2d Cir.1990); *see also 1-800 Contacts*, 414 F.3d at 408 (trademark use "ordinarily at issue in an

infringement claim" involves placement of trademarks on "goods or services in order to pass them off as emanating from or authorized by" the trademark owner). The Lanham Act defines "use in commerce," in relevant part, as follows:
For purposes of this chapter, a mark shall be deemed to be in use in commerce-
(1) on goods when-
(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
(B) the goods are sold or transported in commerce, and
(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

**\*5** 15 U.S.C. § 1127.

In this case, plaintiff asserts that defendant sells Rescuecom to plaintiff's competitors as a keyword that triggers the competitors' sponsored links to appear on the search results page when an Internet user enters Rescuecom as a search term. Plaintiff contends that defendant's actions constitute trademark use because: (1) defendant is attempting to "free-ride" on the good will associated with Rescuecom and its activities cause confusion; (2) defendant's activities lure Internet searchers away and prevent them from reaching plaintiff's website; (3) defendant's activities alter the search results an Internet user receives; and (4) defendant uses Rescuecom internally as a keyword that triggers the appearance of competitors' advertisements.

### 1. Good Will and Confusion

[3] Even if plaintiff proved, as it alleges, that defendant is capitalizing on the good will of plaintiff's trademark by marketing it to plaintiff's competitors as a keyword in order to generate defendant's own advertising revenues, that plaintiff's competitors believed defendant is authorized to sell its trademark, or that Internet users viewing the competitors' sponsored links are confused as to whether the sponsored links belong to or emanate from plaintiff, none of these facts, alone or together,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2811711 (N.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

establish trademark use. In *1-800 Contacts*, 414 F.3d at 410, the Second Circuit found that WhenU's "alleged effort to capitalize on an [Internet] user's specific attempt to access the 1-800 website" by causing a pop-up ad to appear when an Internet user accessed 1-800's website, did not amount to show trademark use because "[a]bsent improper use of [a] trademark ... such conduct does not violate the Lanham Act." Although these facts may suffice to satisfy the "in commerce" and likelihood of confusion requirements at the pleading stage, without an allegation of trademark use in the first instance, they cannot sustain a cause of action for trademark infringement. *Id.* at 412 (rejecting the plaintiff's argument that the defendant's conduct was use because it was likely to confuse Internet users "as to the source of the ad" on the grounds that use, "in commerce", and "likelihood of confusion" are distinct elements and that "use" "must be decided as a threshold matter"); *see also Merck II*, 2006 WL 1418616 at \*2 ("commercial use is not the equivalent of 'use in commerce' for trademark purposes.").

### 2. Access to the Website

[4] Plaintiff also argues that defendant's use of its mark prevents Internet users from reaching its website because an Internet user who has searched for Rescuecom cannot click on a sponsored link and access plaintiff's website simultaneously. In support of its argument, plaintiff cites several cases in which the defendants registered domain names that were similar or identical to the plaintiffs' trademarks. *See PETA*, 263 F.3d 359 (peta.org); *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176 (W.D.N.Y.2000) (thebuffalonews.com); *Planned Parenthood Fed'n of Am. v. Bucci*, 97 Civ. 0629, 1997 WL 133313 (S.D.N.Y. Mar.24, 1997) (plannedparenthood.com). In those cases, an Internet user who typed in the plaintiff's trademark, guessing it to be the plaintiff's website address, would reach a website that bore the plaintiffs' trademark but criticized or parodied the plaintiffs. The defendants' actions, therefore, prevented the Internet user from reaching the plaintiffs' websites directly.

\*6 In this case, according to the complaint, unlike typing in a trademark as a domain name, which leads directly to a website, typing a trademark into defendant's search engine leads to a page showing sponsored links and relevant search results, including a link to plaintiff's website. More importantly, there is no allegation that any of the links among the search results, except those belonging to plaintiff, display

plaintiff's trademark or that defendant's activities effect the "appearance or functionality" of plaintiff's website. In *1-800 Contacts*, the Second Circuit found the district court's holding that WhenU, "by 'causing pop-up advertisements for Defendant Vision Direct to appear when SaveNow users have specifically attempted to access [1-800]'s website, ... [is] displaying [1-800]'s mark in the ... advertising of ... Vision Direct's services' " was "fatal[ly] flaw[ed]" because "WhenU's pop-up ads do not display the 1-800 trademark" and had "absolutely no tangible effect on the appearance or functionality of the *1-800 website*.", 414 F.3d at 410. Thus, plaintiff's allegation that defendant's activities prevent an Internet user from reaching plaintiff's website, even if true, would not entitle plaintiff to relief under the Lanham Act in the absence of an allegation that defendant made a trademark use of Rescuecom in the first instance.

### 3. Alteration of Search Results

[5] In an effort to allege trademark use, plaintiff also asserts that defendant's sale of Rescuecom as a keyword to plaintiff's competitors alters the search results an Internet user receives when he or she searches for Rescuecom, diverting and misdirecting Internet users away from its website. In *1-800 Contacts*, the Second Circuit found it significant that WhenU's activities did not "alter in any way the results a C-user will obtain when searching with the 1-800 trademark", and distinguished WhenU's activities on that basis from *Playboy Enters., Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1024 (9th Cir.2004) (holding that infringement could be based on the defendant's insertion of unidentified banner ads on Internet user's search-results page); *Brookfield Communications v. West Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir.1999) (holding that the defendant's use of trademarks in "metatags," invisible text within websites that search engines use for ranking results, constituted a "use in commerce" under the Lanham Act); and *Bihari v. Gross*, 119 F.Supp.2d 309 (S.D.N.Y.2000) (discussing *Brookfield* and similar cases). In distinguishing those cases, however, the Second Circuit noted that it did "not necessarily endorse their holdings." *Id.* at 411, n. 15 (citing *Playboy*, 354 F.3d at 1034-36 (Berzon, C.J., concurring)). [FN8] Moreover, plaintiff's allegation that defendant's activities alter search results does not show trademark use because here, unlike *Playboy Enters., Brookfield Communications*, and *Bihari*, there is no allegation that plaintiff's trademark is displayed in any of the sponsored links about which plaintiff is concerned, *cf. GEICO*, 330 F.Supp.2d at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2811711 (N.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

704 ("[a]ccepting as true the facts alleged by plaintiff regarding *the inclusion of the marks in advertisements* and defendants' overall control of their advertising program, we find that plaintiffs have alleged facts sufficient to support their claims that advertisers make a "trademark use" of the plaintiffs' mark) (emphasis added), or that defendant's activities prevent a link to plaintiff's website from appearing on the search results page. Thus, according to the complaint, an Internet user who enters Rescuecom into Google as a search term, may still go to plaintiff's website(s) by clicking on the appropriate link on the search results page-even though he or she may have other choices. In *1-800 Contacts*, the Second Circuit found that WhenU's "alleged effort to capitalize on an [Internet] user's specific attempt to access the 1-800 website" by causing a pop-up ad to appear when an Internet user accessed 1-800's website, was alone insufficient to show trademark use, positing the following analogy:

*7 Indeed, it is routine for vendors to seek specific "product placement" in retail stores precisely to capitalize on their competitors' name recognition. For example, a drug store typically places its own store-brand generic products next to the trademarked products they emulate in order to induce a customer who has specifically sought out the trademarked product to consider the store's less-expensive alternative. WhenU employs this same marketing strategy by informing C-users who have sought out a specific trademarked product about available coupons, discounts, or alternative products that may be of interest to them.

414 F.3d at 410-11. Thus, plaintiff has failed to allege any facts which would show that defendant's activities, even if they alter the search results, constitute a trademark use as a matter of law.

**4. Internal Use**

[6] Defendant's internal use of plaintiff's trademark to trigger sponsored links is not a use of a trademark within the meaning of the Lanham Act, either, because there is no allegation that defendant places plaintiff's trademark on any goods, containers, displays, or advertisements, or that its internal use is visible to the public. In *1-800 Contacts*, the Second Circuit held that a:

company's internal utilization of a trademark in a way that does not communicate it to the public is analogous to a individual's private thoughts about a trademark. Such conduct simply does not violate the Lanham Act, which is concerned with the use of

trademarks in connection with the sale of goods or services in a manner likely to lead to consumer confusion as to the source of such goods or services.

414 F.3d at 409; *see also Merck I, 425 F.Supp.2d at 415* (This internal use of the mark "Zocor" as a key word to trigger the display of sponsored links is not use of the mark in a trademark sense.); [FN5] *Merck II, 2006 WL 1418618 at *2* ("This internal use of the mark 'Zocor' as a key word to trigger the display of sponsored links is not use of the mark in a trademark sense; rather, this use is more akin to the product placement marketing strategy employed in retail stores, where, for example, a drug store places its generic products alongside similar national brand products to capitalize on the latter's name recognition."). Thus, in the absence of allegations that defendant placed plaintiff's trademark on any goods, displays, containers, or advertisements, or used plaintiff's trademark in any way that indicates source or origin, plaintiff can prove no facts in support of its claim which would demonstrate trademark use. Accordingly, defendant's motion to dismiss Counts I and II is granted.

**C. Dilution of Trademark-15 U.S.C. § 1125(c)**

[7][8] Defendant also seeks dismissal of plaintiff's federal dilution claim (Count III), which, defendant asserts, requires proof of trademark use. The federal antidilution act provides:

The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's *commercial use in commerce* of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark ....

*8 15 U.S.C. § 1125(c)(1) (emphasis added). To establish trademark dilution under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), plaintiff must show (1) their mark is famous within the meaning of the statute; and (2) defendant's use caused actual dilution of the mark. *Savin Corp. v. Savin Group, 391 F.3d 439, 455 (2d Cir.2004).* Here, as discussed, plaintiff can prove no set of facts showing trademark use in the first instance. *See also U-Haul Intern. Inc. v. When U.com, Inc., 279 F.Supp.2d 723, 729 (E.D.Va.2003)* (entering judgment as a matter of law for the defendant on the plaintiff's claim of trademark dilution because the plaintiff was "unable to show that WhenU was using U-Haul's marks as defined in the Lanham Act."). Accordingly, defendant's motion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2811711 (N.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

to dismiss Count III is granted.

**D. Pendent State Law Claims-Trademark Infringement, Trademark Dilution under N.Y. Gen. Bus. Law § 360-L, and Tortious Interference with Economic Advantage**

[9] In the complaint, plaintiff alleges that the Court has supplemental jurisdiction over its pendent state law claims pursuant to 28 U.S.C. § 1367. The Court, however, has dismissed plaintiff's federal claims and because plaintiff asserts no other basis for the Court's jurisdiction, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims. *See* 28 U.S.C. § 1367(c)(3). Accordingly, Counts IV, V, and VI are dismissed without prejudice.

**IV. CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that defendant's motion to dismiss is **granted**; and it is further

**ORDERED** that Counts I, II, and III are **dismissed with prejudice**; and it is further

**ORDERED** that Counts IV, V, and VI are **dismissed without prejudice.**

**IT IS SO ORDERED.**

FN1. The Second Circuit defines "search engine" operationally:
A search engine will find all web pages on the Internet with a particular word or phrase. Given the current state of search engine technology, that search will often produce a list of hundreds of web sites through which the user must sort in order to find what he or she is looking for.
*Sporty's Farm L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 493 (2d Cir.2000).*

FN2. 15 U.S.C. § 1114 provides, in relevant part,
(1) Any person who shall, without the consent of the registrant-
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale,

offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive
...
shall be liable in a civil action by the registrant for the remedies hereinafter provided.

FN3. 15 U.S.C. § 1125 provides, in relevant part,
(a) Civil action
(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

FN4. In *GEICO,* the plaintiff further alleged that the defendants "incorporate[ed] [the trademark] into advertisements, which are likely to deceive customers into believing that the advertisers provide accurate information about GEICO products"; and that the defendants "exercise significant control over the content of advertisements that appear on their search results pages," *id.* Here, plaintiff has not alleged that the sponsored links display Rescuecom.

FN5. Additionally, none of these cases address whether the defendant's use of the trademark at issue is, in the first place, a trademark use. In *Playboy,* the Ninth Circuit expressly stated that "use in commerce" was undisputed. 354 F.3d at 1024 ("PEI clearly holds the marks in question and defendants

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2811711 (N.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

used the marks in commerce"); *see also* *Brookfield,* 174 F.3d at 1062-66 (finding the defendant's use of trademarks in metatags caused "initial interest confusion" and therefore violated the Lanham Act). In *Bihari,* the court held that the defendant's use of the plaintiff's trademarks in metatags on its websites was a "use in commerce" because they "effectively act[ed] as a conduit, steering potential customers away from [the plaintiff's business] and toward its competitors". 119 F.Supp.2d at 318. Thus, plaintiff's reliance on these cases as authority for the proposition that defendant's "invisible" use of Rescuecom may constitute a trademark use, is unavailing.

FN6. In granting the defendants' motion to dismiss, the court also found it significant "that defendants actually sell Zocor ... on their websites "and held" [u]nder these circumstances, there is nothing improper with defendants' purchase of sponsored links to their websites from searches of the keyword 'Zocor.' " *Merck I,* 2006 WL 800756 at *9.

N.D.N.Y.,2006.
Rescuecom Corp. v. Google, Inc.
--- F.Supp.2d ----, 2006 WL 2811711 (N.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3683038 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Defendant Google Inc.'s Motion to Dismiss (Oct. 19, 2005)
• 2005 WL 2803043 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Defendant Google, Inc.'s Motion to Dismiss all Claims (Sep. 19, 2005)
• 2005 WL 2803044 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Defendant Google, Inc.'s Motion to Dismiss all Claims (Sep. 19, 2005)
• 2004 WL 3513081 (Trial Pleading) Memorandum of Law in Support of Defendant Google Inc.'s Motion to Dismiss (Nov. 8, 2004)
• 5:04cv01055 (Docket) (Sep. 7, 2004)
• 2004 WL 2309584 (Trial Pleading) Complaint (Sep. 6, 2004)
• 2004 WL 3513080 (Trial Pleading) Complaint (Sep. 6, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

231 U.S.P.Q. 316
1986 WL 83707 (Trademark Tr. & App. Bd.), 231 U.S.P.Q. 316
(Cite as: 231 U.S.P.Q. 316)

The Wooster Brush Co.
v.
Prager Brush Co.

Patent and Trademark Office Trademark Trial and
Appeal Board

Opposition No. 65,382

Decided August 22, 1986
United States Patents Quarterly Headnotes

## TRADEMARKS
**[1] Identity and similarity -- How determined --
Descriptive or disclaimed matter (§ 67.4061)**
Inclusion of one or more terms used within industry
to describe certain qualities or characteristics of
product in composite mark will not, in and of itself,
warrant finding of likelihood of confusion.

## TRADEMARKS
**[2] Identity and similarity -- How determined --
Descriptive or disclaimed matter (§ 67.4061)**
Addition of other matter to highly suggestive or
descriptive designation, whether such matter is
equally suggestive or even descriptive, may be
sufficient to avoid confusion.

## TRADEMARKS
**[3] Identity and similarity -- In general (§ 67.401)**
"Poly Flo" for paint brushes does not so resemble
"EASYFLO" and "Poly Pro" for paint brushes and
"Poly-Glo" for paint applicators, as to result in
confusion as to source or sponsorship where those
marks are contemporaneously used in connection
with same or closely related products.

**\*316** Trademark opposition by The Wooster Brush
Company, against Prager Brush Co., application,
Serial No. 250,949, filed February 21, 1980.
Dismissed.

William R. Hinds, Arlington, Va., for applicant.

Donald L. Otto and Charles B. Lyon, both of
Cleveland, Ohio, for opposer.

Before Sams, Allen, and Krugman, Members.

Krugman, Member.

An application has been filed by the Prager Brush
Company to register "POLY FLO" as a trademark for
paint brushes. [FN1]

Registration has been opposed by the Wooster
Brush Company on the ground that applicant's **\*317**
mark so resembles opposer's previously used and
registered marks "POLY PRO" [FN2] and
"EASYFLO" [FN3] for paint brushes and so
resembles opposer's previously used mark "POLY-
GLO" for paint applicators as to be likely, when
applied to applicant's goods, to cause confusion,
mistake or to deceive.

Applicant, in its answer to the opposition, has
denied the allegations therein.

The record consists of the pleadings, the file of
applicant's application, a number of applicant's
answers to opposer's interrogatories relied on by
opposer, a number of third-party registrations relied
on by applicant and testimony (and exhibits) taken by
both parties. Both parties have filed briefs on the
case and opposer has filed a reply brief. Only
applicant was represented at an oral hearing held
before this panel.

Opposer's priority in its "POLY PRO" and
"EASYFLO" marks has been established by
opposer's two pleaded registrations introduced into
evidence in connection with the testimony deposition
of Robert Weiss, opposer's vice-president of
manufacturing. Mr. Weiss testified as to the status
and title of these registrations and he also testified
that the "POLY PRO" mark has been continuously
used in connection with paint brushes since at least
1975 and that the "EASYFLO" mark has been conti-
nuously used in connection with paint brushes since
at least 1951. Opposer's priority in its unregistered
mark "POLY-GLO" has been established by the
Weiss deposition testimony wherein Mr. Weiss
testified that said mark has been used in connection
with paint roller covers since at least 1975.
Applicant, at p. 1 of its brief on the case, concedes
that there is no issue of priority and that opposer is
the prior user of its marks. Since the goods recited in
applicant's application, paint brushes, are identical to

COPR. © 2006 The Bureau of National Affairs, Inc.

231 U.S.P.Q. 316
1986 WL 83707 (Trademark Tr. & App. Bd.), 231 U.S.P.Q. 316
(Cite as: 231 U.S.P.Q. 316)

the goods sold by opposer under the "POLY PRO" and "EASYFLO" marks and are closely related to the roller covers sold under opposer's "POLY-GLO" mark, the only issue to be determined is whether applicant's mark so resembles any one or more of opposer's previously used marks that their contemporaneous use in connection with identical and/or closely related paint applicator products would be likely to result in confusion as to source or sponsorship, for purposes of Section 2(d) of the Trademark Act.

Turning to the marks, applicant's vice-president of sales and marketing, Mr. W. Thomas Willoughby, has testified that all the common elements in its mark and those marks of opposer suggest or describe characteristics of paint brushes and are widely used in the paint brush industry. Willoughby testified that the term "POLY" designates polyester filaments and clearly indicates that the paint brushes are comprised of polyester filaments. Mr. Willoughby further testified that the term "PRO", as applied to paint brushes, refers to tools used by a professional painter and would suggest a better quality, more expensive paint brush for use by professional painters. The testimony goes on to state that "FLOW," as well as its phonetic equivalent "FLO," as applied to paint brushes, suggests a brush where the paint flows out evenly and easily on a surface. The term "GLOW," as well as its phonetic equivalent "GLO" suggests a glowing finish to the painted surface that the paint brush would impart.

Mr. Willoughby further testified that all the foregoing terms are widely used in the paint brush industry to describe or suggest the characteristics noted above. In support of this contention, applicant has introduced into the record a large number of third-party trademarks for paint brushes and related products which include one or more of the terms "POLY," "FLO(W)," "PRO" and "GLO(W)." Mr. Willoughby testified that he is personally familiar with the following marks which he has seen in the marketplace or catalogues and which have been registered to third parties as trademarks by the Office: "POLY-FLOW" for paints, "POLYBUSTER" for paint roller covers, "POLY PAINTER" for paint brushes, "POLY-LON" for paint applicators, namely, rollers, "POLYGLIDE" for paint brushes and paint roller covers, "MASTER-FLO" for paint roller sleeves, "POLY-FLOW" for paints, "FEATHER-FLO" for paint brushes, "OLD PRO" for paint brushes, "ALLPRO" for brushes and rollers, "PRO-KAGE" for paint rollers, "PRO-KNIT" for paint roller covers, "PRO-EDGE" for paint, varnish and

shellac brushes, "PROFAB" for paint rollers and "PRO TOUCH" for paint brushes. A large number of additional third-party registrations were also introduced into the record by way of notice of reliance. These registrations, all in the paint and paint brush field, comprise composite marks which include "POLY," "PRO," "FLO(W)" or "GLO(W)". Except for the ones noted above, however, there was no testimony that Mr. Willoughby was familiar with any of them or that he was personally aware that they were in use.

*318 Aside from the third-party registration and the testimony relating to the marks covered in some of the registrations, applicant, in connection with the Willoughby deposition, introduced a copy of the 1976 *Trademark Directory* issued by the Trademark Bureau of the National Paint & Coatings Association, Inc. Mr. Willoughby testified as to his personal familiarity with a number of listed trademarks. In addition to the marks already testified to by Mr. Willoughby which are covered by the above noted registrations, he also testified to his knowledge that the following marks are in use: "PRO-MITT" for a painter's mitten, "PRONEL" for paint rollers, "FLO-EZY" for brushes, "FLO-MASTER" for brushes; "FULL-FLO" for brushes, "POLY-FOAM" for rollers, and "POLYSET" for paint brushes.

Applicant has also introduced third-party catalogues and price lists into the record and Mr. Willoughby has testified to his personal knowledge of paint brushes and related products being sold under the following marks: "VELVET FLOW" for paint brushes, "POLYFOAM" for paint brushes, "PRO POLYESTER" for roller covers, "POLY FAB" for roller covers, "POLYTRIM" for paint applicators, "PRO POLY" for paint brushes, "PROLINE" for paint brushes, "POLY-LON" for roller covers, "SUPERFLO" for paint brushes, "POLY BRUSHES" for paint brushes and "POLY-ROLLERS" for rollers.

Finally, the Willoughby testimony also indicates that the following third-party trademarks are in use: "PRO ANG" for paint brushes, "TRU-PRO" for paint brushes, "POLY STAIN" for paint brushes and "STAIN PRO" for staining brushes.

Opposer's testimony is to the effect that the term "POLY," as used in connection with paint brushes, refers to polymers, meaning that they are made of synthetic material [FN4] and that "PRO" refers to professional.

[1] It is apparent from the testimony and

231 U.S.P.Q. 316
1986 WL 83707 (Trademark Tr. & App. Bd.), 231 U.S.P.Q. 316
(Cite as: 231 U.S.P.Q. 316)

Page 3

supporting documentary exhibits that the paint brush industry has developed in such a way that certain terms have come to be frequently used as part of trademarks which suggest certain characteristics of the brush. "POLY," for example, appears to be widely used in the field to refer to a brush made of synthetic material, either polyester or other polymers. "PRO" is also widely used to refer to a professional quality brush, indicating one of better quality and greater cost. "FLO" or its phonetic equivalent "FLOW" is also in common use in the field presumably to suggest that the paint flows easily and evenly from the brush to the surface being painted. In view of the foregoing, therefore, we believe that the inclusion of any one or more of these terms in a composite trademark is insufficient, in and of itself, to warrant a finding of likelihood of confusion since these terms are commonly used by paint brush manufacturers to suggest qualities or characteristics of the brushes.

[2][3] It is well established that the scope of protection afforded a descriptive or even a highly suggestive term is less than that accorded an arbitrary or coined mark. As we stated in In re Hunke & Jochheim, 185 USPQ 188 (TTAB 1975), the scope of protection to those marks categorized as "weak" marks has often been limited to the substantially identical notation and/or to the subsequent use and registration thereof for substantially similar goods. Therefore, the addition of other matter to a highly suggestive or descriptive designation, whether such matter is equally suggestive or even descriptive, may be sufficient to avoid confusion. See also Northwestern Golf Co. v. Acushnet Co., 226 USPQ 240 (TTAB 1985). We think this is the situation presented by the instant case. Taking opposer's marks individually and comparing them with applicant's mark, we conclude that none of opposer's marks so resembles applicant's mark as to result in purchaser confusion, for purposes of Section 2(d) of the Act. Applicant's mark is "POLY FLO." This suggest a synthetic paint brush that will allow the paint to flow smoothly. Opposer's mark "EASYFLO" neither looks nor sounds like applicant's mark and is similar only insofar as both marks include the commonly used term "FLO." The two marks are, in our view, clearly distinguishable. With respect to opposer's mark "POLY PRO," it is somewhat similar to "POLY FLO" in appearance and sound but not, we conclude, similar enough to warrant a finding of likelihood of confusion in view of the difference in meanings (opposer's mark suggesting a high quality, "professional" type synthetic brush)

and in view of the common use of all three terms "POLY," "PRO" and "FLO" in the field. Finally, with respect to opposer's mark "POLY-GLO" for roller covers, we believe this is the closest to applicant's mark in appearance and pronunciation. Moreover, while a number of marks including "GLO" or "GLOW" in the paint and/or paint related products field have been registered to third parties, there has been no evidence presented that any of these marks are actually in use. *319 Moreover, the term "GLO" is more suggestive of the end result of a paint job, rather than suggesting any of the qualities of a paint brush. Nevertheless, the commercial impression engendered by "POLY FLO" is sufficiently different from that created by "POLY-GLO" to avoid purchaser confusion. The terms "FLO" and "GLO" are phonetic equivalents of recognized terms having specifically different meanings and, as applied to paint brushes and roller covers, suggesting specifically different qualities.

In view of the foregoing, we conclude that applicant's mark does not so resemble any of opposer's marks as to result in confusion as to source or sponsorship where those marks are contemporaneously used in connection with the same or closely related products.

Decision: The opposition is dismissed.

FN1 Application Serial No. 250,949 filed February 21, 1980.

FN2 Registration No. 1,017,404 issued August 5, 1975. Section 8 affidavit accepted. Section 15 affidavit received.

FN3 Registration No. 670,598 issued December 2, 1958 pursuant to Section 2(f) of the Trademark Act. Renewed.

FN4 Opposer's witness, Mr. Weiss, stated that while "POLY" is used to refer to polyester paint brushes, it is also used to refer to other types of synthetic brushes (e.g. nylon) that are not 100% polyester. Mr. Weiss concluded, therefore, that it is more appropriate to say that "POLY" refers to polymers, rather than polyester.

P.T.O. T.T.A.B.

231 U.S.P.Q. 316

COPR. © 2006 The Bureau of National Affairs, Inc.

231 U.S.P.Q. 316
1986 WL 83707 (Trademark Tr. & App. Bd.), 231 U.S.P.Q. 316
(Cite as: 231 U.S.P.Q. 316)

END OF DOCUMENT

COPR. © 2006 The Bureau of National Affairs, Inc.